# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

-----------------------------------------------------------------X
BING WU, FENG CHUN GUAN, TINA WANG,   :
GUI BIN CAI, JUN ZHANG, QIN PING YUAN,  :
JIN LU MA, ZHEN HAI HE, and BAO WEN TAN, :
                                :

Plaintiffs,                            :          **3:08-cv-746**
                                :

   -against-                    :
                                :          **February 8, 2010**

CHANG'S GARDEN OF STORRS, LLC,    :
CHANG'S GARDEN OF CT, INC.,       :
LE SHIH CHANG, HSIANG I CHANG, and  :
WEI-WEI CHANG,                :
                                :

Defendants.                   :
-----------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# **Table of Contents**

I.   INTRODUCTION ........................................................................................................... 1

II.  FACTS AND PROCEEDINGS .................................................................................... 2

III. STANDARD OF REVIEW .......................................................................................... 4

IV.  ARGUMENT ................................................................................................................. 5

   A.  HSIANG I CHANG WAS AN EMPLOYER FOR THE PURPOSE OF THE FLSA............................. 5

      1.  *Hsiang I Chang's Ultimate Control over Chang's Garden Renders Him an Employer Under FLSA* 5

      2.  *Hsiang I Chang Satisfies the Four-Factor Carter "Economic Realities" Test.* ................................. 9

   B.  A REASONABLE JURY COULD FIND THAT WEI WEI CHANG WAS AN EMPLOYER FOR THE PURPOSE OF THE FLSA. .............................................................................................................. 14

      1.  *Wei Wei Chang had the power to hire employees.* ........................................................... 14

      2.  *Wei Wei Chang had the power to supervise and control employee work schedules and conditions of employment.* ................................................................................................ 16

      3.  *Wei Wei Chang controlled method and rate of payment.* ..................................................... 17

      4.  *Wei Wei Chang's satisfaction of the Carter prongs would allow a reasonable jury to find that she was an employer for the purposes of FLSA.* ....................................................................... 19

   C.  A REASONABLE JURY COULD FIND THAT HSIANG I CHANG WAS AN EMPLOYER FOR THE PURPOSE OF THE CONNECTICUT WAGE AND HOUR LAW. ...................................................... 20

   D.  A REASONABLE JURY COULD FIND THAT WEI WEI CHANG WAS AN EMPLOYER FOR THE PURPOSE OF THE CONNECTICUT WAGE AND HOUR LAW. ............................................................ 22

   E.  A REASONABLE JURY COULD FIND THAT THE LLC VIOLATED THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (CUTPA) AND HSIANG I CHANG SHOULD BE HELD PERSONALLY LIABLE FOR HIS COMPANY'S TORTS. ...................................................................................................... 23

      1.  *The LLC Provided Illegal Housing to the Restaurant Workers.* ......................................... 24

      2.  *The LLC Cannot Escape Liability Under Connecticut's Landlord-Tenant Law Simply Because It Was The Restaurant Workers' Employer In Addition to the Provider of Their Housing.* .............. 25

      3.  *CUTPA creates a private right of action for violations of Connecticut's landlord-tenant law.* 30

      4.  *Defendants' illegal behavior violated CUTPA.* ............................................................ 31

   F.  THERE ARE DISPUTES OF MATERIAL FACT REGARDING THE CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY RESTAURANT WORKERS BING WU AND JUN ZHANG AGAINST THE LLC AND HSIANG I CHANG SHOULD BE PERSONALLY LIABLE FOR ITS TORTS. ....................... 33

      1.  *The LLC's Conduct Was Extreme and Outrageous.* ........................................................ 34

      2.  *Hsiang I Chang and the LLC Should Have Known that Emotional Distress was the Likely Result of His Conduct.* ....................................................................................................... 35

      3.  *A Reasonable Jury Could Find That the Distress Suffered By Bing Wu and Jun Zhang Was the Result of Hsiang I Chang's Behavior.* .............................................................................. 36

      4.  *A Reasonable Jury Could Find That the Distress Suffered By Bing Wu and Jun Zhang Was Severe.* ............................................................................................................................ 37

   G.  THERE ARE MATERIAL DISPUTES OF FACT REGARDING WU'S CLAIM AGAINST WEI WEI CHANG FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS. ................................................. 38

      1.  *Wei Wei Chang's Conduct Was Extreme and Outrageous.* ................................................. 38

      2.  *A Reasonable Jury Could find that Wei Wei Chang's Conduct Caused Bing Wu Emotional Distress.* ............................................................................................................................ 40

3.   *Wei Wei Chang Should Have Known that Emotional Distress was the Likely Result of Her Conduct* ................................................................................................. 41

4.   *A Reasonable Jury Could find that the Distress Caused by Wei Wei Chang's Conduct was Severe* ......................................................................................................... 41

H.   THERE IS A MATERIAL DISPUTE OF FACT REGARDING HSIANG I CHANG AND THE LLC'S NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST RESTAURANT WORKERS BING WU AND JUN ZHANG. ............... 42

I.   BECAUSE HE DOMINATED AND CONTROLLED THE LLC, HSIANG I CHANG SHOULD BE HELD PERSONALLY LIABLE FOR ITS VIOLATIONS OF CUTPA AND INFLICTIONS OF EMOTIONAL DISTRESS. ................................... 45

1.   *Hsiang I Chang and Le Shih Chang's Actions Fulfill the Instrumentality Rule's Requirements for Piercing the Corporate Veil* ............................................................................. 46

2.   *Hsiang I Chang and Le Shih Chang's Actions Fulfill the Identity Rule's Requirements for Piercing the Corporate Veil* ............................................................................. 48

3.   *Justice Requires that the Court Pierce the Corporate Veil* ................................... 50

**V.   CONCLUSION** .................................................................................................. **50**

iii

## I.  INTRODUCTION

Between 1999 and 2008, the Defendants ran a profitable family restaurant while paying the Plaintiffs in this case (hereinafter "Restaurant Workers") less than minimum wage for seventy hours of work per week and housing them in an illegal, crowded, and dangerous basement apartment. Now, in a Motion for Summary Judgment, two members of the family are attempting to wash their hands of the affair. But extensive evidence shows that Hsiang I Chang and Wei Wei Chang in fact had sufficient power and control at the restaurant to make them legally liable for the financial and emotional harms done to the Restaurant Workers.

Hsiang I Chang's motion should be denied with respect to the Restaurant Workers' Fair Labor Standards Act (FLSA) and Connecticut wage and hour law because, as sole owner and officer of the Limited Liability Company ("the LLC") and the person with original and ultimate hiring and firing authority at the restaurant, he is, as a matter of law, one of the Restaurant Workers' employers and thus responsible for his restaurant's violations of the wage laws. Delegation of duties to his subordinates does not relieve him of personal responsibility for following the law. Likewise, as one of the Restaurant Workers' employers, Wei Wei Chang falls under the statutes' regime for eliminating, as the Supreme Court has put it, the evils and dangers resulting from wages too low to buy the bare necessities of life and from long hours of work injurious to health.

Similarly, a reasonable jury could find Hsiang I Chang liable to Restaurant Workers Bing Wu and Jun Zhang for intentional and negligent infliction of emotional distress because of his role, and the role of his LLC, in subjecting them to unlawful, dangerous, and dehumanizing housing. Because the basement housing was indisputably illegal and rent could not be lawfully

1

collected from the workers' paychecks, Hsiang I Chang and the LLC are liable to all nine Restaurant Workers under the Connecticut Unfair Trade Practices Act (CUTPA).

Finally, a reasonable jury could find that because of the extreme and outrageous way that Wei Wei Chang treated Bing Wu on the job, she is personally liable to him for the infliction of emotional distress. Because the Restaurant Workers have established sufficient factual evidence to support their claims and to allow a reasonable jury to rule in their favor on each of these issues, summary judgment is inappropriate and the Defendants' motion should be denied.

Restaurant Workers do not oppose the Defendants' summary judgment motion with respect to the Fifth Claim for Relief for Unjust Enrichment and Quantum Meruit or the Seventh Claim for Relief for Breach of Implied Contract.

## II. FACTS AND PROCEEDINGS

Hsiang I Chang founded Chang's Garden of Storrs, LLC on November 12, 1998, naming himself President and sole member. (Articles of Organization, Domestic Limited Liability Company, Ex. A at 1.) He also listed himself as the LLC's manager in 1999. Using the LLC, Hsiang I Chang executed the purchase of Hong Kong Restaurant and signed a lease for Chang's Garden Restaurant. (Buy and Sell Agreement, Ex. B at 5; Le Shih Chang 30(b)(6) Dep. 11:13-12:4, Ex. E.) Hsiang I personally selected Le Shih Chang to be the restaurant's manager because Hsiang I did not speak English well. (Hsiang I Chang Dep. 56:3-9, 58:25-59:2, 62:23-63:2, Ex. C.) Between 1999 and 2004, Chang's Garden of Storrs, LLC managed and financed operations for Chang's Garden Restaurant. In late 2004, Defendant Le Shih Chang incorporated Chang's Garden of CT, Inc. However, the restaurant continued to operate using the LLC's bank account until 2007. (Checks ## 2421, 2419, Ex. D at 1-2, discussed in Le Shih Chang 30(b)6 Dep. 60:4-8, Ex. E.)

The Restaurant Workers were all employees of the Restaurant at various periods between 1999 and 2008.  (Le Shih Chang Resp. to 4th Interrog. #10, Ex. F at 3-6.)   The Restaurant Workers regularly worked six days a week for approximately twelve hours a day. (Guan Decl. ¶ 3, Ex. G; He Decl. ¶ 3, Ex. H; Wang Decl. ¶ 3, Ex. I; Wu Decl. ¶ 3, Ex. J; Zhang Decl. ¶ 2, Ex. K.) There were no fixed break times at the restaurant and no dedicated amount of time for the workers to eat. When there was an order, the workers had to stop their meals and deal with the order first. (Wang Dep. 68:15-18, Ex. L.)

Wei Wei Chang came to the Restaurant in 2005. (Wu Decl. ¶ 6, Ex. J; Wei Wei Chang Dep. 88:9-16, Ex. M.) In her capacity as a joint employer, Wei Wei Chang wrote and signed employee paychecks (*id.* at 64:13-25; 65:13-21; 74:7-11; 74:18-75:9), paid workers their salaries in cash (Bing Wu Resp. to Defs.' 1st Req. for Admiss. of Facts #5, Ex. N; Wu Decl. ¶ 10, Ex. J; Guan Decl. ¶ 11, Ex. G; Cai Decl. ¶ 8, Ex. O), controlled distribution of tips (Wei Wei Chang Dep. 100:10-25, Ex. M), made payments to creditors and state agencies (*id.* at 66:1-68:3), and instructed the staff on what tasks to complete and how to complete those tasks (Wei Wei Chang Dep. 104:8-20,106:12-17, 109:3-7, 10-20, Ex. M; He Decl. ¶ 7, Ex. H; Guan Decl. ¶¶ 4,5, Ex. G; Wang Decl. ¶¶ 8, 12, Ex. L). Wei Wei Chang regularly scolded the Restaurant Workers and was critical of their work. (Wei Wei Chang Dep. 144:17-145:2, 147:16-149:16, Ex. M; He Decl. ¶¶ 6,7, Ex. H; Wang Decl. ¶¶7,8, Ex. L; Cai Decl. ¶ 8, Ex. O; Guan Decl. ¶¶ 4,5, Ex. G; Wu Decl. ¶¶7, Ex. J; Wu Dep. 109:4-22, Ex. P.)

During their time working at Chang's Garden, the Restaurant Workers lived in the unheated basement of Defendant Le Shih Chang's home.  (Am. Compl. Dkt.# 204, ¶¶ 46-57.) Defendant Le Shih Chang's basement was approximately 1500 square feet and contained five enclosed living spaces, two toilets, two showers, one living area, and one kitchen, generally

housing eight to nine people at a given time. (Letter from Curt Hirsch, May 22, 2008, Ex. Q, citing Mansfield Article 4.A.1, Ex. R at 12; Inspection Report, May 21, 2008, Ex. S at 1-3.)  The basement was infested with mice and rats of three to four inches and cockroaches, the kitchen sink was nonfunctional, and the ceiling in one of the bathrooms leaked.  (Cai Dep. 61:5-9, Ex. W; Guan Dep. 72:20-73, Ex. T; He Dep. 37:12-16, Ex. V; Wang Dep. 96:6-8; Yuan Dep. 28:23-29:4, Ex. U.) Many of the Restaurant Workers were brought to Connecticut from New York City and were kept isolated and under the control of Defendants during the entire period of their employment.  (Am. Compl., Dkt.# 204, ¶¶ 40-45.)

The Restaurant Workers filed suit on May 15, 2008, alleging violations of federal and state wage and hour law, and Connecticut common law. (Compl., Dkt. # 1.) Defendants Hsiang I Chang and Wei Wei Chang filed the instant motion for summary judgment on Dec. 2, 2009. (Dkt. # 208).

### III. STANDARD OF REVIEW

Defendants are entitled to summary judgment if the court determines that there "is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c)(2).  In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).  Judges should not weigh the evidence and determine the truth of the matter, but should determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986). "[T]he court is required to resolve *all* ambiguities, and to credit *all* factual inferences that could rationally be drawn, in favor of the party against whom summary

judgment is sought." *Howley v. Town of Stratford,* 217 F.3d 141, 150-51 (2d Cir. 2000) (emphasis added).

## IV. ARGUMENT

### A.   Hsiang I Chang Was An Employer for the Purpose of the FLSA.

The Fair Labor Standards Act requires employers to pay their employees a minimum wage, abide by overtime provisions, post legal notices in the workplace, and keep employment records. Defendant Hsiang I Chang argues that despite his sole ownership the LLC and his intimate involvement in the Restaurant's management, the FLSA does not apply to him. This is incorrect as a matter of law. In the alternative, disputes exist as to the nature and full extent of Hsiang I Chang's control of the restaurant such that summary judgment must be denied.

Hsiang I Chang is liable as an employer because he had ultimate control over the Restaurant Workers. In 1999, he founded a limited liability company and used that company to open a restaurant. He authorized his son to hire workers for his restaurant. He worked in the restaurant's kitchen, instructing workers how to perform their tasks, when to arrive in the morning, and when to leave. He paid the company's accountant to complete the payroll, paid unemployment insurance for the company's workers, and infused cash into the restaurant when it was having trouble paying its workers. Under the Second Circuit's flexible and expansive inquiry into "economic realities," Hsiang I Chang was their employer. Even under the four-prong test presented by the Defendants, Hsiang I Chang was the Restaurant Workers' employer. Releiving Hsiang I Chang of liability would frustrate the purposes of the Act.

### 1.   Hsiang I Chang's Ultimate Control over Chang's Garden Renders Him an Employer Under FLSA

The FLSA defines "employee" as "any individual employed by an employer," and to "employ" as including "to suffer or permit to work."  29 U.S.C. §§ 203(e)(1) and 203(g).  The Supreme Court has noted that the FLSA "defines the verb 'employ' expansively…[with] striking breadth," *Nationwide Mut. Ins. v. Darden*, 503 U.S. 318, 326 (1992). The Second Circuit similarly has remarked upon "the expansive nature of the FLSA's definitional scope." *Frankel v. Bally, Inc.,* 987 F.2d 86, 89 (2d Cir. 1993); *see also Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 ("The definition is necessarily a broad one in accordance with the remedial purpose of the Act."); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (noting that the "suffer or permit to work" formulation "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles"). The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).

In order to determine whether an employment relationship exists, courts "must evaluate the 'economic reality' of the relationship." *Carter v. Dutchess Comm. College*, 735 F.2d 8, 12 (2d. Cir. 1984). The "overarching concern" in cases such as these involving a corporate officer whose employer status is disputed "is whether the alleged employer possessed the power to control the workers in question." *Herman v. RSR Security Services Ltd*., 172 F.3d 132, 139 (2d Cir.1999); *see also Carter*, 735 F.2d at 10 ("[t]he power to control a worker clearly is a crucial factor in determining whether an employment relationship exists"). Given Hsiang I Chang's numerous actions as sole owner and officer of Chang's Garden of Storrs, LLC, Hsiang I Chang possessed the power to control the Restaurant Workers and was thus an employer under FLSA.

Dispute over employer status for the sole owner and officer of a company is rare enough to warrant examination of precedent from other circuits. In *Donovan v. Grim Hotel*, the Fifth

6

Circuit examined the employer status of Charles Alberding, the president of five hotel-owning corporations accused of wage violations. 747 F.2d 966 (5th Cir. 1984). Without applying any multifactor "economic realities" test, found that Alberding was undoubtedly an employer for FLSA purposes. The court specifically found Alberding to be an employer on the basis of the following evidence:

> Alberding began and controlled the hotel corporations. He has held their purse-strings and guided their policies. It was only he who could authorize compliance with the Fair Labor Standards Act. He personally selected the manager of every hotel. He travelled to Texas to inspect the hotels and to solve major problems. The hotels were part of the Alberding family business. In short, the hotels, speaking pragmatically, were Alberding's and functioned for the profit of his family.

*Id.*, 747 F. 2d. at 972.

Hsiang I Chang participated in many acts with respect to Chang's Garden of Storrs, LLC and the restaurant that are fundamentally similar to those of Alberding with respect to his hotels and corporations. Like Alberding, Hsiang I had a unique role in the founding of entities responsible for the wage violations:

- Founding the LLC on November 12, 1998 and naming himself President and sole member. Articles of Organization, Domestic Limited Liability Company, Ex. A at 1.
- Listing himself as manager of the LLC in the company's filings. LLC Filings, Nov. 2000, Ex. RR at 1.
- Purchasing the restaurant. Buy and Sell Agreement, Ex. B at 5.
- Personally selecting Le Shih Chang to be the restaurant's manager. Hsiang I Chang Dep. 56:3-9, 58:25-59:2, 62:23-63:2, Ex. C.

Moreover, Hsiang I Chang demonstrated that although he delegated managing authority to Le Shih Chang, it was his authority to delegate in the first place, and he retained ultimate authority to act with respect to the restaurant's finances:

- Signing checks to the restaurant's accountant to prepare taxes and manage the payroll. Chk. ## 2851, 2871, 2883, 2892, 2894, Ex. X at 1-5.
- Travelling to New York City, at least five times a year for more than three years, to sign tax documents at the office of the restaurant's accountant. Chen Wha Chang Dep. 23:4-17, Ex. Y.

7

- Signing multiple checks to the Connecticut Commissioner of Revenue Services on behalf of the restaurant. Chk. ## 2856, 2862, 2885, Ex. Z at 1-4.
- Disbursing company moneys to himself, including signing a check to himself, for $25,000, from the Restaurant's account. Chk. ## 1748, Ex. AA at 1.
- Signing at least one check to the Connecticut Department of Labor on behalf of the Restaurant. Chk. # 2859, Ex. BB at 1.
- Filing records associated with the restaurant with the Connecticut Secretary of the State's office in every year from 1998 until 2008. Articles of Organization, Ex. A at 1-16.
- Holding the Food Service License for Chang's Garden Restaurant for at least the years 2002, 2003, 2004, and 2005. Food Service Licenses, Ex. CC at 1-4.

Like Alberding, as sole officer, owner, and manager of the LLC, Hsiang I Chang uniquely possessed certain authority. Hsiang I had sole authority to dissolve the concern, sign certain official documents, and close the LLC's checking account.

Although in the present case all defendants could have ensured compliance with FLSA, the focus of the economic realities test is the *power* to control, not the exercises of that control. Hsiang I Chang, as the sole owner and officer, had final authority to compel or disallow compliance with FLSA. Finally, Chang's Garden, like Alberding's hotels, was a family business that functioned for the profit of Hsiang I Chang's family.[1] For these reasons, Hsiang I Chang possessed sufficient control over the restaurant to satisfy the core "economic realities" inquiry.

Nevertheless, based on a rigid and erroneous application of factors articulated in *Carter v. Dutchess Comm. College*, Defendants argue that Hsiang I Chang cannot be an employer. They erroneously assert "the [*Carter*] 'economic reality' test is a list of facts which *must* be examined to determine whether the Defendants were 'Employers' under the FLSA…" Defs.' Memo of Law at 15 (emphasis added). However, the Second Circuit has been clear that an employer need not meet the four-factor *Carter* test in order to be held liable under FLSA:

---

[1] Susan Chang Dep. 36:5-13, 40:17-21, 47:11-15, Ex. EE; *see* Sections IV.B. and IV.D. regarding Wei Wei Chang's duties as a manager.

> [W]e held only that the four factors [of the *Carter* "economic realities" test] applied by the District Court in this case can be *sufficient* to establish employer status. We did not hold, nor under *Rutherford* [*Food Corp. v. McComb*, 331 U.S. 722 (1947)] could we have held, that a positive finding on those four factors is *necessary* to establish an employment relationship.

*Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 67 (2003). Indeed, the Second Circuit has relied on multiple formulations of the economic realities test, each seemingly specific to the facts of the given case.

More importantly, to apply the *Carter* "economic realities" test rigidly to find that an entity with ultimate control over his enterprise is not an employer would be an unjust, perverse, and indeed, ironic result. In *Carter*, the Defendant's central claim was that "an entity's control over a worker must be 'ultimate' in order to justify finding an employer-employee relationship." 735 F.2d at 12. The Second Circuit rejected this reasoning, stating that an entity's control over an individual need not be ultimate in order for the employment relationship to exist. Nowhere did the court suggest that ultimate control would be *insufficient*.

Finally, as the Second Circuit has repeatedly observed, the interpretation of employer is necessarily broad to encompass the statute's remedial purpose. *See Herman v. RSR Sec. Servs.*, 172 F.3d 132, 139 (2d Cir. 1999) ("the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have the widest possible impact in the national economy"). It would frustrate the purpose of the FLSA to allow Hsiang I Chang, who had complete legal authority to control the LLC and all of its workers, to escape liability through an unjustifiably narrow interpretation of the *Carter* factors.

2. **Hsiang I Chang Satisfies the Four-Factor *Carter* "Economic Realities" Test.**

Even if the *Carter* were to apply, it is of no use to the Defendant: Hsiang I Chang meets three of the factors of the test and fails the fourth factor only because he undeniably violated FLSA's record-keeping requirement.

The *Carter* test examines four factors and "[n]o one of the four factors standing alone is dispositive." *Herman*, 172 F. 2d at 139. The test asks whether the putative employer:

> (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.

*Carter*, 735 F. 2d. at 12.

### a.   Hsiang I Chang had the power to hire and fire employees.

As sole owner and President of the LLC, Hsiang I Chang unquestionably had the power to hire and fire employees. When he founded the company, Hsiang I Chang hired his son and gave him authorization to manage the restaurant and hire employees.  In his deposition, Hsiang I Chang conceded that he possessed the authority as boss to delegate authority to his son, stating: "Well, even though I am the boss, but everything my son, I authorize my son to do everything." (Hsiang I Chang Dep. 58:25-59:2, Ex. C). Despite the delegation of some duties to his son, Hsiang I Chang has sworn that it was his restaurant and Le Shih was acting as his agent:

> Q: So you opened this restaurant, correct?
> Mr. Sullivan: Object to form.
> A: Yes. Was my name.
> Q: Why did you open the restaurant?
> A: Well, I've been so long in America, and since my son had came, and he asked me to open up a restaurant, and since I have the chance, so I open up the restaurant and give it to him or ask him to manage.

(*Id.* at 62:19-63:2). Hsiang I Chang hired his son as a manager and thus had authority to fire his son. As their boss' boss, Hsiang I Chang also had authority to fire the Restaurant Workers.[2]

Hsiang I Chang continued to make personnel decisions into the fall of 2007.  For example, near the end of 2007 Hsiang I Chang expressed displeasure at the performance of a new cook and talked to Le Shih Chang about the cook. He was fired within two days. (Guan Decl. ¶ 10, Ex. G; Wang Decl. ¶ 5, Ex. L.)

As the sole owner of the LLC, as a matter of law, Hsiang I Chang had the ultimate power to hire and fire employees. The fact that he used that power sparingly is irrelevant. As the Second Circuit has observed,

> "[Employer] status does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees. Control may be restricted, *or exercised only occasionally*, without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the significance of its existence.

*Herman*, 172 F.3d at 139 (emphasis added) (internal citation omitted).

---

[2] The very evidence in Defendants' motion contradicts their assertion that Hsiang I Chang was not the workers' boss and employer. The following excerpt from the deposition of Restaurant Worker Gui Bin Cai, included in Defendants' motion for summary judgment, is straightforward:

    Q: (By Attorney Sullivan) Now, did you ever meet the boss' father?
    A: Yes, few times.
    Q. Was he the boss?
            Mr. Penteshin: Objection to the form.
            The Witness: He was boss before.

(Defs.' Memo of Law at 14, citing Cai Dep. 79.) Similar is the excerpt from the deposition of Restaurant Worker Jin Lu Ma, also included in Defendants motion for summary judgment:

    Q: Did – was your only boss at the restaurant Le Shih Chang?
            Mr. Barkan: Objection
            The Witness: Before that was his father.

(Defs.' Memo of Law at 12, citing Ma Dep. 113:18-21.)

    Although Defendants' motion claims that Restaurant Worker Jun Zhang said in his deposition that Hsiang I Chang was not his boss, Mr. Zhang in fact said no such thing. Attorney Sullivan asked Mr. Zhang "Was he the boss?" and "Was he your boss?" to which Mr. Zhang twice responded "I don't know." *See* Defs.' Memo of Law at 12, citing Zhang Dep. 32. The Restaurant Workers need not understand the FLSA's definition of "employer" in order to be protected by it.

Defendants' argument that Hsiang I Chang was an owner "in name only," Defs.' Memo of Law at 19, is specious and contradicted by ample evidence. He had multiple financial and legal duties and powers. *See* Section IV.A.1., *supra*. Hsiang I Chang's intimate involvement in the LLC's legal and financial business belies his claim that was an owner "in name only" and supports the clear conclusion that he had ultimate legal authority at the company.

### b. Hsiang I Chang supervised and controlled employee work schedules and the conditions of employment.

Throughout the period that the Restaurant Workers were employed by the restaurant, Hsiang I Chang worked periodically in the kitchen as a supervisor, monitoring the Restaurant Workers' performance, acting as a supervisor, and controlling their conditions of employment and work schedules.[3] Le Shih Chang admits that Hsiang I Chang continued to work at the restaurant until 2008. (Le Shih Chang 30(b)(6) Dep. 56:8, Ex. E.)

Although Hsiang I Chang contends that he had no supervisory role at the restaurant, this is contradicted by the testimony of multiple Restaurant Workers.  For example, Restaurant Worker Zhen Hai He, who worked at Chang's Garden from 1999 until 2002, and then again from 2007 until 2008, has stated that during both periods, Hsiang I Chang gave the kitchen workers instructions about how to prepare and cook meals, along with other types of instructions. (Cai Decl. ¶ 5, Ex. O; Guan Decl. ¶ 9, Ex. G; He Decl. ¶ 4, Ex. H; Ma Dep. 113:11-14, Ex. FF; Wang Decl. ¶ 4, Ex. I.) Similarly, the Restaurant Workers' sworn and credible testimony contradicts Hsiang I Chang's assertion that he had no control over the work schedules or conditions of employment. On multiple occasions, Hsiang I Chang directed the workers to come in to work at a certain time the following day. (He Decl. ¶ 5, Ex. H.) He also told the workers when to leave:

---

[3] For federal regulations regarding joint employment, see 29 CFR § 791.2.

he "repeatedly told us when to go home at the end of the day. "Let's go home," he would sometimes say, and then the kitchen workers would stop working." (*Id.*)

Although Defendants' motion asserts that Hsiang I Chang had no control or involvement in the conditions of the Restaurant Workers' employment and their work schedule, the Restaurant Workers have produced ample sworn testimony to the contrary. At the very least, there is a dispute of material facts regarding Hsiang I Chang's supervision of the Restaurant Workers' schedule and conditions of employment.

### c. Hsiang I Chang participated in the determination of the method and rate of payment.

Hsiang I Chang paid unemployment insurance taxes for the LLC. (Chk. #2854, Ex. HH at 1.) Unemployment insurance constituted a component of the Restaurant Workers' compensation and Hsiang I Chang's decision not to purchase supplemental unemployment insurance for his workers was a determination about the rate of compensation that they would receive. Furthermore, Le Shih Chang has testified that when business was slow in the Restaurant's early days, Hsiang I Chang lent money to the Restaurant so it could pay its workers. (Le Shih Chang Dep. 53:17-54:4, Ex. DD.) Hsiang I Chang thus also participated in the determination of the rate of payment – if he had not infused the company with cash, it would have had to reduce wages further or lay workers off.

### d. Hsiang I Chang did not maintain employment records, but that independent violation of FLSA should not protect him from liability.

Under FLSA, Chang's Garden Restaurant was obligated to keep employment records of hours worked and wages paid. 29 U.S.C. § 211(c). Defendants admit that they did not keep any such records. (Le Shih Chang's Revised Resp. to Pls.' 4th Set of Interrog. No. 7, Ex. F at 2.) This

independent violation of FLSA should not provide protection under the four-pronged *Carter* test. The failure of one employer to keep records is only useful in determining FLSA liability if a separate employer *did* keep those records; only then might the lack of records provide information regarding the workers' true employer. It would contradict the language, purpose, and structure of the Act to allow Hsiang I Chang to escape employer liability because his restaurant kept no wage or hour records.

**B. A Reasonable Jury could find that Wei Wei Chang Was An Employer for the Purpose of the FLSA.**

The Defendants argue that under the *Carter* test, Defendant Wei Wei Chang is not a FLSA employer (Memo. of Law at 15), but a reasonable jury could find that, like the Defendant in *Herman v. RSR Services*, Wei Wei Chang satisfies at least three of the four Carter factors: She hired employees, fundamentally altered the Restaurant Workers' job responsibilities, and controlled the rate and method of payment, thus demonstrating that she had the power to do all of these activities. 172 F.3d at 140. Her failure to keep employment records, like Hsiang I Chang's, cannot possibly weigh in her favor. Thus, a reasonable trier of fact could and should conclude that she is liable as an employer under FLSA.

**1. Wei Wei Chang had the power to hire employees.**

Wei Wei Chang demonstrated the ability to hire temporary employees when she recruited Ya Hua Lin, her brother-in-law and a former employee of hers, to help at the restaurant for payment that she subsequently authorized. (Wei Wei Chang Dep. 124:16-17, Ex. M.) Meanwhile, her brother, whom she claims hired this employee, was not even certain of whether Ya Hua Lin worked at Chang's Garden at the time that Wei Wei Chang wrote paychecks to Lin. This evidence demonstrates that Wei Wei Chang possessed the power to hire.

Wei Wei Chang and her husband first hired Ya Hua Lin to work in their restaurant, Hunan Delight, in 1995. (*Id.* 89:12-13, Ex. M.) Wei Wei Chang admits that Le Shih Chang knew of Ya Hua Lin only because of her marriage to his brother. (*Id.* 124:16-17, Ex. M.) Ya Hua Lin testified that Wei Wei Chang contacted him in August, 2007 and told him about the job availability at the restaurant, Lin Dep. 143:1-5, Ex. GG, although Wei Wei Chang now claims that her brother hired him and that she only provided his telephone number. (Wei Wei Chang Dep. 124:14-21, Ex. M.)

Wei Wei Chang has admitted to writing checks on the Inc.'s behalf to Ya Hua Lin in December of 2006 in order to show, for immigration purposes, that Ya Hua Lin was employed at the restaurant at a time during which he, according to his own testimony, was not working as a permanent employee.[4] (Lin Dep. 97:16-23, Ex. GG; Wei Wei Chang Dep. 62:2-12, Ex. M.) Wei Wei Chang expressed no uncertainty about whether Ya Hua Lin was employed by Chang's Garden at the time, and in fact suggested that the date on the checks might have been inconsistent with the pay period during which Mr. Lin performed work for the restaurant. *Id.*

When asked about these same checks, Defendant Le Shih Chang repeatedly stated that Defendant Ya Hua Lin's employment in the restaurant at that time is "not [his] affair." (Le Shih Chang Dep. 103:14-104:4, 105:23-25, Ex. DD). Le Shih Chang's testimony that Ya Hua Lin's employment at the time was "not [his] business" makes clear that it was Wei Wei Chang who was primarily responsible for Lin's employment. Wei Wei Chang's relationship with Ya Hua Lin and superior knowledge of the timing of his work would allow a jury to infer that she and not her brother first asked Ya Hua Lin to work in the restaurant.

---

[4] By his own testimony, Ya Hua Lin began working as a permanent employee in Chang's Garden in August 2007; prior to that, he merely went "in and out" of the restaurant. (Ya Hua Lin Dep. 99:2-25, Ex. GG.)

**2. Wei Wei Chang had the power to supervise and control employee work schedules and conditions of employment.**

The record evidence further indicates that Wei Wei Chang supervised and controlled employee work schedules and conditions of employment. The Second Circuit has held that a defendant satisfied this factor where he was merely "involved in" the assignment of employees to particular work locations and instructed employees to complete a task on even just one occasion. *Herman*, 172 F.3d at 140. Wei Wei Chang's conduct meets or exceeds this standard.

Wei Wei Chang admitted that she told the wait staff in the restaurant what to do and that they followed her direction. (Wei Wei Chang Dep. 107:19-23, Ex. DD.) She told them to check identification when serving alcohol, (Wei Wei Chang Dep. 104:8-20, Ex. M.), and if the workers were not sure what to do, they would ask her for direction. (*Id.* at 106:12-17, Ex. M.)  She admits to giving the kitchen workers instructions as well. (*Id.* at 109:13-110:1, Ex. M.) Moreover, she admitted that, in her brother's absence, she is the person to whom the workers, including the main chef, directed their questions. (*Id.* at 118:20-119:18, Ex. M.) Thus, Wei Wei Chang cannot seriously contend, as she does in her affidavit, that she never controlled or supervised conditions of employment. (Wei Wei Chang Aff. ¶ 6, Defs.' Ex. B at 1.)

The Defendants erroneously state that the "[p]laintiffs do not allege that . . . Wei Wei Chang had any supervision of and/or control over the employee's work schedules or the conditions of their employment." (Defs.' Memo of Law at 10-11.) Additionally, they note that some of the workers have admitted that they rarely, if ever, interacted with Wei Wei Chang.[5] However, they omit the testimony of many workers to whom she gave orders.

---

[5] The Defendants make much of the fact that four of the workers admitted to not taking direction from Wei Wei Chang. This only establishes that she had infrequent occasion to give these workers direction or supervise their work. The crux of the economic realities test is whether a putative employer possessed the authority or control at issue, not how much they exercised it. *Herman*, 172 F.3d at 140.

For example, Wei Wei Chang supervised Plaintiff Wu's work as a delivery man, gave him his delivery orders, and took money from the orders. (Wu Decl. ¶ 7, Ex. J.) Wei Wei Chang told Restaurant Worker Zhen Hai He what food to fry and in which order to fry it (He Decl. ¶ 7, Ex. H; He Dep. 41:1-7, Ex. V.), and directed Restaurant Worker Feng Chun Guan to change the water in the kitchen sink, make rice, clean glasses, and take out the trash. (Guan Decl. ¶ 4, Ex. G; Guan Dep. 57:12-18, Ex. T.) In addition, she instructed Restaurant Worker Tina Wang on how to complete some of her job tasks, and directed Ms. Wang to prepare meals for staff. (Wang Decl. ¶ 8, Ex. I; Wang Dep. 74:17-18, 73:5-8, Ex. L.) Wei Wei Chang also scolded members of the kitchen staff for mistakes in the orders they filled. (Wang Decl. ¶¶ 8-10, Ex. I; Wang Dep. 73:10-15, Ex. L.) She herself admits to giving Bing Wu instructions to go to the market to buy food for the Restaurant. (Wei Wei Chang Dep. 109:4-7, Ex. M; *see also* Wu Decl. ¶ 10, Ex J.)

Plaintiff Tina Wang's testimony establishes that Wei Wei Chang had the ability to fundamentally alter the Restaurant Workers' job responsibilities: Wei Wei Chang had the power to direct Ms. Wang to prepare meals, even though, as the Defendants now acknowledge, meal preparation was not one of Ms. Wang's job responsibilities. (Wei Wei Chang Dep. 83:8-15; Chang's Garden LLC's Revised Resp. to Pls.' 4th Set of Interrog. No. 10., Ex. II.) Wei Wei Chang's conduct thus demonstrates control over of the Restaurant Workers' employment.

### 3. Wei Wei Chang controlled method and rate of payment.

Wei Wei Chang's control over the method of payment – including the signing of payroll checks – is also similar to the defendant's in *Herman v. RSR Services*. In *Herman*, the Second Circuit found the fact that the defendant had signed payroll checks on at least three occasions to satisfy this factor. 172 F.3d at 140. Wei Wei Chang's authority to write and sign pay checks for the restaurant, payment of cash salaries, control over tip distribution, and payments to the

administrator of unemployment would allow a reasonable jury to conclude that she controlled method and rate of payment.

The evidence of Wei Wei Chang's control over method of payment is undisputed. Both Wei Wei Chang and her sister, Susan Chang, have testified that she wrote and signed Susan Chang's name on Chang's Garden's payroll checks. (Wei Wei Chang Dep. 64:13-25, Ex. M; Susan Chang Dep. 36:5-13, 40:17-21, 47:11-15, Ex. EE; Check # 1985, Ex. JJ at 1.) Wei Wei Chang wrote and signed her own paycheck. (Wei Wei Chang Dep. 74:7-11, Ex. M; Check # 2049, Ex. KK at 1.) She also wrote and signed paychecks to Restaurant Worker Bing Wu. (Wei Wei Chang Dep. 74:18-75:9, Ex. M; Wu Decl. ¶ 8, Ex. J; Check # 1814, Ex. LL at 1.) Furthermore, Wei Wei Chang paid workers their salaries in cash on numerous occasions. (Cai Decl. ¶ 8, Ex. O; Guan Decl. ¶ 4, Ex. G; Wu Decl. ¶ 8, Ex. J.)

Wei Wei Chang does not dispute that she made salary payments to the Restaurant Workers. Rather, she claims that Le Shih Chang directed her on how much to pay the workers each and every time. (Wei Wei Chang Dep. 75:1-3, Ex. M.) A jury should be entitled to weigh the plausibility of this testimony in light of testimony establishing Wei Wei Chang's responsibility to pay workers during Le Shih's absences from the restaurant, including a month-long vacation that Le Shih Chang took to China. (Wei Wei Chang Dep. 118:12-13, Ex. M.) Thus, Wei Wei Chang possessed control over the restaurant's method of payment. Wei Wei Chang exercised control over the workers' rate of compensation as well. Like Hsiang I Chang, she wrote checks to the state for unemployment benefits. (*Id.* at 68:17-21, Ex. M; Check # 1866, Ex. MM at 1.) This unemployment insurance was part of the workers' overall compensation.

In addition, Defendants do not dispute that Wei Wei Chang exercised control over the distribution of tip money charged on credit cards. She calculated and distributed tips to each

worker at the end of each day. (Wei Wei Chang 100:10-25, Ex. M.) Defendant Le Shih Chang, in contrast, did not find out the amount that each worker was paid in tips until after Wei Wei Chang had distributed the tips. (*Id.* 81:17-25, Ex. M.) Wei Wei Chang thus controlled the rate of compensation of all employees who received tips, including Plaintiff Wu Bing.

**4. Wei Wei Chang's satisfaction of the *Carter* prongs would allow a reasonable jury to find that she was an employer for the purposes of FLSA.**

The record clearly demonstrates that Wei Wei Chang had the power to hire employees, fundamentally alter the job responsibilities, and control the rate and method of payment. While she did not determine salaries, was not the primary supervisor of the Restaurant Workers, and did not terminate employees, these facts are not dispositive of whether she was an employer.

Courts considering similarly situated managers have held them to be employers within the meaning of statute. In *Chad v. Vidtape, Inc*., the court found that a defendant who had authority to sign checks for the business, hire, and prioritize work for employees and instructed employees as to aspects of their jobs, and to whom employees reported in the absence of the President and sole shareholder of the company was an employer. 196 F. Supp. 2d 281, 292 (E.D.N.Y. 2002). In *Ke v. Saigon Grill, Inc.*, the district court considered whether a manager like Wei Wei Chang was an employer within the meaning of FLSA. 595 F. Supp. 2d 240, 265 (S.D.N.Y. 2008). Like Wei Wei Chang, this putative employer "did not himself determine the plaintiffs' workday and did not have authority to set wages." *Id.* The court nevertheless found that he was employer, noting that he "had the authority to terminate employees, and to impose sanctions . . . [and] assigned their work." Finally the court observed:

> Moreover, it is plain that he understood the conditions under which plaintiffs were working, including their wages, and readily lent himself to, and facilitated, a system under which they were denied their rights under federal and state law. In

> sum, the economic realities suggest that he was an employer within the meaning of the FLSA and state law.

*Id.* Like the defendants in *Saigon Grill* and *Vidtape, Inc.*, Wei Wei Chang assigned the plaintiffs' work, scolded members of the kitchen staff for mistakes in the orders they filled, as described above. Although she did not terminate or impose sanctions, she did exercise hiring authority over temporary staff. Finally, she clearly understood and facilitated the conditions under which these plaintiffs lived and worked.

Wei Wei Chang clearly satisfies three of the four factors in the Carter economic realities test. The remaining factor, maintaining employment records, should not weigh in favor of her argument because the defendants have failed to maintain any records of the Restaurant Workers' employment whatsoever. Wei Wei Chang's satisfaction of at least three of the four factors in the *Carter* economic realities test renders summary judgment in her favor inappropriate.

### C. A Reasonable Jury Could Find that Hsiang I Chang Was An Employer for the Purpose of the Connecticut Wage and Hour Law.

Hsiang I Chang's relationship with the Restaurant Workers is covered by the terms of the Connecticut Wage and Hour law, Conn. Gen. Stat. §§ 31-58 *et. seq.*, which establishes minimum wage and overtime obligations for employers and is in many ways analogous to the FLSA. Connecticut's courts have held that owners of companies, like Hsiang I Chang, may not escape liability by delegating responsibility for compliance with the wage law to their subordinates. Indeed, the courts have been willing to assign even criminal liability in cases precisely like the one at bar, where the owner of a restaurant seeks to have his manager take the fall.

Hsiang I Chang is an employer under Connecticut law because Connecticut's Supreme Court has held that "the term employer as used in [Conn. Gen. Stat.] § 31-72 encompasses an individual who possesses the ultimate authority and control within a corporate employer to set

the hours of employment and pay wages and *therefore is* the specific or exclusive cause of improperly failing to do so." *Butler ex rel. Skidmore v. Hartford Tech. Inst., Inc.*, 243 Conn. 454, 462 (1997) (emphasis added). Hsiang I Chang possessed all ultimate authority within the LLC – an admitted corporate employer – and cannot escape liability.

Defendants erroneously rely on *Hartford Tech,* even though the case supports finding Hsiang I Chang to be an employer.  *Hartford Tech* stands for the proposition that civil liability for an employer under Conn. Gen. Stat. § 31-72, relied upon here, is at least co-extensive with criminal liability under Conn. Gen. Statute § 31-71g.  In that case, Connecticut's Supreme Court held that because §31-71g establishes criminal liability for "any employer or any officer or agent of an employer" who fails to pay the wages owed to employees, the corresponding civil violations in §31-72 must also create personal liability for a company's president in addition to creating corporate liability. *Hartford Tech*, 243 Conn. 454 at 462.  Read in combination with the case of *State v. Merdinger,* 37 Conn. App. 379 (1994), *Hartford Tech* establishes unambiguously that Hsiang I Chang is an "employer" within the meaning of § 31-71g.

In *Merdinger*, the defendant was president and sole shareholder of a restaurant—just like Hsiang I Chang—who challenged his criminal conviction under §31-71g, arguing that he had no daily management responsibility. The appeals court held that the owner of a company cannot avoid liability by delegating responsibility to follow the law to subordinates. *Id.* at 384 (holding that allowing officers to avoid liability would thwart the purpose of the statute). Because *Hartford Tech* extends civil liability under § 31-72 consistent with § 31-71g, just as criminal liability would attach to Hsiang I Chang under *Merdinger*, civil penalties must also attach to him under *Hartford Tech*.

Defendants mistakenly rely on the superior court decision of *Butler v. McIntosh*, 1997 Conn. Super. LEXIS 483 (Conn. Super Ct., February 21, 1997). Defs.' Memo of Law at 17-19. First, *McIntosh* was decided ten months before *Hartford Tech* and proceeds from an erroneous understanding of the wage and hour law. The Connecticut Supreme Court explicitly rejected the argument adopted in *McIntosh* that because § 31-71g applies to employers and officers and agents of employers whereas § 31-72 applies only to employers, §31-72 must not apply to officers or agents of employers. *See McIntosh*, 1997 Conn. Super. LEXIS 483 at *4; *Hartford Tech.*, 243 Conn. at 463-64 (holding that the *McIntosh* argument has "superficial textual appeal" but is ultimately unpersuasive). Second, unlike Hsiang I Chang, the defendant in *McIntosh* was not an owner or executive at the company that employed the plaintiffs in her case.

### D. A Reasonable Jury Could Find that Wei Wei Chang Was An Employer for the Purpose of the Connecticut Wage and Hour Law.

The Defendants likewise misapply the holding of *Hartford Tech* to Wei Wei Chang's circumstances. In *Hartford Tech*, Connecticut's Supreme Court concluded that employer status depends on the authority to control hours and wages. Wei Wei Chang possessed such authority.

Although Wei Wei Chang did not tell the workers which days of the week to work, she nevertheless controlled work hours. The restaurant did not abide by strict hours of operation: Defendant Le Shih Chang admits that the restaurant stayed open late when it seemed lucrative to do so. (Le Shih Chang Dep. 107:7-108:2, Ex. DD.) Likewise, the length of the Restaurant Workers' meal breaks shrunk when additional work materialized. Work hours necessarily expanded to the number of tasks assigned. Thus, to the extent that Wei Wei Chang was able to and did give the Restaurant Workers work assignments, (He Decl. ¶ 7, Ex. H; He Dep. 41:1-7, Ex. V; Guan Decl. ¶ 4, Ex. G; Guan Dep. 57:12-18, Ex. T; Wang Decl. ¶ 8, Ex. I; Wang Dep. 74:17-18, 73:5-8, Ex. L,) she controlled their work hours. Furthermore, although Wei Wei Chang

did not set salaries, she did control distribution of tips (Wei Wei Chang Dep. 100:10-25, Ex. M) and had the power to pay employees (Wei Wei Chang Dep. 74:7-11, 74:18-75:9, Ex. M; Check No. 2049, Ex. KK at 1; Check No. 1814, Ex. LL at 1; Wu Decl. ¶ 8, Ex. J; Cai Decl. ¶ 8, Ex. O; Guan Decl. ¶ 4, Ex. G; Wu Decl. ¶ 8, Ex. J.)

As with Hsiang I Chang, the Defendants' reliance on *Butler v. McIntosh* is misplaced with respect to Wei Wei Chang because the textual analysis advanced therein was explicitly rejected in *Hartford Tech*. *See* Section IV.C. *supra*. In addition, Wei Wei Chang's circumstances, like those of Hsiang I, are distinguishable from those present in *McIntosh*. She, unlike Linda McIntosh, possessed authority to hire in addition to signing payroll checks and supervising workers. *See McIntosh*, at *6 (holding that signing a worker's payroll check, dispatching, and supervising would not constitute employment without more such as "ownership of the enterprise or authority to hire or fire"). Moreover, unlike McIntosh, Wei Wei Chang did not merely *sign* payroll checks, she wrote them and, for some employees, disbursed cash salaries. (Wei Wei Chang Dep. 74:7-11, 74:18-75:9, Ex. M; Check No. 2049, Ex. KK at 1; Check No. 1814, Ex. LL at 1; Wu Decl. ¶ 8, Ex. J; Cai Decl. ¶ 8, Ex. O; Guan Decl. ¶ 4, Ex. G; Wu Decl. ¶ 8, Ex. J.) She further distributed credit card tips. (Wei Wei Chang Dep. 100:10-25, Ex. M.) Thus there can be no question that she had the power to alter compensation.

### E.   A Reasonable Jury Could Find that the LLC Violated the Connecticut Unfair Trade Practices Act (CUTPA) and Hsiang I Chang Should Be Held Personally Liable For His Company's Torts.

By deducting money from the Restaurant Workers' wages in exchange for illegal and unsafe housing, the LLC violated the CUTPA. Furnishing illegal housing is a violation of Connecticut's landlord-tenant law, and doing so for money is indisputably a violation of

CUTPA. In Section IV.I, *infra*, the Restaurant Workers show that Hsiang I Chang should be held personally liable for his company's torts.

Defendants argue that Hsiang I Chang should not be liable under CUTPA because he was not involved in the provision of the Restaurant Workers' housing and  the provision of housing was incidental to the employment relationship and thus not subject to CUTPA. Neither of these arguments withstands scrutiny. Below, the Restaurant Workers show that (1) the housing provided to the Restaurant Workers by the LLC violated Connecticut's landlord-tenant law, (2) the LLC can find no protection under law simply because it was their employer in addition to the provider of their housing, (3) CUTPA creates a private right of action for violations of Connecticut's landlord-tenant law and (4) the LLC is liable under CUTPA for the provision of illegal housing. In the final section, the Restaurant Workers show that the court should find Hsiang I Chang personally liable for the LLC's violations of CUTPA.

**1. The LLC Provided Illegal Housing to the Restaurant Workers.**

There is no material dispute of facts regarding the Restaurant Workers' claim that the LLC provided them with housing that was illegal under Connecticut's landlord tenant law. According to inspectors from the Town of Mansfield's Department of Building and Housing Inspection, the basement apartment violated multiple state and local housing laws and created a severe risk of serious injury or death. The inspectors identified the following violations of law:

- Three of the "bedrooms" were illegal because they lacked emergency escape openings, such as windows, and were therefore unsafe for human habitation. All five of the "bedrooms" and the living room lacked the legally required smoke detectors. (Inspection Report, May 21, 2008, Ex. S at 1.) This combination, in a basement with a working gas stove and a large population of smokers, created a serious risk of deadly fire. As the Housing Code Enforcement Officer noted, "Repairs and/or resolution of *life safety hazards* found at the time of inspection of the unit must be made immediately" (emphasis added). (Letter from Derek Debus, May 22, 2008, Ex. NN at 1.) The absence of smoke detectors constituted a *per se* violation of

Connecticut's Fire Code, Conn. Gen. Stat. § 29-292, which is itself a *per se* violation of Connecticut's landlord tenant law, Conn. Gen. Stat. §47a-7, which mandates that landlords comply with "all applicable building and housing codes materially affecting health and safety."

- The entire basement apartment was illegal because it violated the town's zoning regulations, which prohibit boarding houses in that neighborhood. (Letter from Curt Hirsch, May 22, 2008, Ex. Q at 1, citing Mansfield Article 4.A.1.) This violation of local zoning law was a *per se* violation of Conn. Gen. Stat. § 47a-7.

- The failure to obtain a certificate of occupancy for the basement boarding house was also a violation of Mansfield regulations and, thus, Conn. Gen. Stat. § 47a-57, which prohibits human habitation in dwelling units that lack a certificate of occupancy. (Inspection Report, May 21 2008, Ex. S; Letter from Curt Hirsch, May 22, 2008, Ex. Q at 1).

- The bathroom ceiling was "in disrepair and coming down," in violation of Mansfield Code § 305.3. (Inspection Report, May 21, 2008, Ex. S at 2).

Under Connecticut's landlord-tenant law, these violations of § 47a-7 preclude the receipt of rental payments: "A rental agreement shall not permit the receipt of rent for any period during which the landlord has failed to comply with subsection (a) of section 47a-7." Conn. Gen. Stat. § 47a-4. . It is uncontested that the LLC deducted $200 per month from each of the Restaurant Workers' paychecks and used that money to pay Le Shih Chang to house the Restaurant Workers in his basement apartment. (Chang's Garden of Storrs, LLC's Resp. to Pls.' 4th Set of Interrog. No. 3; II at 2-3.) ("Chang's Garden of Storrs, LLC would pay about $200 a month to Le Shih Chang for each employee who lived in the walk-in apartment"). Thus, the LLC's admitted payment of rent on behalf of the Restaurant Workers violated Connecticut's landlord-tenant law.

### 2. The LLC Cannot Escape Liability Under Connecticut's Landlord-Tenant Law Simply Because It Was The Restaurant Workers' Employer In Addition to the Provider of Their Housing.

#### a. The landlord-tenant statute clearly covers the relationship between Defendants and the Restaurant Workers.

Defendants argue that their housing arrangement with the Restaurant Workers was "incidental to the Plaintiffs' employment" and thus not subject to Connecticut's landlord-tenant

25

law. Defs.' Memo of Law at 33-36. They provide no statutory evidence for this claim, relying instead on a 1924 Connecticut Supreme Court decision that predates – by fifty years – the state's first comprehensive landlord-tenant law.

Connecticut's first comprehensive landlord-tenant statute, Conn. Pub. Act. No. 76-95, was passed in 1976, and it enumerated in great detail the rights and obligations of landlords and tenants.[6] Ignoring this law and instead relying on *Guiel v. Barnes*, 100 Conn. 737 (1924), to adjudicate contemporary landlord-tenant disputes, as Defendants would have this court do, is like relying on *Lochner*-era common law decisions governing employment contracts, and ignoring the enactment of the FLSA.  Despite Defendants' claims to the contrary, current landlord-tenant law clearly covers the relationship between the Defendants and the Restaurant Workers.

Conn. Gen. Stat. §47a-1 establishes definitions of "dwelling unit,", "landlord," "rent," "rental agreement," and "tenant" that all clearly apply to this case: The basement apartment was a portion of a house that was rented out to more than one person as a residence; Le Shih Chang fit the definition of a landlord; the LLC made periodic rent payments to Le Shih Chang; there was an oral rental agreement to pay $200 per person per month; and the Restaurant Workers were "tenants" entitled to occupy the dwelling unit to the exclusion of others.[7] The Defendants ignore these clear statutory definitions.

---

[6] Until 1976, the Connecticut general statutes had very little to say about landlord-tenant law. *See, e.g.*, Conn. Gen. Stat. 47-24a (1958), announcing that there could be "No rent recoverable for period of unlawful occupation," but saying little else about landlord-tenant relationships. In contrast, the 1976 law laid out for the first time definitions of "landlord," "dwelling unit," "rent," and "rental agreement." *Conn. Pub. Act. No. 76-95* §1.

[7] "(c) 'Dwelling unit' means any house or building, or portion thereof, which is occupied, is designed to be occupied, or is rented, leased or hired out to be occupied, as a home or residence of one or more persons…(d) 'Landlord' means the owner, lessor or sublessor of the dwelling unit, the building of which it is a part or the premises….(h) 'Rent' means all periodic payments to be made to the landlord under the rental agreement….(i) 'Rental agreement' means all agreements, written or oral, and valid rules and regulations adopted under section 47a-9 or subsection (d) of section 21-70 embodying the terms and conditions concerning the use and occupancy of a dwelling unit or premises…. (l) 'Tenant' means the lessee, sublessee or person entitled under a rental agreement to occupy a dwelling unit or premises to the exclusion of others or as is otherwise defined by law…." Conn. Gen. Stat. Sec. §§ 47a-1(c) to 47a-1(l)

If the plain meaning of these definitions is not enough to prove that the rental relationship in this is case is covered by the law, then Conn. Gen. Stat. Sec. § 47a-2a certainly is. That subsection lists the type of housing arrangements that are not covered by the landlord-tenant law. It exempts from coverage: occupancy at a medical or educational institution, under a contract for sale of a unit, at a fraternal organization, at a hotel or motel, and at a condominium. Section 47a-2a(6) also exempts from the landlord tenant law "occupancy by a personal care assistant…[who] is provided dwelling space in the personal residence" of the disabled person for whom the assistant works. According to the statutory canon of *expressio unius est exclusio alterius*, the presence of specific exemptions in §47a-2a, including one specific exemption relating to an employer-employee relationship, means that other types of occupancy agreements are not excluded from the landlord tenant law. The legislature created no exception for occupancy agreements like the one between the Restaurant Workers and the Defendants.

### b. Connecticut Case Law Confirms That the Parties' Relationship Is Covered By the Landlord-Tenant Statute.

Connecticut judicial decisions make clear that the parties' relationship is covered by the state's landlord-tenant law. In *Cruess Realty v. Heath*, for example, the court applied the state's landlord-tenant law to an occupancy agreement between an employer and employee. 1997 Conn. Super. LEXIS 1707. As in the case at bar, the tenant worked as a cook at a company owned by the landlord. Nevertheless, the court did not doubt that landlord-tenant law applied to their housing relationship.

Defendants point to *Muniz v. Kravis*, 59 Conn. App. 704 (2000), for the proposition that housing arrangements "incidental" to employment agreements are not protected by the states landlord-tenant law. However, *Muniz* does not help the Defendants. First, *Muniz* was decided

27

wrongly: the court completely ignored the language of the landlord-tenant statute, relying instead on *Guiel v. Barnes,* a decision that pre-dated the law by fifty years and focused on commercial-subcontracting cases completely unrelated to residential occupancy agreements. Second, *Muniz* is entirely distinguishable from the case at bar.

### i.   *Muniz* **was a badly reasoned decision that conflicted with Connecticut law**

The court in *Muniz* failed to even examine Connecticut's landlord-tenant law. It provided a cursory cite to Conn. Gen. Stat. §47a-1(l), which defines a "tenant," but failed to acknowledge that its ruling conflicted with the plain meaning of the statute. The court in *Muniz* should have applied the plain meaning of the statute and recognized that the only employer-employee exception to the coverage of occupancy agreements by the landlord tenant law relates specifically to home health care workers caring for a disabled patient, Conn. Gen. Stat. 47a-2a, *supra*, Section IV.E.2.a.  Instead of reasoning from the text and structure of the statute, *Muniz* improperly relied on analogies to non-residential contractual and employment disputes. *Muniz,* 59 Conn. App. at 713. *Muniz* is not binding precedent on this Court and, because it was so poorly reasoned, it should not be given undue weight as this Court seeks to interpret Connecticut's law. *See, e.g.*, *West v. American Tel. & Tel. Co.,* 311 U.S. 223 (1940) (the decisions of state intermediate courts are not binding on federal courts but are useful in interpreting state law); *Pinto v. Allstate Ins. Co.*, 221 F.3d 394 (2nd Cir 2000) (in the absence of guidance from the state's highest, a federal court should predict how that court would resolve the issue at hand).

### ii.   *Muniz* **is easily distinguishable from this case.**

*Muniz* can be distinguished from the case at bar in at least two fundamental ways. First, in *Muniz*, the court concluded that there was no occupancy agreement, noting that the plaintiff made "no allegation as to the amount of 'rent' paid by the plaintiff or that the value of the

occupancy [wa]s deducted from wages otherwise due." *Id.* at 715. In the present case, however, neither party disputes the existence of an occupancy agreement. *See, e.g.*, Chang's Garden of Storrs, LLC's Resp. to Pls.' 4th Set of Interrog. No. 3, Ex. II at 2-3, ("Chang's Garden of Storrs, LLC would pay about $200 a month to Le Shih Chang for each employee who lived in the walk-in apartment."); Le Shih Chang's Resp. to Pls.' 4th Set of Interrog. No. 7, Exhibit F at 2, ("If the employee does not want to live in the walk-in apartment, I would pay them about $200 extra each month to help them with their housing expenses.") This occupancy agreement – which was not a required component of the Restaurant Workers' employment – proves the existence of a distinct landlord-tenant relationship between the parties.

Second, the cook in *Muniz* lived *at her place of employment* along with her husband, who was a butler *on the premises*. As a result, the court found that the occupancy was nothing other than "incidental to and allowed for the purpose of the plaintiff's employment." *Id*. at 714. In contrast, the Restaurant Workers did not live at Chang's Garden Restaurant. They lived in a basement seven miles away, and were shuttled back and forth between the basement and the restaurant on a daily basis.

Although it may have been convenient for the Restaurant Workers and the Defendants to enter into an oral occupancy agreement in addition to their oral employment agreement, the housing arrangement was not "incidental" to the employment relationship; unlike the live-in cook and butler in *Muniz,* it was not subordinate to or necessary as a result of the employment relationship. Rather, it was a separate contractual relationship, which cost the Restaurant Workers $200 per month each, subject to extensive regulation under Connecticut state law.

Extending *Muniz* to apply to the case at bar – thereby denying the Restaurant Workers protection under Connecticut's landlord -tenant law – would provide employers with a perverse

incentive to offer (or even require) housing as a component of compensation without any obligation to ensure that the housing was habitable. Indeed, it would sanction, for example, the provision of overcrowded dwelling units without heat and exposed to asbestos.

**3. CUTPA creates a private right of action for violations of Connecticut's landlord-tenant law.**

CUTPA prohibits unfair or deceptive acts in the conduct "of any trade or commerce" and defines those terms liberally, to include "the sale or rent or lease, the offering for sale or rent or lease...any property, tangible or intangible, real, personal or mixed." Conn. Gen. Stat. § 42-110. The Supreme Court of Connecticut has held that a landlord's failure to obtain a certificate of occupancy prior to renting a dwelling unit, in violation of Conn. Gen. Stat § 47a-57, creates a private cause of action under CUTPA. *Conaway v. Prestia*, 191 Conn. 484, 491 (Conn. 1983) Federal and state courts have repeatedly followed *Conaway* and explained that it must also mean that CUTPA governs violations of § 47a-7, which describes landlords' various responsibilities to their tenants. *See, e.g.*, *Gonzalez v. City of Bridgeport,* 2008 U.S. Dist. LEXIS 66750 (D. Conn. Sept. 2, 2008) (granting summary judgment in favor of a tenant on her CUTPA claim against her landlord for illegal entry in violation of Conn. Gen. Stat. § 47a-43(a)); *Donaldson v. Auger Assocs.*, 1993 Conn. Super. LEXIS 1265 (Conn. Super. Ct. Apr. 13, 1993) ("The leasing of premises or the collection of rent while the premises are known to be in violation of 47a-7 does in fact constitute an unfair/deceptive practice for which a tenant may recover under CUTPA"); *and High Hopes, Inc. v. Fornaciari*, 1986 Conn. Super. LEXIS 200 (Conn. Super. Ct. Dec. 2, 1986) (holding that, under *Conaway*, CUTPA also applies to Conn. Gen. Stat. § 47a-7(a), which delineates the landlord's obligations to keep the apartment in good condition.)

**4. Defendants' illegal behavior violated CUTPA.**

The behavior of Le Shih Chang, who provided housing to the Restaurant Workers, and the LLC and the Inc., which paid for the housing, clearly met the Connecticut state courts' standard for a violation of CUTPA. CUTPA covers far more business conduct than does common law tort law, and "because CUTPA is a self-avowed 'remedial' measure, General Statutes 42-110b(d), it is construed liberally in an effort to effectuate its public policy goals." *Caleb Village Heights Found. v. Barclay*, 2001 Conn. Super. LEXIS 42, *9 (Conn. Super. Ct. Jan. 8, 2001).CUTPA is to be interpreted to comply with interpretations of the Federal Trade Commission Act. Conn. Gen. Stat. § 42-110b(b). The Connecticut Supreme Court thus applies the Federal Trade Commission's "cigarette rule" to assess whether a business practice is unfair under CUTPA. The rule examines three criteria:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise- in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].

*Updike, Kelly & Spellacy v. Beckett*, 269 Conn. 613, 655-56, 850 A.2d 145 (2004) (citations omitted). Not all three criteria need to be satisfied to establish CUTPA liability. "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three," *Hartford Electric Supply Co. v. Allen-Bradley Co.*, 250 Conn. 334, 367-68, 736 A.2d 824 (1999) (citation omitted).

**a. Defendants' landlord practices violated public policy.**

Violations of regulatory statutes are *per se* violations of public policy. Defendants' landlord practices have already been deemed illegal by the Town of Mansfield, *see* Section

IV.E.1., *supra*, and thus meet the first prong of the CUTPA "cigarette test." Connecticut's appellate court has ruled that "a violation of a regulatory statute satisfies the first and second criteria of the 'cigarette rule,'" *Green v. Gosselin*, 2005 Conn. Super. LEXIS 1247, *6-7 (Conn. Super. Ct. May 10, 2005) (citation omitted) (finding that a landlord's failure to remove snow in violation of § 47a-7, leading to slip-and-fall, created a CUTPA cause of action). The Defendants' failure to maintain the apartment in a safe and habitable condition similarly satisfies at least the first two, if not all three, of the cigarette test's prongs. *See Caleb Village*, 2001 Conn. Super. LEXIS 42 at *13 (Conn. Super. Ct. Jan. 8, 2001) (finding that a landlord's failure to maintain property in a safe and habitable condition "satisfies the cigarette rule and opens the landlord to liability for violations of CUTPA.")

### b.  Defendants' practices were immoral, unethical, oppressive, and unscrupulous.

It is immoral and unethical to violate a regulatory statute intended to protect the health and welfare of the public for one's own financial gain. *See Green,* 2005 Conn. Super. LEXIS 1247 at *6-7 ("a violation of a regulatory statute satisfies the first and second criteria of the 'cigarette rule'" (quotation omitted)) and *Caleb Village*, 2001 Conn. Super. LEXIS 42, at *13 (Conn. Super. Ct. Jan. 8, 2001). When the Restaurant Workers arrived in Connecticut, they were extremely poor and were new to the area. They did not speak English and had no connections in the local town, and they were entirely unaware of their rights under Connecticut and Mansfield law. In contrast, Defendant Le Shih Chang is a business and home owner with extensive ties in his community. Le Shih Chang deposited the Restaurant Workers in his illegal, unsafe, and isolated basement – eight or nine people squeezed into 1500 square feet, sharing one or sometimes two working toilets and showers. The LLC and Hsiang I Chang then paid Le Shih

Chang rent by withdrawing money from the Restaurant Workers' paychecks. The Defendants' actions satisfied the standard of being immoral, unethical, oppressive, or unscrupulous.

### c. Defendants' acts caused substantial injury to consumers.

The Restaurant Workers suffered financial injury as a result of Defendants' illegal business practices. As previously stated, Conn. Gen. Stat. § 47a-4a prohibits "the receipt of rent for any period during which the landlord has failed to comply" with the health and safety requirements of the housing code. Because the Defendants continuously failed to abide by those requirements, as delineated in Section IV.E.1., *supra*, they were legally prohibited from receiving rent from the Restaurant Workers

The rent that was illegally taken out of Restaurant Workers' paychecks constitutes a verifiable and concrete harm to them, fulfilling the third prong of the FTC's "cigarette test." Although all three elements of the "cigarette test" need not be proven in order to show a violation of CUTPA, *Hartford Electric Supply Co.*, 250 Conn. at 367-368, the Restaurant Workers have established all three prongs, thus establishing Defendants' liability.

### F. There Are Disputes of Material Fact Regarding the Claim for Intentional Infliction of Emotional Distress By Restaurant Workers Bing Wu and Jun Zhang Against the LLC and Hsiang I Chang Should Be Personally Liable for Its Torts.

Restaurant Workers Bing Wu and Jun Zhang have brought a claim of intentional infliction of emotional distress (IIED) against the LLC because it paid for them to be housed in an illegal and dangerous basement apartment, violated public policy, put their lives at risk, and caused them severe emotional distress. This conduct was extreme and outrageous, and the LLC should have known that emotional distress was the likely result of its conduct. As shown in Section IV.I., *infra*, summary judgment in favor of Hsiang I Chang is inappropriate because the LLC's corporate veil should be pierced and Hsiang I Chang held personally liable for its torts.

In order to establish a claim for IIED, Restaurant Workers Wu and Zhang must show that: (1) the LLC's conduct was extreme and outrageous; (2) the LLC knew or should have known that emotional distress was the likely result of its conduct; (3) the conduct was the cause of the Restaurant Workers' distress; and (4) the emotional distress sustained by the Restaurant Workers was severe. *See Appleton v. Board of Ed.*, 254 Conn. 205, 210 (2000). Bing Wu and Jun Zhang have produced overwhelming evidence as to the first two claims and a reasonable jury could find for the Restaurant Workers on the third and fourth elements.

**1.  The LLC's Conduct Was Extreme and Outrageous.**

The LLC's conduct towards Bing Wu and Jun Zhang was extreme and outrageous because it withheld $200 a month from each of their paychecks and gave that money to Le Shih Chang so that he would house them in an illegal, dangerous, and crowded basement apartment that was infested with rodents and subject to extreme temperatures. A reasonable jury could easily find that the LLC's conduct was extreme and outrageous.

Le Shih Chang's basement apartment is approximately 1550 square feet. (Fishman Appraisal Services Rent Study 2, Ex. SS at 2.) The basement was very crowded – between seven and nine workers slept in the five "bedrooms" and the living room. Guan Dec. ¶13, Ex. G; Zhang Decl. ¶7, Ex. K. According to inspectors from the Town of Mansfield's Department of Building and Housing Inspection, the basement apartment violated multiple state and local housing laws and created a severe risk of serious injury or death. *See* Section IV.E.1, *supra*, for detailed violations.

Taking money out of the workers' paychecks to pay Le Shih Change for housing them in this obviously illegal housing was extreme and outrageous. The absence of the smoke detector and emergency escape openings in the bedrooms are a fatal combination, perhaps the most

dangerous       violations       of       Connecticut's       landlord       tenant       law.       *See,       e.g.*
*Tucker v. Lopez*, 38 Conn. Supp. 67, 69 (Conn. Super. Ct. 1982) ("[W]e find that the failure to
install [smoke detectors] in violation of the state fire code poses a material safety hazard to those
persons occupying the affected dwelling units.")

In addition to the violations of law documented by the Town of Mansfield, the Restaurant
Workers have provided sworn testimony and photographic evidence of the following horrendous
housing conditions:

- The basement was infested with rats and cockroaches. Cai Decl. ¶9, Ex. O; Cai Dep. 61:5-9, Ex. W; Guan Decl. ¶15, Ex. G; Guan Dep. 73:2-14, Ex. T;  He Decl. ¶8, Ex. H; He Dep. 37:12-16. Ex. V; Wang Dep. 96:6-8, , Ex. L; Wu Decl. ¶16, Ex. J; Yuan Dep. 28:23-29:4, Ex. U; Zhang Decl. ¶6, Ex. K. Restaurant Worker Bing Wu testified that he killed fifteen or sixteen mice in the basement. (Wu Dep. 53:23, Ex. P.)
- The basement was cold in the winter, in direct violation of Conn. Gen. Stat. § 47a-7(6), which requires landlords to provide sufficient heat. When the workers tried to adjust the heat, either Le Shih Chang or his wife would turn down. Guan Decl. ¶16, Ex. G; He Decl. ¶8, Ex. H; He Dep. 37:12-16, Ex. V; Wang Decl. ¶15, Ex. I; Wang Dep. 97:15-17, Ex. L; Wu Decl. ¶16, Ex. J; Zhang Decl. ¶5, Ex. K. This heating irregularity caused Mr. He to become ill. (He Dep. 37:12-16, Ex. V.)
- The bathroom ceiling leaked, violating the requirement in Conn. Gen. Stat. § 47a-7(4) that plumbing and sanitary facilities be in working order. Wang Decl. ¶14, Ex. I; Wu Decl. ¶16, Ex. J; Wu basement photos, Ex. TT.

At the very least, the Restaurant Workers have established sufficient facts to permit a
reasonable jury to determine that Hsiang I Chang's actions were extreme and outrageous, such
that summary judgment is inappropriate on this claim.  *See Appleton v. Board of Educ.*, 254
Conn. 205, 210 (2000) ("Whether a defendant's conduct is sufficient to satisfy the requirement
that it be extreme and outrageous is initially a question for the court to determine....Only where
reasonable minds disagree does it become an issue for the jury") (citation omitted).

**2.  Hsiang I Chang and the LLC Should Have Known that Emotional Distress was the
Likely Result of His Conduct.**

The LLC should have known that deducting money from their paychecks in exchange for housing them in a dangerous and illegal basement was likely to cause the Restaurant Workers emotional distress. According to his sworn testimony, Hsiang I Chang lived in the basement apartment at Le Shih Chang's apartment, except when it became too crowded. (Hsiang I Chang Dep. 133: 12-23, Ex. C.) Intimately familiar with the basement apartment, Hsiang I Chang (as the principle of the LLC) should have known that living there for extended period would likely cause emotional distress. Although he moved up to the main house when life in the basement became too crowded, neither Bing Wu nor Jun Zhang had that option. Instead, they were required to remain in the dangerous, cramped, and illegal basement.

Living in an illegal, dangerous, and dark basement, with intense humidity in the summer and cold chills in the winter, surrounded by vermin and without properly functioning bathroom facilities is a straightforward recipe for distress. Hsiang I Chang knew the details of the housing arrangement that he worked out with Le Shih Chang. He therefore knew or should have known that emotional distress was the likely result of his company's conduct.

### 3. A Reasonable Jury Could Find That the Distress Suffered By Bing Wu and Jun Zhang Was the Result of Hsiang I Chang's Behavior.

Both Bing Wu and Jun Zhang have sworn that their distress was caused by the intolerable housing conditions in the basement apartment. At the kitchen table where Jun Zhang prepared his meals, rats scampered multiple times a day. (Zhang Decl. ¶6, Ex. K.) He was disgusted and angry about the filthy conditions, but afraid to complain at the risk of losing his job. *Id*. He was cold in the winter, but afraid that asking for more heat would get him fired. *Id*. at ¶5. The living situation made Zhang angry and afraid. Unable to afford better housing because the Defendants

were paying him illegally low wages, Zhang was too afraid and trapped to insist on better accommodations.

Bing Wu also found the living conditions terrible. Wu Decl. ¶16, Ex. J. When Wu complained to Le Shih Chang about the vermin, he was told that there was nothing that could be done. *Id*. The extreme humidity in the basement caused Wu to lose sleep. *Id*.  Wu felt a sense of helplessness because the only housing that was available to him on his illegally low wages was dangerous and disgusting.

The distress suffered by Wu and Zhang was a direct result of the housing conditions. They both experienced the same living conditions and have sworn that they were distressed by specific aspects of the housing conditions. If the LLC had not paid Le Shih Chang to house the workers in his basement, they would not have lived there. Based on the Restaurant Workers' testimony, a reasonable jury could easily find that the distress suffered by Bing Wu and Jun Zhang was the result of the housing paid for by Hsiang I Chang and his LLC.

## 4. A Reasonable Jury Could Find That the Distress Suffered By Bing Wu and Jun Zhang Was Severe.

Both Bing Wu and Jun Zhang have sworn that they suffered severe emotional distress.  A reasonable jury could find that Bing Wu and Jun Zhang suffered severe distress in the form of fear, disgust, and anger as a result of the Defendants' decision to deduct extensive wages from their paycheck in exchange for illegal and dangerous housing. The Connecticut appellate courts have yet to comment on the severity of distress a plaintiff must experience in order to sustain a claim for intentional infliction of emotional distress. *See Stapleton v. Monro Muffler*, No. CV980580365S, 2003 WL 462566, *3 (Conn. Super., Feb. 3, 2003). However, trial courts generally hold that distress must rise to a level that no reasonable person could endure. *Gilman v.*

*Gilman*, 46 Conn. Supp. 21, 23, 736 A.2d 199 (1999) ("the plaintiff's emotional distress . . . must be sufficiently severe and extreme that no reasonable person should be expected to endure it").

No reasonable person should be expected to endure the conditions to which Jun Zhang and Bing Wu were subjected. Their fear, disgust, and anger at the housing situation established by the LLC was unbearable and a reasonable jury could find that it constituted severe emotional distress.

### G. There Are Material Disputes of Fact Regarding Wu's Claim Against Wei Wei Chang for Intentional Infliction of Emotional Distress.

Plaintiff Wu has alleged that Wei Wei Chang's behavior toward him in their workplace constituted intentional infliction of emotional distress. There are material disputes of fact regarding all four elements of Wu's claim of intentional infliction of emotional distress against Wei Wei Chang and summary judgment is thus inappropriate.

### 1. Wei Wei Chang's Conduct Was Extreme and Outrageous.

"Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Toilette v. Peterson*, 44 Conn. Supp. 490, 497-98 (1995) (citing 1 Restatement (Second) of Torts § 46, comment h; *Brown v. Ellis*, 40 Conn. Supp. 165, 168 (1984)). Wei Wei Chang repeatedly yelled at Plaintiff Wu, punished him for trying to recover tips that were legally his, and treated him poorly as compared to other employees. Reasonable people could disagree about whether Wei Wei Chang's actions taken together were sufficiently extreme an outrageous as to constitute intentional infliction of emotional distress.

Employer deprivation of rightfully owed wages may be deemed outrageous and extreme where that conduct is egregious and apparent to the employee. In *Sangan v. Yale University*, the

District of Connecticut held that "[Defendant's] refusal to sign Plaintiff's time sheets and repeated withholding of her pay may be deemed extreme and outrageous." No. 3:06CV587, 2006 WL 2682240, *6 (D.Conn. Sep 15, 2006) (Dorsey, J.). On the basis of the evidentiary record in this case, a reasonable jury could find that Wei Wei Chang withheld Plaintiff Wu's tips and regularly sought to exploit him financially using her position as his supervisor. When Wu objected to Wei Wei Chang's theft and exploitative behavior, Wei Wei Chang yelled at Wu and threatened to jeopardize his employment. Connecticut courts have found employer behavior sufficiently extreme and outrageous where employers have singled employees out for inferior treatment. *See Mellaly v. Eastman Kodak Co.*, 42 Conn. Supp. at 19-20 (denying motion to strike intentional infliction of emotional distress claim where supervisor harassed worker about free time, indiscriminately yelled at, and repeatedly threatened to fire plaintiff).

In addition, Wei Wei Chang used her position as Wu's supervisor to take advantage of him. When Wei Wei Chang arrived at the restaurant in 2005, she hired Plaintiff Wu and some of his friends to move her furniture and possessions from Flushing, New York to Connecticut on one of Wu's days off from Chang's Garden. (Wu Decl. ¶ 9, Ex. J.) Wei Wei Chang paid Bing Wu's friends for their work, but did not pay Wu. (*Id.*) Wu was afraid to refuse to help or request to be paid because of Wei Wei's position as his supervisor. (*Id.*)

Bing Wu made deliveries for Chang's Garden in his own car and paid for his own gasoline out of his tip and delivery charge money. (Wu Dep. 75:1-7, Ex. P.) However, when he ran other errands for the restaurant, there were no tips or delivery fee to offset the fuel expense. Nevertheless, on multiple occasions, Wei Wei Chang instructed Bing to go to a store far away from the restaurant and buy supplies for the restaurant without reimbursing him for mileage or

gas. When he asked for reimbursement, she yelled at him in front of customers and employees (Wu Decl. ¶ 10, Ex. J.)

Wei Wei Chang also threatened Bing Wu with job loss when he tried to assert his right to receive the tips that were designated for him. *See* 29 C.F.R. 531.52 and 29 C.F.R. 531.53 (describing the rights of employees to receive their tips). On one occasion, Bing Wu found proof that Wei Wei Chang was withholding his tips and when he asked her to give him the full amount, she said to him, "either you go or I go." (Wu Decl. ¶ 11, Ex. J; Wu Dep. 109:14-22, Ex. P.) Bing Wu believed thereafter that he would be fired for further investigation or efforts to recover tips illegally withheld by the Defendants. (*Id.* 109:4-10; *see also id.*, 82:4-83:5).

A reasonable jury could conclude that Wei Wei Chang's exploitation of Bing Wu, unlawful withholding of Bing Wu's tips, intentional efforts to thwart his recovery of those tips, and efforts intimidate and humiliate him in front of the other employees constituted extreme and outrageous conduct. At the very least, reasonable people could differ as to whether the defendants' conduct was extreme and outrageous. Therefore, this issue should be submitted to the jury for its determination.

### 2. A Reasonable Jury Could find that Wei Wei Chang's Conduct Caused Bing Wu Emotional Distress.

Wei Wei Chang's exploitation of Bing Wu and withholding of his tips caused him prolonged depression because he felt that he could not get just compensation without losing his job. He was further unable to understand why Wei Wei Chang would yell at him in front of his peers or threaten to imperil his employment for his efforts to get the tip money that was rightfully his. This conduct, taken in combination, made Bing Wu feel understandably betrayed because he thought his job performance did not warrant such scolding, threats, and exploitation.

A reasonable jury could find that the combination of aggrievement and powerlessness caused depression that Bing experienced.

### 3. Wei Wei Chang Should Have Known that Emotional Distress was the Likely Result of Her Conduct.

Given Wei Wei Chang's position in the restaurant, she should have foreseen that her efforts to intimidate and humiliate Bing Wu would cause him emotional distress. Regarding his tip related dispute, tip dispensation is a task that has only been trusted to members of the Defendants' family since a nonfamily member was responsible for stealing customer credit card information. (Wei Wei Chang Dep. 96:23-97:13, Ex. M.) She should have known that her threats to complain to her brother about Wu would reflect negatively upon Wu and would be perceived by him as a threat to his job security. Because her actions were calculated to prevent Wu from further inquiring about his tips, his feelings of inefficacy and depression as a result thereof were foreseeable.

### 4. A Reasonable Jury Could find that the Distress Caused by Wei Wei Chang's Conduct was Severe

A reasonable jury could find that Bing Wu suffered severe distress in the form of depression as a result of Wei Wei Chang's conduct. However, trial courts generally hold that distress must rise to a level that no reasonable person could endure. *Gilman v. Gilman*, 46 Conn. Supp. 21, 23, 736 A.2d 199 (1999) ("the plaintiff's emotional distress . . . must be sufficiently severe and extreme that no reasonable person should be expected to endure it").

Connecticut courts have found that prolonged depression can rise to the level of severity necessary to sustain a claim of intentional infliction of emotional distress. *See id.* at 23, 736 A.2d 199 (finding plaintiff's stress and depression constitute severe emotional distress). There is a

genuine issue of material fact regarding whether Plaintiff Wu's depression rose to the necessary level of severity to sustain a claim for intentional infliction of emotional distress. Thus, Defendant Wei Wei Chang is not entitled to summary judgment on this element of the claim. Because a reasonable jury may find each element of Plaintiff Wu's claim of intentional infliction of emotional distress against Wei Wei Chang, she is not entitled to summary judgment on this claim for relief.

### H. There Is A Material Dispute of Fact Regarding Hsiang I Chang and the LLC's Negligent Infliction of Emotional Distress Against Restaurant Workers Bing Wu and Jun Zhang.

Bing Wu's and Jun Zhang's claims of negligent infliction of emotional distress (NIED) against the LLC and Hsiang I Chang arise from the appalling and illegal housing conditions to which they were subjected. By deducting $200 a month from the Restaurant Workers' wages and paying Le Shih Chang to house them in a dangerous and illegal apartment, the LLC and Hsiang I Chang created an unreasonable risk of causing them emotional distress. Material disputes of fact regarding this claim remain, and summary judgment is inappropriate.

Connecticut courts have repeatedly acknowledged the relationship that bad housing can have on an individual's emotional well-being, and have recognized the appropriateness of the NIED cause of action in these contexts.  *See, e.g.*, *Camerone v. Phillips*, No. 2007 Conn. Super. LEXIS 149 (Conn. Super. Ct. Jan. 17, 2007) (holding defendants liable for negligent infliction of emotional distress for misrepresenting deplorable conditions of home purchased by plaintiffs); *Voghel v. City of Waterbury*, 1999 Conn. Super. LEXIS 2458 (Sept. 9, 1999) (holding defendants liable for negligent infliction of emotional distress that resulted when the first floor of plaintiffs' house was damaged by sewer back-up).

To establish a claim of NIED, Restaurant Workers Wu and Zhang must prove that: (1) Hsiang I Chang's conduct created an unreasonable risk of causing the them emotional distress; (2) their distress was foreseeable; (3) their emotional distress was severe enough that it might result in illness or bodily harm; and (4) Hsiang I Chang's conduct was the cause of the their distress. *See, e.g., Pecoraro v. New Haven Register*, 344 F. Supp. 2d 840, 845 (D. Conn. 2004); *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003). In *Montinieri v. Southern New England Telephone Co.*, 175 Conn. 337, 345 (1978), the Connecticut Supreme Court recognized that "recovery for unintentionally-caused emotional distress does not depend on proof of either an ensuing physical injury or a risk of harm from physical impact." Rather, a defendant will be liable if he "should have realized that [his] conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm*." Id.* Accord *Perodeau v. City of Hartford*, 259 Conn. 729 (2002) (stating that plaintiff in negligent infliction claim need not allege actual bodily harm). *See also Morris v. Hartford Courant Co.*, 200 Conn. 676 (1986). The Connecticut Supreme Court has explained further that defendants will be liable if "the fear or distress experienced by the plaintiffs [is] reasonable in light of the conduct of the defendants. *Vogul*, 1999 Conn. Super. LEXIS 2458, *17, citing *Barrett v. Danbury Hospital,* 232 Conn. 242, 260 (1995).

The NIED claims of Restaurant Workers Bing Wu and Jun Zhang must survive summary judgment because their distress as a result of their housing conditions was reasonable, and the LLC's payment for that housing was negligent and illegal. Hsiang I Chang's argument for summary judgment is based entirely on the claim that he was not involved with the Restaurant Workers' termination and "had nothing to do with the Plaintiffs' housing accommodation." (Defs.' Memo of Law at 28). His first argument is irrelevant, because neither Zhang nor Wu's

43

NIED claim against Hsiang I Chang is based on Chang's involvement in their termination. And Chang's second claim is patently false, as he had sole legal control of the LLC, which has admitted to paying Le Shih Chang for the housing. (Chang's Garden of Storrs, LLC's Resp. to Pls.' 4th Set of Interrog. No. 3, Ex. II.)

First, just as the LLC's conduct was extreme and outrageous, *see* Section IV.F.1, *supra,* it created an unreasonable risk of causing Bing Wu and Jun Zhang emotional distress. It is not unreasonable or exceptional to suffer emotional distress after being housed in an illegal, unsafe, windowless, crowded, rat-infested, basement apartment subject to extreme temperatures.

Second, just as the LLC should have known that the Restaurant Workers' distress was the likely result of its conduct, *see* Section IV.F.2*, supra*, their distress was foreseeable. In Connecticut "the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?" *Clohessy v. Bachelor*, 237 Conn. 31, 45 (1996). An ordinary person should know that people living in a basement like Le Shih Chang's would be reasonably likely to suffer distress.

Third, Both Bing Wu and Jun Zhang have sworn that their distress was caused by the intolerable housing conditions in the basement apartment. *See* Section IV.F.3, *supra*. Based on the Restaurant Workers' testimony, a reasonable jury could easily find that their distress was the result Hsiang I Chang and his LLC's payment for that housing.

Fourth, and finally, both Bing Wu and Jun Zhang have sworn that they suffered severe emotional distress in the form of fear, disgust, and anger.  *See* Section IV.F.4, *supra*. A reasonable jury could agree with them. Restaurant Workers Bing Wu and Jun Zhang have made a showing that the LLC is liable to them for negligent infliction of emotional distress. In Section

V.I., *infra*, they show that the company's veil should be pierced and Hsiang I Chang held personally liable for this tort.

**I.   Because He Dominated and Controlled the LLC, Hsiang I Chang Should Be Held Personally Liable for Its Violations of CUTPA and Inflictions of Emotional Distress.**

Hsiang I Chang utterly dominated and controlled Chang's Garden of Storrs. Today, that corporate defendant is entirely unable to satisfy the judgment that the Restaurant Workers may win, in part because over the course of four months in late 2007, the remaining value of the LLC's bank account was transferred to Hsiang I Chang's personal account, Chk. ## 2422, 2423, 2427, 2428, 2429, Ex. OO. The Inc. now has approximately $75,000 in its accounts, only $45,941 of which has been secured to satisfy the Restaurant Workers' claims. Chang's Garden LLC Stipulated Agreement As To PJR Hearing, Ex. PP at 3. The Restaurant Workers have established strong claims against the Defendants for at least $518,000, which makes it unlikely that the corporate defendants will be able to satisfy judgment. Application for Prejudgment Remedy, Dkt. #201. Thus, the Court should pierce the corporate veil and hold Hsiang I Chang personally liable for the restaurant's violation of CUTPA and for its liabilities to Bing Wu and Jun Zhang under Negligent (NIED) and Intentional Infliction of Distress (IIED).

In Connecticut, the corporate veil may be pierced under either the "instrumentality rule" or the "identity rule," *Saphir v. Neustadt*, 177 Conn. 191, 210 (1979). Both tests are fundamentally procedures for reaching an equitable outcome: "The corporate veil will be pierced when 'the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor.'" *United Electrical Contractors, Inc. v. Progress Builders, Inc.,* 26 Conn. App. 749, 755-56 (1992). Under both the instrumentality and identity tests, the LLC and Inc. veils may be pierced, and both Hsiang I Chang and Le Shih Chang should be found personally liable to the Restaurant Workers.

45

1. **Hsiang I Chang and Le Shih Chang's Actions Fulfill the Instrumentality Rule's Requirements for Piercing the Corporate Veil**

Connecticut's Supreme Court has laid out a three-pronged instrumentality rule for piercing the corporate veil. In order to be personally liable, Defendants must exercise:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory *or other positive legal duty,* or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Saphir*, 177 Conn. at 210. With respect to the Restaurant Workers' CUTPA and NIED/IIED claims, Hsiang I Chang and Le Shih Chang meet all three of these prongs.

    a. **Hsiang I Chang and Le Shih Chang Completely Dominated the Finances, Policy, and Business Practices of the LLC and the Inc. With Respect to the Housing of the Restaurant Workers, and Neither the LLC Nor the Inc. Existed in Any Meaningful Sense Separate or Apart From Hsiang I Chang and Le Shih Chang.**

Housing the Restaurant Workers in Le Shih Chang's basement apartment easily meets the first prong of the "instrumentality" test. As in *Saphir*, 177 Conn. at 211, where the Supreme Court of Connecticut found the defendant personally liable for the debts of his company, Hsiang I Chang and Le Shih Chang exercised "complete domination" over the LLC and the Inc. As in *Saphir*, the Changs were the sole shareholders of the companies, were the presidents of the companies, and held the only proprietary interest in the companies. In addition, like the company at issue in *Saphir*, irregularities in the management of the business show that the individual defendants completely dominated the companies' decision-making: no minutes were kept at the meetings of the Chang's Garden Restaurant's directors (because no formal meetings ever occurred), no records of annual elections existed (because no elections had been held), and the

other officers of the Inc. – Susan Chang, the daughter of Hsiang I Chang – was named solely to accommodate the Changs.  Defs.' Resp. to Pls.' First Req. for Produc. #38, Ex. XX.

The housing of the Restaurant Workers was the paradigmatic example of a transaction that is "completely dominated" by the individual defendants and for which the "the corporate entity…had at the time no separate mind, will or existence of its own." Le Shih Chang and Hsiang I Chang admit that they took money out of the corporate accounts and transferred them to Le Shih Chang, personally, so that he would house the Restaurant Workers in the basement of his apartment. This arrangement was infused with self-interest and self-dealing on the part of the Changs, and by exposing the LLC and the Inc. to serious liability for violating CUTPA, and inflicting emotional distress on the Restaurant Workers, it harmed the companies' interest. It thus met the Connecticut Supreme Court's requirement that "the controlled corporation has … no separate mind, will or existence of its own and is but a business conduit for its principal." *Angelo Tomasso, Inc. v. Armor Constr. & Paving, Inc.*, 187 Conn. 544, 556 (1982).

   **b.  The Control Exercised By Hsiang I Chang and Le Shih Chang Was Used to Perpetrate the Violation of a Statutory or Other Positive Legal Duty, In Contravention of Plaintiff's Legal Rights.**

As shown in great detail in Sections IV.E. and IV.F, *supra*, the housing of the Restaurant Workers in Le Shih Chang's basement violated their statutory rights to safe and habitable living conditions and caused them severe emotional distress. These violations fulfill the second prong of Connecticut's "instrumentality rule" for piercing the corporate veil.

   **c.  The Control and Breach of Duty Proximately Caused the Restaurant Workers' Injury and Unjust Loss**

Had Le Shih Chang and Hsiang I Chang not agreed to pay Le Shih Chang out of the restaurant's accounts in exchange for housing the Restaurant Workers, those workers would have

received a supplemental $200 every month. Instead, because of the self-interested control by the

Changs, the Restaurant Workers were deprived of the money and housed in an illegal and unsafe

basement. The housing arrangement reached between the Hsiang I Chang, his LLC, and Le Shih

Chang, and the financial transactions that they developed to execute that agreement, were the

proximate cause of the Restaurant Workers' injury and unjust loss. Thus, the transaction fulfilled

the third prong of state of Connecticut's "instrumentality rule" for piercing the corporate veil.

## 2. Hsiang I Chang and Le Shih Chang's Actions Fulfill the Identity Rule's Requirements for Piercing the Corporate Veil

In addition to the "instrumentality rule," in Connecticut the corporate veil can also be

pierced under the "identity rule." The Connecticut Supreme Court has described the "identity

rule" as follows:

> If plaintiff can show that there was such a unity of interest and ownership that the independence of the corporation had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.

*Saphir*, 177 Conn. at 210.

For two reasons, the Court should find that neither the LLC nor the Inc. had sufficient

independence from their presidents and owners to provide the Chang's with protection from

liability. First, as described directly above in the context of the "instrumentality rule," Le Shih

Chang and Hsiang I Chang designed a financial arrangement for the housing of the Restaurant

Workers that provided *no* benefit to the LLC and the Inc., while enriching Le Shih Chang at the

expense of the Restaurant Workers. That is, the owners of the restaurants envisioned their

interests as identical with the interest of the companies, and thus did not hesitate to expose the

restaurants to liability for their own profit.  Second, Le Shih Chang and Hsiang I Chang treated

the restaurants' bank accounts as their own, comingling personal and corporate assets and eliminating any semblance of corporate independence. For example, in his deposition Le Shih Chang admitted that he took money out of the restaurant's bank accounts whenever he needed it:

> Q: How often did you pay yourself salary?
> A: No fixed time. If I need money, then I pay myself. Then I will write a check from the restaurant and pay myself and get my salary.
> Q: So when you need money, do you just take it out of the restaurant?
> A: Of course. Because all my money is already in the restaurant.
> Q: And that's what you have been doing since 1998?
> A: Approximately.
> Q: Did you have a fixed salary?
> A: No.
> Q: Was it your general practice to take out money for expenses and however much else you thought you might need to live on?
> A: Yes. Well, because all my money was paid by me to the restaurant and sometime I don't have even have my salary. If I think of in future I need to save some money for future use, so my salary kind of varies.
> Q: Were the majority of your personal expenses paid out of the restaurant's bank account?
> A: Yes.

Le Shih Chang Dep. 77:2-78:3, Ex. DD.

Similarly, Hsiang I Chang took out large payments of cash from the LLC without justification. Between August and December of 2007, Hsiang I Chang received checks of $3000 (Chk. #2422), $6000 (Chk. #2423), $2000 (Chk. #2427), $5000 (Chk. #2428), and $5000 (Chk. #2429) from Chang's Garden of Storrs, LLC bank account. Ex. OO at 1-3. His income from the restaurant that year, therefore, totaled at least $21,000. However, his 2007 Federal Tax return shows total gross adjusted income of only $10,097. Hsiang I Chang 2007 Federal Tax Return, Ex. QQ at 3.  In 2004, Hsiang I Chang wrote himself a $25,000 check from the LLC's account, Chk # 1748, Ex. AA at 1, and declared $25,000 in dividend income from the LLC, Hsiang I Chang 2004 Federal Tax Return, Ex. UU at 2, but the LLC only declared $11,000 in payment to

its officers, LLC 2004 Federal Tax Return, Ex. VV at 2. There are no written records of this $25,000 dividend payment

This record of comingling assets between the companies and the Changs fulfills the requirements of the "identity" rule. The Inc and the LLC operated as alter egos of Hsiang I Chang and Le Shih Chang and, in the case of the basement housing arrangement, acted in ways that advanced their personal interests at the expense of the companies' interest.

### 3.   Justice Requires that the Court Pierce the Corporate Veil

Ultimately, the question of whether to pierce the corporate veil is a question of equity. Due to Hsiang I Chang's liquidation of accounts just months before this lawsuit initiated, the funds currently secured under the Chang's Garden LLC Stipulated Agreement As To PJR Hearing, Ex. PP at 3, are not nearly enough to cover the Restaurant Workers' claims against the Defendants. Application for Prejudgment Remedy, Dkt. #201. If the corporate veil is not pierced, the Restaurant Workers will be unable to recover the money owed to them, while the Chang family will reap the rewards of their illegal behavior simply by shutting down the companies.

## V.   CONCLUSION

The evidentiary record establishes that a reasonable jury could find Defendants Wei Wei Chang and Hsiang I Chang liable to the Restaurant Workers for violating FLSA, Connecticut wage and hour law, CUTPA, and Connecticut common law. The Restaurant Workers respectfully request that this Court deny the Defendants motion for summary judgment.

Dated: February 8, 2010

                              Respectfully submitted,

                              _____/s/_____
                              Michael J. Wishnie, Esq., ct27221
                              Muneer I. Ahmad, Esq., ct28109
                              Susan Hazeldean, Esq., ct28093
                              Ohad Barkan, Law Student Intern
                              William C. Collins, Law Student Intern
                              Jerome N. Frank Legal Services Organization
                              P.O. Box 209090
                              New Haven, CT 06520-9090
                              Telephone: (203) 432-4800
                              Facsimile: (203) 432-1426
                              Email: michael.wishnie@yale.edu

                              *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 8, 2010, a copy of the foregoing Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

_____/s/_____

Muneer I. Ahmad, Esq., ct28109
Michael J. Wishnie, Esq., ct27221
Susan Hazeldean, Esq., ct28093
Ohad Barkan, Law Student Intern
William C. Collins, Law Student Intern
Jerome N. Frank Legal Services Organization
P.O. Box 209090
New Haven, CT 06520-9090
Telephone: (203) 432-4800
Facsimile: (203) 432-1426
Email: muneer.ahmad@yale.edu

*Counsel for Plaintiffs*