# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------------**X**
BING WU, FENG CHUN GUAN, TINA WANG,     :
GUI BIN CAI, JUN ZHANG, QIN PING YUAN,     :
JIN LU MA, ZHEN HAI HE, and BAO WEN TAN,   :
                                                                       :
Plaintiffs,                                              :CIVIL ACTION NO. 3:08-cv-746
                                                                       :
   -against-                                       :
                                                                       :
CHANG'S GARDEN OF STORRS, LLC,       :
CHANG'S GARDEN OF CT, INC.,                :May 18, 2010
LE SHIH CHANG, and                              :
HSIANG I CHANG                                    :
                                                                       :
Defendants.                                           :
-------------------------------------------------------------**X**

# PLAINTIFFS' MEMORANDUM IN OPPOSITION
# TO DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF CONTENTS.............................................................................................. 2
I.   INTRODUCTION .............................................................................................. 4
II.  FACTS AND PROCEEDINGS......................................................................... 5
III. STANDARD OF REVIEW ............................................................................... 8
IV. ARGUMENT...................................................................................................... 9
   A. THE CONNECTICUT STATUTE OF LIMITATIONS FOR WAGE ACTIONS
      WAS EQUITABLY TOLLED BECAUSE THE DEFENDANTS' UNLAWFUL
      CONDUCT PREVENTED THE RESTAURANT WORKERS FROM
      LEARNING OF THEIR CAUSE OF ACTION.................................................. 9
      1. There is no merit to Defendants' argument that the statute of limitations began
         to run one month after the Restaurant Workers were hired; a separate claim
         for unpaid wages accrued each time that the Defendants failed to pay the
         workers the amount required by Connecticut wage and hour law................... 10
      2. Connecticut precedent supports the equitable tolling of the statute of
         limitations for the Restaurant Workers' state wage and hour claims. ........... 13
   B. GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY
      JUDGMENT ON THE QUESTION OF FLSA COVERAGE FOR
      RESTAURANT WORKERS' WAGE AND HOUR CLAIMS BETWEEN 1999-
      2003...................................................................................................................... 24
      1. A genuine issue of material fact exists regarding the Restaurant's income from
         1999-2003, which precludes summary judgment on the issue of enterprise
         coverage under FLSA. .................................................................................... 25
      2. A genuine issue of material fact exists regarding individual Restaurant
         Workers' coverage under FLSA, thereby precluding summary judgment in
         favor of Defendants on the issue of individual employee coverage under the
         Act................................................................................................................... 35
   C. A REASONABLE JURY COULD FIND THAT THE DEFENDANTS
      VIOLATED THE CONNECTICUT UNFAIR TRADE PRACTICES ACT....... 40
      1. The Defendants Provided Illegal Housing to the Restaurant Workers. .......... 42
      2. Defendants Cannot Escape Liability Under Connecticut's Landlord-Tenant
         Law Simply Because They Were The Restaurant Workers' Employers In
         Addition to the Providers of Their Housing. .................................................. 44
      3. CUTPA creates a private right of action for violations of Connecticut's
         landlord-tenant law. ........................................................................................ 49
      4. Defendants' illegal behavior violated CUTPA. .............................................. 50
   D. A REASONABLE JURY COULD FIND THAT THE CUTPA STATUTE OF
      LIMITATIONS IS TOLLED BECAUSE DEFENDANTS ENGAGED IN A
      CONTINUOUS ILLEGAL COURSE OF CONDUCT. ................................... 52
      1. A Reasonable Jury Could Find that Defendants Committed an Initial Wrong 54
      2. A Reasonable Jury Could Find that Defendants' Subsequent Acts Were
         Breaches of Legal Duty Related to their Prior Wrong..................................... 54
   E. A REASONABLE JURY COULD FIND THAT DEFENDANTS ENGAGED IN
      A CONTINUOUS ILLEGAL COURSE OF CONDUCT AND THAT THE
      BREACH OF IMPLIED CONTRACT IS THUS TOLLED.............................. 57

      1.   The Defendants Seek Only Partial Summary Judgment With Respect to Only Three of the Restaurant Workers. ................................................................. 57

      2.   A Reasonable Jury Could Find That Defendants' Housing of the Restaurant Workers in an Illegal Apartment Constituted a Breach of Contract .............. 58

      3.   A Reasonable Jury Could Find that the Defendants' Subsequent Illegal Acts As Landlords Were Related to their Initial Breach of Duty to the Restaurant Workers.................................................................................................. 60

V.  CONCLUSION ...................................................................................... 61

## I. INTRODUCTION

From 1999 to 2008, while serving as employer to the Plaintiffs in this case (hereinafter the "Restaurant Workers"), Defendants failed to pay the Restaurant Workers minimum wage and overtime compensation and ignored their legal obligations to inform the Restaurant Workers of their rights under state and federal law. In their Second Motion for Partial Summary Judgment [Dkt. #250], the Defendants seek to exploit the Restaurant Workers' ignorance of the law, itself the result of Defendants' malfeasance, to continue to deny them just compensation under Connecticut wage law.  In addition, Defendants rely on tax returns that do not accurately reflect their gross income in order to contend that the Restaurant Workers are not entitled to the benefit and protection of the Fair Labor Standards Act (FLSA) for the years 1999 to 2003.  Defendants also claim that they bear no responsibility under the Connecticut Unfair Trade Practices Act (CUTPA) for their practice of collecting rent for the dangerous and unlawfully maintained basement in which they housed the Restaurant Workers. Finally, they seek to escape liability for the breach of housing contracts made with the Restaurant Workers.

Although Hsiang I Chang has declared bankruptcy, proceedings in this suit are stayed only against Defendant Hsiang I Chang, and this Court should deny the remaining Defendants' motion. Defendants' argument that the Restaurant Workers' state wage and hour claims are partially time-barred by Section 52-596 of the Connecticut General Statutes is without merit.  The Restaurant Workers are entitled to equitable tolling of the statute of limitations on their state wage claims because of their unawareness of their

legal rights, facilitated by Defendants' failure to comply with the state labor law notice and posting requirements.

Nor are Defendants entitled to prevail on their motion with respect to the Restaurant Workers' FLSA claims. A reasonable fact-finder could determine that the Restaurant Workers have demonstrated both individual and enterprise coverage for the years 1999 to 2003.

This Court should also deny Defendants' motion for summary judgment with respect to the merits of the Restaurant Workers' CUTPA claim. The Restaurant Workers have presented evidence sufficient to establish that Defendants furnished illegal housing in violation of Connecticut's landlord-tenant law, and did so for money in violation of CUTPA.

Finally, Defendants' statute of limitations argument with respect to the Restaurant Worker's CUTPA and breach of implied contract claims should be rejected as well. A reasonable jury could find that Defendants engaged in a continuous illegal course of conduct, and thus, the statute of limitations is tolled on both claims.  As such, a material dispute of fact exists that precludes summary judgment on these claims.

## II.  FACTS AND PROCEEDINGS

The Restaurant Workers were employed by the Defendants in Chang's Garden Restaurant ("Chang's Garden" or "the Restaurant") at various periods between 1999 and 2008. During their employment, Restaurant Workers Ma, Tan, Yuan, and Zhang were completely unaware of that they were protected by labor laws. (Ma Decl. ¶4, Ex. M; Tan Decl. ¶4, Ex. O; Yuan Decl. ¶4, Ex. L; Zhang Decl. ¶4, Ex. P). Restaurant Workers Cai, He, and Wu did not understand the substance of those laws. (Cai Decl. ¶4, Ex. K; He

Decl. ¶4, Ex. N; Wu Decl. ¶4, Ex. Q.)  None of these Restaurant Workers learned of their rights until late 2007 or 2008. (Ma Decl. ¶5, Ex. M; Tan Decl. ¶5, Ex. O; Yuan Decl. ¶6, Ex. L; Zhang Decl. ¶5, Ex. P; Cai Decl. ¶5, Ex. K; He Decl. ¶5, Ex. N; Wu Decl. ¶7, Ex. Q.)

Nor were the Restaurant Workers able to learn of their rights during the relevant time period. Between 1999 and 2008, by their own admission, Defendants failed to post a notice of the restaurant minimum wage order, setting forth minimum wage and overtime requirements as required by law.  (Le Shih Chang Dep. 189:18-190:24, Ex. D; Le Shih Chang's Revised Resp. to Pls.' 4th Set of Interrog. No. 9, Ex. R at 10-11). With the exception of Bing Wu, who had some English language ability, none of the Restaurant Workers spoke English.  (He Dep. 14:3-4, Ex. S; Ma Dep. 6:9, Ex. T; Tan Dep. 65:10-11, Ex. U; Wu Dep. 58:10-59:8, Ex. V; Yuan Dep. 6:9-12, Ex. W; Zhang Dep. 59:22-23, Ex. X.)  They lived in the basement of Defendant Le Shih Chang's suburban home and relied on him or one of his employees for transportation. (Cai Dep. 42:18-24, Ex. Y; He Dep. 34:8-9, Ex. S; Ma Dep. 102:4-8, Ex. T; Tan Dep. 15:9-13, 37:5-8, Ex. U; Wu Dep. 33:8-13, Ex. V; Yuan Dep. 26:15-22, Ex. W; Zhang Dep. 16:4-19, Ex. X.)

While they employed the Restaurant Workers, the Defendants recorded and reported the Restaurant's income inaccurately. The available bank records for the Restaurant's account during the time period 1999 to 2003 reflect *no* cash deposits. (Bank Deposit Records for 1999-2003, Ex. B at 1-6; Bank Deposit Slips from 2002-2003, Ex. C. at 1-43)  Defendant Le Shih Chang admits that he regularly took cash out of the cash register as part of his salary, in order to pay part of the employees' salaries, and to pay for repair expenses at the Restaurant. (Le Shih Chang Dep. 88:8-90:19, Ex. D.) The total

revenue figures for the Restaurant were simply reported to the Defendants' accountant over the phone and were not based on receipts or any paper records whatsoever. (Cheng Dep. 26:21-27:13, Ex. E.) Between January 1, 2005 and March 31, 2009, Chang's Garden Restaurant's reporting of cash earnings – between 2.5 percent and 10 percent of total revenues – was "extraordinarily low" compared to other small restaurants. (Expert DeCusati's Report on Accounting, Ex. A at 4 and 7.)

Le Shih Chang made an explicit oral offer to house the Restaurant Workers on behalf of Defendants while they worked for Chang's Garden. (Le Shih Chang's Revised Resp. to Pls.' 4th Set of Interrog. 6, Ex. R at 8-9). The Restaurant Workers accepted this offer to work at Chang's Garden in exchange for a salary and benefits. (Le Shih Chang's Revised Resp. to Pls. 4th Set of Interrog. 10, Ex. R at 11-14.)

Defendants deducted $200 per month from each of the Restaurant Workers' paychecks and used that money to pay Le Shih Chang to house the Restaurant Workers in his basement apartment. (Chang's Garden of Storrs, LLC's Resp. to Pls.' 4th Set of Interrog. No. 3, Ex. CC at 2-3). Living in the basement apartment was *optional* and not a requirement of working at the restaurant. (Le Shih Chang's Revised Resp. to Pls.' 4th Set of Interrog. No. 6, Ex. R at 8-9). If a worker chose not to live in the basement, he or she would receive an additional $200 in salary. (Le Shih Chang's Resp. to Pls.' 4th Set of Interrog. No. 7, Ex. R at 9-10).

On May 21, 2008, a housing code officer for the town of Mansfield inspected the Defendant Le Shih Chang's basement. The inspector documented numerous violations of municipal housing law, state landlord tenant law, and state fire code.  Three of the "bedrooms" in which the Restaurant Workers were housed were illegal because they

lacked emergency escape openings, such as windows, and were therefore unsafe for human habitation. (Inspection Report, May 21, 2008, Ex. Z at 1.)  All five of the "bedrooms" in which they lived and the living room lacked legally required smoke detectors. (Inspection Report, May 21, 2008, Ex. Z at 1.) The bathroom ceiling was "in disrepair and coming down," in violation of Mansfield Code § 305.3. (Inspection Report, May 21, 2008, Ex. Z at 2.)  Finally, the entire basement apartment was illegal because it violated the town's zoning regulations, which prohibit boarding houses in that neighborhood. (Letter from Curt Hirsch, May 22, 2008, Ex. BB at 1, citing Mansfield Article 4.A.1.)

The Restaurant Workers filed suit on May 15, 2008, alleging violations of federal and state employment law, and Connecticut common law. [Dkt. # 1.] Defendants Hsiang I Chang and Wei Wei Chang filed a motion for partial summary judgment on Dec. 2, 2009. [Dkt. # 208.]  This Court granted in part and denied in part that motion on March 11, 2010. [Dkt. # 242.]  Defendants filed the instant motion for summary judgment on March 30, 2010. [Dkt. # 250.]  Defendant Hsiang-I Chang filed for Chapter 7 bankruptcy on April 23, 2010. [Dkt. # 260.]  The Restaurant Workers requested to continue this case against the other Defendants on May 13, 2010. [Dkt. # 264.]

### III. STANDARD OF REVIEW

Defendants are entitled to summary judgment if the Court determines that there "is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson*

*Plumbing Prods.*, 530 U.S. 133, 150 (2000).  Judges should not weigh the evidence and determine the truth of the matter, but should determine whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986). "[T]he court is required to resolve *all* ambiguities, and to credit *all* factual inferences that could rationally be drawn, in favor of the party against whom summary judgment is sought." *Howley v. Town of Stratford,* 217 F.3d 141, 150-51 (2d Cir. 2000) (emphasis added).


**IV. ARGUMENT**

**A. THE CONNECTICUT STATUTE OF LIMITATIONS FOR WAGE ACTIONS WAS EQUITABLY TOLLED BECAUSE THE DEFENDANTS' UNLAWFUL CONDUCT PREVENTED THE RESTAURANT WORKERS FROM LEARNING OF THEIR CAUSE OF ACTION.**

The Restaurant Workers are entitled to equitable tolling of the statute of limitations for their state wage and hour claims. Connecticut law requires that wage actions be brought within two years of accrual. Conn. Gen. Stat. § 52-596. Contrary to the Defendants' erroneous assertion that claims for the entire duration of employment accrue at the time of hiring, as a matter of law, wage claims accrue at the end of each pay period. Therefore, the Restaurant Workers' claims for wages earned within two years of June 14, 2008, when the complaint was served, are unquestionably timely. Moreover, their claims for wages earned outside of that two-year period are also timely because the statute of limitations was equitably tolled. As Connecticut's courts have recognized, the doctrine of equitable tolling prevents a statute of limitations from running when a plaintiff is unaware of his cause of action despite exercising due diligence. This case presents precisely the type of factual scenario that warrants tolling of the statute of

9

limitations in order to avoid gross inequity. The Defendants violated state statutes that require employers to post notices regarding wage and hour laws and to inform workers in writing of the terms of their employment. They should not be permitted to profit from their unlawful conduct. The Restaurant Workers, in turn, should not be penalized for their lack of knowledge of labor laws, given that their employers had a statutory obligation to apprise them of those laws. Unable to speak English and isolated from the world outside of their workplace, the Restaurant Workers had no realistic means of learning of their rights. Equity demands that the statute of limitations be tolled.

The application of equitable tolling to the Restaurant Workers' Connecticut wage and hour claims is supported by a substantial body of federal case law holding that an employer's failure to comply with notice requirements can toll the statute of limitations for claims under the Fair Labor Standards Act. The Second Circuit and district courts within this circuit have applied equitable tolling in cases whose facts are very similar to those here. This case law, though not binding on this Court's interpretation of state law, is highly persuasive for two reasons. First, Connecticut's courts have borrowed the equitable tolling doctrine from the federal courts and would likely apply it in a similar manner. Second, Connecticut's courts routinely look to federal labor law precedent to interpret state labor laws. Because the Restaurant Workers have established facts that would allow a reasonable jury to find that they are entitled to equitable tolling, summary judgment on statute of limitations grounds is inappropriate.

1. **There is no merit to Defendants' argument that the statute of limitations began to run one month after the Restaurant Workers were hired; a separate claim for unpaid wages accrued each time that the Defendants failed to pay the workers the amount required by Connecticut wage and hour law.**

Defendants' statute of limitations argument begins with the flawed premise that the statute of limitations for *all* wage claims began to run one month after each Restaurant Worker was hired. This is unambiguously wrong as a matter of law. Connecticut law requires that an action for the payment of wages be brought "within two years after the right of action accrues," Conn. Gen. Stat. § 52-596, and case law makes clear that the right of action accrues at the end of each pay period, not at the moment of hiring. Defendants rely on one case, *Brule v. Nerac Corporation*, No. HHDCVX04085023811S, 2009 Conn. Super. LEXIS 3365 (Conn. Super. Ct. Dec. 9, 2009), to assert that each Restaurant Worker's wage claims for the entirety of his or her employment accrued the first time that the Defendants failed to pay the wages required by statute. Even a cursory reading of *Brule* reveals that its reasoning is inapposite here.

*Brule* involved claims for bonuses and a raise that were allegedly promised under an employment contract, which are different in kind from the Restaurant Workers' minimum and overtime wage claims. The plaintiff in *Brule* brought suit under Conn. Gen. Stat. § 31-72, which governs, among other things, actions deriving from a dispute over the amount of wages that the employer had agreed to pay the employee. The cases cited in the section of *Brule* quoted by the Defendants also involve disputes over the amount of wages promised. *See*, *e.g.*, *Burns v. Koellmer*, 11 Conn. App. 375 (1987) (plaintiff claimed that employer had promised her additional compensation); *Warzecha v. Nutmeg Companies*, 48 F. Supp. 2d 151 (D. Conn. 1999) (plaintiffs alleged that employer failed to contribute to pension plans and pay agreed-upon compensation); *Anderson v. Zweigbaum*, 150 Conn. 478 (1963) (plaintiff sued to enforce terms of oral agreement). In these types of cases, a disagreement arises over the agreed-upon terms of the employment

contract, the employer declines to pay the amount that the employee demands, and the employee has two years from that point in time to bring a claim.

By contrast, the Restaurant Workers and Defendants were never in disagreement as to the amount of pay promised. Rather, the Restaurant Workers have sued under Conn. Gen. Stat. § 31-68, which governs actions to recover unpaid minimum and overtime wages, because the amount promised was below the amount required by statute. The claim is not that the Defendants failed to abide by the employment agreement, but rather that the terms of the agreement were contrary to law. *See* Conn. Gen. Stat. § 31-68 ("any agreement between [the employee] and his employer to work for less than such minimum fair wage or overtime wage shall be no defense"). Therefore, the statement relied on by the Defendants, that the cause of action accrues "when an employer refuses to compensate an employee according to the terms of an express or an implied contract," is inapposite. Defs.' Memo of Law at 12, *quoting Brule* at *20. Each time that the Defendants made a deficient salary payment, the Restaurant Workers were entitled by statute to bring a claim.

Case law addressing the time limitations on claims brought under Conn. Gen. Stat. § 31-68 supports the Restaurant Workers' position. In *McKosky v. Plastech Corp.*, No. 426036, 2001 Conn. Super. LEXIS 1635, at *13 (Conn. Super. Ct. June 13, 2001), where the plaintiff sued to recover unpaid minimum wages, the court ruled that his right of action "accrued every week that he was not paid" and that he could recover wages due within two years of service of process. In most of the Connecticut wage and hour cases where statute of limitations defenses were raised, the defendants challenged wage claims falling outside of, not within, the two-year period prior to the commencement of the

action. *See*, *e.g.*, *Crist v. O'Keefe & Associates*, No. X06CV010176326S, 2005 Conn. Super. LEXIS 2364 (Conn. Super. Ct. Aug. 31, 2005); *Butler v. McIntosh*, No. CV 950555751S 1997, 1997 Conn. Super. LEXIS 483 (Conn. Super. Ct. Feb. 20, 1997); *Richardson v. Costco Wholesale Corp.*, 169 F. Supp. 2d. 56 (D. Conn. 2001).

The Defendants' position, if accepted, would produce illogical and inequitable results. Plaintiff Feng Chun Guan, who was employed at the Restaurant from January 20, 2007 to August 20, 2007, is not barred from bringing his wage claims. However, by the Defendants' reasoning, Plaintiff Jin Lu Ma, who was employed at the Restaurant from July 18, 2003 to June 30, 2007, would be entirely barred from bringing any wage claims because he was hired more than two years prior to the commencement of the action. It is nonsensical to argue that Plaintiff Ma's right of action for wages due in 2007 accrued when he was hired in 2003. There is neither legal nor logical basis for Defendants' argument, and this Court should accord it no weight.

> **2. Connecticut precedent supports the equitable tolling of the statute of limitations for the Restaurant Workers' state wage and hour claims.**

> > **a. Connecticut's courts permit the tolling of statutes of limitations to avoid inequitable circumstances.**

Under Connecticut law, an otherwise applicable statute of limitations may be tolled for equitable reasons. As a general matter, statutes of limitations serve Connecticut's public policy of granting "some degree of certainty to litigants." *Bellemare v. Wachovia Mortg. Corp.*, 284 Conn. 193, 199 (2007). However, statutes of limitations are not absolute rules. Connecticut's Supreme Court has held that allowing equitable exceptions to time limitations is consistent with the public policy of affording reasonable certainty to litigants. *See Pedro v. Miller*, 281 Conn. 112, 120 (2007) ("the

phrase 'reasonable certainty' implies that in certain circumstances, certainty must be balanced against other goals"). The courts have applied a number of tolling doctrines that sound in equity, including the doctrines of equitable estoppel and continuing course of conduct. *See, e.g.*, *Morris v. Costa*, 174 Conn. 592, 601 (1978) (defendant was "clearly estopped by his conduct from asserting the defenses of the statute of limitations and laches"); *Jarvis v. Lieder*, 117 Conn. App. 129, 148 (2009) (trial court's finding that defendant's conduct tolled the statute of limitations under the continuous course of conduct doctrine not clearly erroneous); *DeLeo v. Nusbaum*, 263 Conn. 588, 597 (2003) (client in legal malpractice action may invoke the continuous representation doctrine to toll the statute of limitations).

Equitable tolling is a distinct tolling doctrine that Connecticut's courts have explicitly recognized. *See Wiele v. Board of Assessment Appeals of City of Bridgeport*, 119 Conn. App. 544, 554 (2010) ("The doctrine of equitable tolling is accepted in our state and has been applied by our courts to limitations in other statutes"). It is applicable to Section 52-596 of the General Statutes, the state statute of limitations on minimum wage and overtime claims. *Asp v. Milardo Photography, Inc.*, 573 F. Supp. 2d 677, 698 (D. Conn. 2008). The doctrine is applied to prevent the running of a statute of limitations when a plaintiff, "despite all due diligence…is unable to obtain vital information bearing on the existence of his claim." *Gallop v. Commercial Painting Co., Inc.*, 42 Conn. Supp. 187, 192 (1992) (*quoting Cada v. Baxter Healthcare Corporation*, 920 F.2d 446, 451 (7th Cir. 1990)). Thus, under Connecticut law, equitable tolling is appropriate if the Restaurant Workers meet the two requirements set forth in *Gallop*: lack of knowledge of the cause of action, and the exercise of due diligence.

**b.   A reasonable jury could conclude that the statute of limitations should be equitably tolled because the Restaurant Workers, through no fault of their own, failed to discover their cause of action.**

The Restaurant Workers have established facts that would allow a reasonable jury to conclude that they were unaware of information vital to their claims, despite exercising due diligence, and are therefore entitled to equitable tolling of the statute of limitations for their Connecticut wage and hour claims. First, the Restaurant Workers' testimony establishes that they were unaware of information that was critical to their claims: the existence of wage and hour laws. While working at Chang's Garden, Restaurant Workers Jin Lu Ma, Bao Wen Tan, Qin Ping Yuan, and Jun Zhang were completely unaware of that they were protected by labor laws. (Ma Decl. ¶4, Ex. M; Tan Decl. ¶4, Ex. O; Yuan Decl. ¶4, Ex. L; Zhang Decl. ¶4, Ex. P.) Restaurant Workers Gui Bin Cai, Zhen Hai He, and Bing Wu, while vaguely aware of the existence of labor laws, did not understand the substance of those laws. (Cai Decl. ¶4, Ex. K; He Decl. ¶4, Ex. N; Wu Decl. ¶4, Ex. Q.) None of these Restaurant Workers learned of their rights until late 2007 or 2008, well within two years of the commencement of this action on June 14, 2008. (Ma Decl. ¶5, Ex. M; Tan Decl. ¶5, Ex. O; Yuan Decl. ¶6, Ex. L; Zhang Decl. ¶5, Ex. P; Cai Decl. ¶5, Ex. K; He Decl. ¶5, Ex. N; Wu Decl. ¶7, Ex. Q.) Based on this testimony, a reasonable jury could find that the Restaurant Workers were unaware of their cause of action.

Second, a reasonable jury could conclude that the Restaurant Workers exercised due diligence. The Connecticut courts have not articulated the meaning of due diligence in the context of equitable tolling. However, in other contexts, the courts have emphasized that due diligence means "doing everything reasonable, not everything possible." *Kubeck v. Foremost Foods Co., Inc.*, 190 Conn. 667, 672 (Conn. 1983)

(*quoting People v. Sullivan*, 97 Mich. App. 488, 493 (1980)); *Ferris v. Faford*, 93 Conn. App. 679, 687 (2006). The facts of this case permit the conclusion that the Restaurant Workers acted reasonably. Most critically, the Defendants broke state laws requiring them to inform employees of their rights and of the terms of their employment. Under Connecticut law, the Defendants were obliged to post a notice of the restaurant minimum wage order, which sets forth minimum wage and overtime requirements, "at the place of employment where it can be read easily by the employees." Conn. Gen. Stat. § 31-66. Defendant Le Shih Chang has admitted that such a notice was not posted in a visible location. (Le Shih Chang Dep. 189:18-190:24, Ex. D; Le Shih Chang's Revised Resp. to Pls.' 4th Set of Interrog. No. 9, Ex. R at 10-11.) The Defendants also ignored a statutory requirement that they advise the Restaurant Workers in writing of the terms of their employment. Conn. Gen. Stat. § 31-71f.

Implicit in the notice requirement is the idea that workers are not presumed to be fully cognizant of their rights. Moreover, the requirement reflects a legislative decision to place an affirmative duty of disclosure on employers, rather than placing a duty on employees to investigate. The Defendants' legal obligations should factor into the assessment of what "doing everything reasonable" entails on the part of workers. A reasonable jury could conclude that because employers bear an affirmative duty to provide notice, a worker whose employer neglects to do so should not be guilty of lack of diligence.

In addition to the fact that the Defendants ignored their statutory obligations, facts about the Restaurant Workers' circumstances support a finding that they acted reasonably. The Restaurant Workers were severely limited in their ability to obtain

information about wage and hour laws. With the exception of Bing Wu, who had some English language ability, none of the Restaurant Workers spoke English. (He Dep. 14:3-4, Ex. S; Ma Dep. 6:9, Ex. T; Tan Dep. 65:10-11, Ex. U; Wu Dep. 58:10-59:8, Ex. V; Yuan Dep. 6:9-12, Ex. W; Zhang Dep. 59:22-23, Ex. X.) They lived in the basement of Defendant Le Shih Chang's suburban home and relied on him for transportation. (Cai Dep. 42:18-24, Ex. Y; He Dep. 34:8-9, Ex. S; Ma Dep. 102:4-8, Ex. T; Tan Dep. 15:9-13, 37:5-8, Ex. U; Wu Dep. 33:8-13, Ex. V; Yuan Dep. 26:15-22, Ex. W; Zhang Dep. 16:4-19, Ex. X.) As a result, they had little opportunity to interact with other people who could advise them of their rights, as Defendants were legally obligated to do. Based on these facts, a reasonable jury could find that the Restaurant Workers did "everything reasonable" and yet remained unaware of their rights, and are therefore entitled to equitable tolling of the statute of limitations for their Connecticut wage and hour claims.

Furthermore, basic equitable principles embraced by Connecticut's courts demand that the statute of limitations be tolled. The courts have long maintained that "[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." *Thompson v. Orcutt*, 257 Conn. 301, 316 (2001) (*quoting Bird v. Plunkett,* 139 Conn. 491, 496-97 (1953)).  *See also Anthony Julian R.R. Const. Co., Inc. v. Mary Ellen Drive Associates*, 39 Conn. App. 544, 548 (1995) ("[I]t is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff.") Here, to accept the Defendants' statute of limitations defense would be to allow them to take advantage of their own wrong of failing to notify the Restaurant Workers of their rights. Permitting this defense when it is the employer's own conduct

that prevented the employees from bringing their claims would create a perverse incentive for employers to keep their workers uninformed of labor laws.

> **c. Federal precedent is highly persuasive as to the equitable tolling analysis because the Connecticut courts imported the doctrine from the federal courts and regularly utilize federal precedent to interpret state labor laws.**

Although Connecticut's Supreme Court has not had the occasion to apply the doctrine of equitable tolling to the statute of limitations for wage claims, if called to do so, it would likely adopt analogous federal precedent. This reflects the fact that the doctrine of equitable tolling in Connecticut was imported from federal case law, and is consistent with the Connecticut courts' routine practice of utilizing federal precedent to interpret state labor legislation, including wage and hour laws.

In the absence of guidance from the state's highest court, a district court is "required to determine how it believe[s] that court would rule if the issue were before it." *Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 48 (2d Cir. 1993). In making that determination, "a federal court is free to consider all of the resources to which the highest court of the state could look, including decisions in other jurisdictions on the same or analogous issues." *Id.*

In applying the doctrine of equitable tolling to the facts of this case, Connecticut's Supreme Court would likely examine federal precedent. The two Connecticut Supreme Court opinions that have recognized the doctrine of equitable tolling have explicitly noted its federal origins. *State v. Commission on Human Rights and Opportunities*, 211 Conn. 464, 475 (1989); *Williams v. Commission on Human Rights and Opportunities*, 257 Conn. 258, 277 (2001). Other Connecticut cases that that discuss the doctrine also cite federal authority. *Gallop v. Commercial Painting Co.*, 42 Conn. Supp. 187, 192 (1992);

*H.J. Kelly & Assocs. v. Meriden*, No. CV 03 0285781, 2008 Conn. Super. LEXIS 512, at *56 (Conn. Super. Ct. Jan. 17, 2008); *Clemente v. Cedar Lane Rehabilitation and Health Care Center, LLC*, No. CV 09-5027120S, 2010 Conn. Super. LEXIS 402, at *15 (Conn. Super. Ct. Feb. 10, 2010). Since the equitable tolling doctrine was borrowed from the federal courts, Connecticut's Supreme Court would likely look to the federal courts for guidance when applying the doctrine to a new situation. Therefore, in assessing how Connecticut's Supreme Court would decide the issue, this Court should examine federal case law.

Analysis of federal authority on equitable tolling is especially appropriate in a wage and hour case because Connecticut's courts have often "looked to federal labor law when it is consistent with Connecticut labor law." *Poole v. City of Waterbury*, 266 Conn. 68, 81 (2003); *accord City of Danbury v. International Ass'n of Firefighters*, 221 Conn. 244, 251-52 (1992) (noting that Connecticut's Supreme Court has regularly relied on federal labor law precedent to interpret parallel state legislation); *see also City of New Haven v. New Haven Police Union Local 530*, 210 Conn. 597, 617 (1989) (holding that interpretation of the National Labor Relations Act is "of great assistance and persuasive force" in the interpretation of Connecticut's Municipal Employee Relations Act); *Williams v. Commission on Human Rights and Opportunities*, 257 Conn. 258, 278 (2001) (Connecticut courts have "often looked to federal employment discrimination law for guidance in enforcing [Connecticut's] own anti-discrimination statute.").

FLSA is closely analogous to Connecticut's wage and hour laws. First, FLSA and Connecticut's wage and hour laws serve the same remedial purposes. The Connecticut Supreme Court has emphasized that "the state wage collection statute, is like the Fair

Labor Standards Act, a remedial statute that is entitled to a liberal construction." *Schoonmaker v. Lawrence Brunoli, Inc.*, 265 Conn. 210, 240 (2003).

Second, the specific provisions of Connecticut's wage and hour laws mirror the provisions of FLSA. The Connecticut minimum wage is tied to the federal minimum wage, and Connecticut's overtime provision is essentially the same as FLSA's overtime provision. Conn. Gen. Stat. § 31-58; Conn. Gen. Stat. § 31-76c; 29 U.S.C. § 207. Both Connecticut law and federal law require employers to keep certain records and to post wage and hour notices in the workplace. Conn. Gen. Stat. § 31-66; 29 U.S.C. § 211(c); 29 C.F.R. § 516.4. With respect to informing workers of their rights, Connecticut law places even more stringent requirements on employers than federal law does. Under Connecticut law, employers must not only post notices, but must also advise employees in writing of wage rates and hours, and make available information regarding vacation pay, health benefits, and other benefits. Conn. Gen. Stat. § 31-71f. FLSA and Connecticut's wage and hour laws share similar purposes and provisions, and to the extent that they differ, state law affords even greater protections to workers.

Recognizing the clear parallels between FLSA and Connecticut's wage and hour laws, Connecticut's Supreme Court previously has extended federal judicial interpretations of FLSA to the state wage and hour laws. For example, in *Schoonmaker v. Lawrence Brunoli, Inc.*, 265 Conn. 210 (2003), the Connecticut Supreme Court drew upon on the similarities between FLSA and state wage and hour laws in its decision to incorporate into state law the FLSA burden-shifting scheme set forth in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946), which requires an employer who keeps inadequate records to assume the burden of disproving the employee's claims. *Id.*

at 240-41. It is probable that Connecticut's Supreme Court would adopt a similar approach in this case, looking to precedent on the FLSA statute of limitations for guidance on how to treat the statute of limitations for state wage claims.

In light of Connecticut Supreme Court's longstanding practice of looking to federal labor law, and the similarities between FLSA and Connecticut's wage and hour laws, analysis of federal precedent is warranted in this case.

### d. Analogous cases under FLSA also support the equitable tolling of the statute of limitations

Extensive case law at the federal level supports equitable tolling of the statute of limitations in this case. Although the doctrine first developed in the context of fraud actions, the Second Circuit has now made clear that "fraudulent concealment is not essential to equitable tolling." *Valdez ex rel. Donely v. U.S.*, 518 F.2d 173, 182 (2d Cir. 2008). Rather, the relevant question is "whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action." *Veltri v. Building Service 32B-J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004). When a statute of limitations is equitably tolled, it does not begin to run until "the plaintiff either acquires actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice." *Cerbone v. International Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir. 1985) (*quoting City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2d Cir. 1974)).

Based on Second Circuit precedent, equitable tolling is clearly warranted here. The Second Circuit has held that a defendant's failure to comply with a regulatory obligation to disclose certain facts is grounds for equitable tolling. *Veltri v. Building*

*Service 32B-J Pension Fund*, 393 F.3d 318 (2d Cir. 2004). Although *Veltri* was an ERISA case, its reasoning is applicable here. In *Veltri*, a pension fund failed to comply with a federal regulation requiring it to inform the plaintiff of his right to challenge an adverse benefits determination. The court held that the plaintiff was entitled to equitable tolling, explaining that nondisclosure must be viewed in light of the regulatory framework: "The notice regulation assumes that a reasonable beneficiary would not otherwise be aware of the existence of a cause of action, and the congressional policy favors placing a burden of disclosure on pension plans and adopting an approach of caution before closing the courthouse door." *Id.* at 324. In this case, the Defendants also violated a federal regulation, 29 C.F.R. § 516.4, that required them to notify the Restaurant Workers of their rights. This notice regulation reflects a similar congressional intent to place the burden of disclosure on employers. Under the logic of *Veltri*, the Defendants' failure to disclose vital information as mandated by federal law is grounds for equitable tolling in this case.

In addition, the district courts in this circuit have applied equitable tolling in many cases involving facts similar to those here. These opinions recognize the vulnerability of low-wage workers as an important factor in the application of equitable tolling. In *Ramirez v. CSJ & Co.*, No. 06 Civ. 13677 (LAK), 2007 U.S. Dist. LEXIS 28901 (S.D.N.Y. April 3, 2007), the court denied the defendants' motion to dismiss on statute of limitations grounds, ruling that the plaintiffs were entitled to the opportunity to prove equitable tolling at trial. In reaching this decision, the court noted that because most low-wage workers have few means of learning of their legal rights, "employers that [fail] to post the required notices take advantage of the defenseless in a very real way" and

"frustrate [the] legislative objective of protecting those most in need of protection." *Id.* at *7. Similarly, another recent case in the Southern District of New York rejected a statute of limitations defense where the restaurant owner defendants failed to notify restaurant deliverymen of their rights under FLSA. *Ke v. Saigon Grill, Inc.* 595 F. Supp. 2d 240 (S.D.N.Y. 2008). *See also Baba v. Grand Central P'shp.,* No. 99 Civ. 5818 (TPG), 2000 U.S. Dist. LEXIS 17876, at *4-5 (S.D.N.Y. Dec. 7, 2000) (denying the defendants' motion for summary judgment on statute of limitations grounds because whether defendants posted notice and when plaintiffs learned of their rights were disputed issues). Likewise, in *U.S. v. Sabhnani*, 566 F. Supp. 2d 139 (E.D.N.Y. 2008), the court held that where the employer did not provide notice and the workers could not speak English and were unaware of FLSA, the statute of limitations was unquestionably tolled. *Id.* at 146. These courts are properly cognizant of the power dynamics often at play in wage and hour cases, as these are exactly the types of considerations that the equitable tolling doctrine should capture. Under this line of precedent, equitable tolling is undoubtedly appropriate in this case, where the Defendants ignored their legal duties and left the Restaurant Workers in a vulnerable position.

Finally, case law in this district supports the proposition that failure to post wage and hour notices is grounds for equitable tolling of both the FLSA and state statutes of limitations. In *Asp v. Milardo Photography, Inc.,* 573 F. Supp. 2d 677 (D. Conn. 2008), Judge Squatrito recently held that equitable tolling is warranted where the defendants did not post notices and the plaintiffs did not consult with counsel during their employment. Surveying the case law within and outside of this circuit, the court found a trend toward permitting equitable tolling under these circumstances. *Id.* at 698. Reasoning that the

plaintiffs "should not be penalized for not being aware of a right that they had no means of knowing," the court ruled that the plaintiffs were entitled to equitable tolling for both their FLSA and state wage claims. *Id.* This decision lends further support to the argument in Section IV.A.2.c, *supra*, that this Court should look to federal precedent on equitable tolling.

### B. GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE QUESTION OF FLSA COVERAGE FOR RESTAURANT WORKERS' WAGE AND HOUR CLAIMS BETWEEN 1999-2003.

Defendants contend that Restaurant Workers' wage and hour claims for the period 1999-2003 are not covered under FLSA, but disputes of material fact preclude summary judgment on this question.[1] Under FLSA, there are two forms of liability: enterprise and individual. The Restaurant Workers qualify for both enterprise and individual employee coverage under the Act.

FLSA enterprise coverage attaches to any business fulfilling two requirements. First, the business must have "employees engaged in commerce or in the production of goods for commerce" or have "employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person." 29 U.S.C § 203(s)(1)(A)(i) (2006). Second, the business' "annual gross volume of sales made or business done" must not be "less than $500,000 (exclusive of excise taxes at the

---

[1] The Defendants' motion for summary judgment on the issue of FLSA coverage for wage and hour claims for the period 1999-2003 affects only Plaintiffs Zhen Hai He, Qin Ping Yuan, Gui Bin Cai, and Jin Lu Ma. Plaintiff He began work at Chang's Garden on or around July 1, 1999 and worked until on or around February 15, 2002. He was later again employed by the Restaurant from on or around August 1, 2007 and worked until on or around February 11, 2008. Plaintiff Yuan began work at Chang's Garden on or around April 20, 2001 and worked until on or around November 30, 2001. He was later again employed by the Restaurant from on or around May 4, 2003 and worked until on or around August 1, 2007. Plaintiff Cai began work at Chang's Garden on or around March 23, 2002 and worked until on or around July 26, 2007. Plaintiff Ma began work at Chang's Garden on or around July 18, 2003 and worked until on or around June 30, 2007.

retail level that are separately stated).” *Id.* § 203(s)(1)(A)(ii). FLSA enterprise coverage protections apply to “*all* employees in a particular business unit that constitutes an ‘enterprise’…” *Bowrin v. Catholic Guardian Society*, 417 F.Supp.2d 449, 457 (S.D.N.Y 2006). *See also* 29 U.S.C §206 (2006); 29 U.S.C §207 (2006). Under FLSA’s coverage of individual employees, on the other hand, “any employee ‘engaged in commerce or in the production of goods for commerce’ is covered by the Act, irrespective of whether his employer is an enterprise engaged in commerce as statutorily defined.” *Bowrin*, 417 F. Supp. at 465 (quoting 29 U.S.C §§ 206(a), 207(a)(1)).

A jury could reasonably find that the Restaurant met the $500,000 threshold for FLSA enterprise coverage in the years from 1999 to 2003 once it considers the Restaurant’s significant underreporting of cash and payroll expenses, in addition to reasonable calculations of actual gross income based on expected cash earnings for a restaurant of its kind. Additionally, the Restaurant Workers whose wage and hour claims fall within the 1999-2003 period personally engaged in commerce and are thus entitled to individual employee coverage under FLSA. Evidence that the Restaurant’s gross volume of sales exceeded $500,000 between 1999-2003, and evidence that the Restaurant Workers employed during that time were individually engaged in commerce, precludes summary judgment on the question of FLSA coverage.

> **1. A genuine issue of material fact exists regarding the Restaurant’s income from 1999-2003, which precludes summary judgment on the issue of enterprise coverage under FLSA.**

Defendants’ motion for summary judgment regarding FLSA enterprise coverage is based solely on inaccurate and fraudulent tax returns that cannot form a basis for establishing the Restaurant’s gross volume of sales or business done. Ample evidence

points to extensive underreporting of income by the Restaurant. Indeed, there is sufficient evidence for a jury to conclude that the Restaurant's actual income met or exceeded the requisite $500,000 threshold for FLSA enterprise coverage.

### a. Defendants' inaccurate and fraudulent tax records form no basis for calculating the Restaurant's gross sales or business done.

Defendants rely exclusively upon the Restaurant's tax returns for the proposition that the Restaurant's income between 1999 and 2003 was below the $500,000 threshold necessary for FLSA enterprise coverage. (Defs.' Second Mot. For Partial Summ. J. 9-10 [Dkt. #250].) But the figures from the Defendants' tax returns cannot support summary judgment in Defendants' favor. Strong evidence shows that the Defendants engaged in inaccurate and fraudulent accounting practices that render the reported income on their tax returns wholly unreliable. Expert testimony, the Defendants' own testimony, and the Defendants' financial records all demonstrate that they failed to accurately report substantial cash earnings as part of the Restaurant's income. Moreover, according to expert testimony, the Restaurant engaged in a coordinated practice of underreporting payroll expense and an equivalent amount of revenue.

### i. Defendants substantially underreported their cash earnings on the Restaurant's tax returns.

Expert analysis and testimony, the Defendants' own banking records, the Defendants' deposition testimony, and the deposition testimony of the Restaurant's own accountant amply demonstrate that the Defendants failed to report significant cash earnings. The Restaurant Workers' accounting expert, Joseph A. DeCusati, CPA, ASA, CFE, has independently found that the Restaurant likely underreported its cash income by a significant amount.  In his expert report, Mr. DeCusati notes that the Restaurant

"reported no greater than 10 percent of their monthly revenues in the form of cash receipts" for the period covering January 1, 2005 through March 31, 2009 (as reported in the Restaurant's Daily Sales Reports and sales tax returns). (Expert DeCusati's Report on Accounting, Ex. A at 4 and 7.) In fact, "in no month since 2007 did the Companies report greater than 5.88 percent of revenues coming in the form of cash receipts (March 2009)." (*Id.*) Based on Mr. DeCusati's experience as an accountant for small restaurants and in litigation support, he considers the Restaurant's reporting of cash earnings "extraordinarily low." *Id.* He expects that the percentage of almost any small restaurant's monthly revenues in the form of cash receipts to be no less than 40 percent – between four and eight times higher than that reported by the Defendants. *Id.*

And while Mr. DeCusati's detailed analysis of the Restaurant's underreporting of cash relied on evidence pertaining to 2005-2009, his conclusion that the Restaurant consistently and significantly underreported its cash earnings supports an inference that a system for underreporting of cash had similarly been in place from 1999-2004.[2] Furthermore, Mr. DeCusati noted in his report that his confidence in the figures reported in the Restaurant's tax returns from 1999-2008 is "limited" with regards to the figures reported as "gross revenues." (Expert DeCusati's Report on Accounting, Ex. A at 5.)

Additionally, the Restaurant's bank records for the years 2002-2003 indicate that the Restaurant did not make *any* cash deposits into its bank account. (Bank Deposit Slips for 2002-2003 Ex. C at 1-43). None of the deposit slips submitted by Defendants contain

---

[2] Mr. DeCusati based his analysis of underreporting of cash only on the Restaurant's Daily Sales Reports and sales tax returns from 2005-2009 because Defendants did not produce this information for other years despite Restaurant Workers' subpoena requesting all business and accounting records. (First Request for Production of all bank statements relating to bank accounts held by Chang's Garden of CT, Inc. and Chang's Garden of Storrs, LLC during the relevant time period for all claims (Request No. 22), Ex. I. at 2,6.)

any indication that any portion of those deposits consisted of cash. (Bank Deposit Slips for 2002-2003, Ex. C at 1-43.) Given Mr. DeCusati's expert opinion that restaurants of the type and size of Chang's Garden earn no less than 40 percent of their revenues in the form of cash, the absence of cash deposits is highly suspect. The lack of cash deposits would permit a reasonable jury to conclude that the Defendants engaged in significant underreporting of income on their tax returns.

Defendant Le Shih Chang's admission that he freely and regularly took cash from the Restaurant's cash register without tracking the cash as revenue or expenses provides further evidence that the Restaurant's income, as reported on its tax returns, cannot support judgment in favor of Defendants. Specifically, Defendant Le Shih Chang regularly took cash out of the cash register as part of his salary, as part of employees' salaries, and to pay for repair expenses at the Restaurant. (Le Shih Chang Dep. 88:8-90:19, Ex. D.)  Le Shih stated that he did not keep a record of the money that he took out of the cash register for these purposes.[3]

Finally, the Defendants' own accountant confirmed that the total revenue figures for the Restaurant were simply reported to him over the phone and were not backed up by receipts or any paper records whatsoever:

> Q. Who keeps track of how much income they're bringing in?
> A. That's restaurant's responsibility, yeah…So I need the figure and I would call them, and I call them, they tell me, okay, okay, how much is sale for this year, how much is taxable, how much is not taxable, and then based on that information I put it on the tax return and send it out.
> Q. So those numbers are just reported to by someone at the restaurant?
> A. Yes, yes.

---

[3] Although Defendant Le Shih Chang attempted to rationalize his lack of recordkeeping by explaining that the cash register usually contained two hundred dollars and that when that amount was less at the end of the day he could surmise that something was wrong, such testimony at the very least introduces serious doubt as to the accuracy of such purported recordkeeping. (Le Shih Chang Dep. 88:8-90:19, Ex. D.)

Q. And do you have any way of confirming whether those figures are accurate?
A. I don't, no, I don't.

(Cheng Dep. 26:21-27:13, Ex. E.) Cheng's testimony explicitly acknowledges that the Restaurant's accounting practices did not have a mechanism in place for verifying its reported income at any stage. It is not surprising therefore that the Restaurant's tax returns reported extraordinarily low cash earnings between 1999 and 2003.

### ii. Defendants underreported payroll expenses and associated revenue.

Expert analysis of the deposition testimony of the Restaurant's accountant, as well as the Restaurants' financial records, indicates that the Restaurant underreported payroll expenses. This evaluation also shows that the Restaurant likely underreported income in an amount equivalent to the unreported expenses. Mr. DeCusati's analysis of the deposition testimony of David Cheng, the Restaurant's accountant, determined that Mr. Cheng "describe[d] a methodology for reporting payroll for the Restaurant that clearly [did] not reflect the financial reality of the [Restaurant's] actual payroll…" (Expert DeCusati's Report on Accounting, Ex. A at 5.) Mr. DeCusati further determined that "analysis of the daily sales reports of the Restaurant, evaluation of direct labor norms within the industry, and specific experience with respect to many other restaurants in the past lead[s] [him] to believe that payroll expense for the Restaurant is underreported." (Expert DeCusati's Report on Accounting, Ex. A at 2.)

This failure to report payroll expenses is significant because unreported expenditures were likely balanced out by unreported revenue. Mr. DeCusati states that, "when underreporting of actual payroll expenses occurs within a business, a business owner rarely reports … an equivalent amount of gross revenues…" (Expert DeCusati's

Report on Accounting, Ex. A at 3.) As Mr. DeCusati explains, there is a financial logic to this parallel underreporting of income when a company underreports its payroll expenses. If a restaurant were to accurately report income and not report its full payroll expense, it would over-report its profit, and therefore its taxable income (DeCusati Dep. 61:7-9, Ex. F.)

In the case of Chang's Garden, underreporting of payroll expenses likely exceeded $100,000 for most of the years in question. The Restaurant reported only $21,870 in payroll expenses in 1999, for example. In light of the Defendants' own testimony that five full-time employees worked in the kitchen alone, this figure is absurd, as it would amount to an annual salary of approximately $4,000 per full-time employee. (Le Shih Chang Dep. 132:22-133:9, Ex. D.)   The Restaurant's underreported payroll expense can be estimated based upon (1) evidence regarding the number of employees working at the Restaurant between 1999-2003; (2) employees' average salary for that period; and (3) the Restaurant's payroll expenses, as reported in its tax returns. Defendant Le Shih Chang's deposition testimony established that prior to 2007, the Restaurant employed five workers in the kitchen, not including Le Shih Chang who sometimes helped in the kitchen. (Le Shih Chang Dep. 132:22-133:9, Ex. D.) Defendants' deposition testimony also established that there are normally approximately two additional employees working at the front of the Restaurant as wait staff. (Le Shih Chang Dep. 134:7-8, Ex. D.) Thus, a jury could reasonably calculate the actual payroll expenses based on a total of seven full-time employees (five in the kitchen and two in the front of the Restaurant).

The parties agree that, between 1999 and 2003, the Restaurant Workers were paid approximately $600-$1000 on a bi-weekly basis during that period. (Le Shih Chang's Revised Resp. to Pls.' 4th Set of Interrog. No. 4, Ex. R at 6-7; Spreadsheet Documenting the Wages and Hours of the Restaurant Workers, Ex. G.) Therefore, it is reasonable to estimate that the average salary for kitchen workers between 1999 and 2003 was $800 on a bi-weekly basis. Assuming the same salary range and average for employees working outside of the kitchen, a jury could reasonably conclude that the Restaurant's annual salary and wage expenses for seven full-time employees would have totaled on average $145,600.[4]

Calculating the difference between this reasonable estimate of actual payroll expenses and the Restaurant's reported payroll expenses shows that the Restaurant underreported expenses by up to $123,730 annually between 1999 and 2003. For example, the Restaurant reported only $21,870 in payroll expenses in 1999. This figure is $123,730 less than the $145,600 estimate of the Restaurant's actual payroll expenses for that year. Table 1 below details, on an annual basis, estimates of the Restaurant's unreported payroll expenses.

**Table 1. Estimates of the Restaurant's Underreported Payroll Expenses**

| Year | Salaries and Wages (Reported in Tax Forms)[5] | Total Salaries and Wages Paid (based on 7 employees earning $800 on a bi-weekly basis) | Estimated Unreported Salaries and Wages |
|---|---|---|---|
| 1999 | $21,870 | $145,600 | **$123,730** |
| 2000 | $27,000 | $145,600 | **$118,600** |
| 2001 | $29,528 | $145,600 | **$116,072** |

---

[4] Breakdown of calculation: ($800 x 26 bi-weekly payments/year) x 7 employees
[5] (Restaurant Tax Returns for 1999-2003, Ex. H at 1-43.)

| 2002 | $49,500 | $145,600 | **$96,100** |
| 2003 | $81,840 | $145,600 | **$63,760** |

Overall, the evidence on underreporting of cash and payroll expense indicates highly fraudulent accounting practices on the part of the Restaurant. This evidence completely undermines the probative value of the tax return information that Defendants rely on exclusively in their summary judgment motion. Indeed, with regards to the Restaurant's income tax returns from 1998-2008, Mr. DeCusati stated that he does "not place significant reliance on the financial information reported" therein because his "confidence is limited" with respect to line items involving "payroll and payroll related expenses" and "gross revenues." (Expert DeCusati's Report on Accounting, Ex. A at 5.) In conjunction with the evidence detailed below, the Restaurant's underreporting introduces a genuine issue of material fact regarding whether or not the Restaurant met FLSA's enterprise coverage requirements.

> **b. A reasonable jury could find that the Restaurant's gross sales and business done met or exceeded the $500,000 threshold between 1999 and 2003.**

A reasonable jury could find that the Restaurant's actual income met, and even significantly exceeded, the $500,000 threshold required for FLSA enterprise coverage between 1999 and 2003. To reach such a conclusion, a reasonable jury need only consider the Restaurant's bank deposit records, which show income to the Restaurant, in addition to expert testimony establishing that cash revenue for a restaurant like Chang's Garden should amount to not less than 40 percent.

First, the Restaurant's bank deposit totals should serve as a starting point for any estimates of the Restaurant's actual gross volume of sales or business done. Records of

the Restaurant's total bank deposits from 1999 to 2003 indicate that the total amount deposited is higher than the income reported in the Restaurant's tax returns, which Defendants rely upon exclusively in their motion for summary judgment. See Table 2 below for a comparison of income reported on the Restaurant's tax returns and the Restaurant's income based on bank account deposits.

**Table 2. Comparison of Restaurant's Gross Volume of Sales or Business Done when Derived from the Restaurant's Reported Tax Income vs. the Restaurant's Bank Account Deposit Information[6],[7],[8]**

| Year | Income Reported on the Restaurant's Tax Return | Total Amount Deposited into Restaurant's Bank Account |
|------|------------------------------------------------|------------------------------------------------------|
| 1999 | $211,940 | $221,312 |
| 2000 | $297,855 | $311,899 |
| 2001 | $381,445 | $400,772 |
| 2002 | $444,973 | $463,882 |
| 2003 | $480,710 | $490,348 |

Second, evidence shows that Defendants did not deposit any cash into the Restaurant's bank account between 1999 and 2003. None of the bank deposits that were produced by Defendants for the time period at issue in this motion for summary judgment consisted of cash, (Bank Deposit Slips from 2002-2003, Ex. C at 1-43), and because Defendants did not produce bank deposit records for years prior to 2002 despite Plaintiffs' request in their First Request for Production, a jury could infer that the Restaurant similarly failed to deposit cash into its bank account from 1999-2001. (First Request for Production of all bank statements relating to bank accounts held by Chang's Garden of CT, Inc. and Chang's Garden of Storrs, LLC during the relevant time period

---

[6] (Bank Deposit Records for 1999-2003, Ex. B at 1-6.)
[7] All figures are rounded to the nearest dollar
[8] (Restaurant Tax Returns for 1999-2003, Ex. H at 1-43.)

for all claims (Request No. 22), Ex. I. at 2,6.) Third, expert witness Mr. DeCusati states that in his opinion, restaurants like Chang's Garden typically ought to report "no less than 40 percent" of monthly revenues in the form of cash. (Expert DeCusati's Report on Accounting, Ex. A at 4). Therefore, evidence suggests that the amount reported in bank deposits for each year, in fact, represents no more than 60 percent of the Restaurant's total income. Table 3 shows the amount of actual gross volume of sales or business done that could reasonably be inferred from the available bank deposit evidence, assuming that the Restaurant's bank deposits amounted to 60 percent of total income.

**Table 3. Estimate of the Restaurant's Total Gross Volume of Sales or Business Done Derived by Inferring that the Amounts Deposited into the Restaurant's Bank Account Constituted 60 percent of the Actual Total[9]**

| Year | Total Amount Deposited into Restaurant's Bank Account[10] (estimated to equal 60% of total Restaurant revenue) | Estimate of Actual Amount of Cash Income (estimated to equal 40% of total Restaurant revenue) | Estimated Total Gross Volume of Sales or Business Done |
|------|------|------|------|
| 1999 | $221,312 | $147,541 | **$368,853** |
| 2000 | $311,899 | $207,933 | **$519,832** |
| 2001 | $400,772 | $267,181 | **$667,953** |
| 2002 | $463,882 | $309,255 | **$773,137** |
| 2003 | $490,348 | $326,899 | **$817,247** |

The Restaurant's gross volume of sales or business done from 2000-2003 exceeds $519,832 when based on this reasonable assumption that the Restaurant's bank deposit totals represent 60 percent of the Restaurant's actual revenue. Considering that Mr. DeCusati's expert report explicitly stated that he would expect a Restaurant's cash earnings to amount to "*no less* than 40 percent" (emphasis added), a reasonable jury could also conclude that the Restaurant's overall revenue amounted to at least $500,000

---

[9] All figures are rounded to the nearest dollar.
[10] (Bank Deposit Records for 1999-2003, Ex. B at 1-6.)

for 1999 by assuming a higher estimate of cash earnings for that year.[11] Ultimately, evidence produced by Defendants themselves in the form of bank deposit totals and records, expert testimony, and deposition testimony from Defendants and their accountant establish both that the Defendants' tax returns are highly fraudulent and inaccurate, and that a material dispute of fact plainly exists as to the Restaurant's true gross volume of sales done for the years at issue. As such, Defendants' motion for summary judgment should be denied.

**2.   A genuine issue of material fact exists regarding individual Restaurant Workers' coverage under FLSA, thereby precluding summary judgment in favor of Defendants on the issue of individual employee coverage under the Act.**

The Restaurant Workers whose wage and hour claims fall within the 1999-2003 period have adduced sufficient evidence to support an inference that they were engaged in commerce for the purpose of individual employee coverage under FLSA. This genuine issue of material fact further precludes summary judgment on FLSA coverage in favor of Defendants. Courts have held in similar cases that employees who stored goods coming in from out-of-state, as Restaurant Workers did, were engaged in commerce for the purpose of FLSA individual coverage. The Restaurant Workers' engagement in commerce was sufficiently substantial to qualify for individual FLSA coverage.

**a.   Restaurant Workers' storage of goods being delivered from out-of-state constitutes engagement in commerce under FLSA.**

---

[11] For example, if one were to assume that the Restaurant's bank deposits for 1999 actually represented 40 percent of revenue, and that the remaining revenue consisted of unreported cash, the Restaurant's revenue would exceed $500,000.

The Restaurant Workers were individually engaged in commerce for the purpose of FLSA coverage because they regularly moved food and ingredients that arrived at the Restaurant from out-of-state to their final destination. Case law directly upholds the principle that an employee is engaged in commerce for the purposes of FLSA individual coverage when the employee stores goods within a business after those goods had been delivered through interstate commerce. The First Circuit in *Successors of De A. Mayol & Col., Inc. v. Mitchell*, 280 F.2d 477, 480-81 (1st Cir. 1960), held that workers who stored goods after they had been delivered and placed "inside the door on the floor of the building," were "engaged in commerce" because they were "concerned with receiving, checking, and storing goods within the warehouse." The court accepted "the view that interstate commerce ceases when the goods come to rest." *Id.* at 480 (citing *Mitchell v. Livingston & Thebaut Oil Co., Inc.*, 256 F.2d 757, 760 (5th Cir. 1958)). However, the court in *Successors of De A. Mayol & Col.* saw the question presented as "where, within the warehouse, the goods come to rest in such a way as to terminate the flow of commerce." *Id.* The court reasoned that "[t]he journey obviously does not terminate simply when the destined owner takes possession (or defendant could solve all its troubles by sending a single employee to the pier), nor should it when the property crosses some particular threshold." *Id.* In the court's opinion, "the placement of a shipment in an elevator or on the floor by a doorway, results in only a temporary pause." *Id.* (internal quotations omitted).

Similarly, in *Batts v. Professional Bldg., Inc.*, 276 F.Supp. 356, 359-60 (D.C.W.Va. 1967), the court held that employees who accepted freight and express shipments, which had moved through interstate commerce, and "carried them to their

respective offices" were engaged in commerce for the purpose of FLSA individual coverage.  The Fourth Circuit has also affirmed that a worker was an individual engaged in commerce when he carried shipments from out-of-state to a room where they were stored and mingled with the stock of the defendants.  *Wirtz v. Durham Sandwich Co*., 367 F.2d. 810, 811 (4th Cir. 1966).

The conclusion that an employee's storage of goods upon their delivery from out-of-state satisfies individual engagement in commerce under FLSA is in line with the Supreme Court's understanding of the Act. The Supreme Court has determined that Congress intended to "extend federal control in this field throughout the farthest reaches of the channels of interstate commerce." *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 567 (1943). Moreover, concluding that individual employees who store goods delivered and unloaded from out-of-state qualify for FLSA coverage comports with the established principle that "a temporary pause" in the transit of goods "does not mean that they are no longer in commerce within the meaning of the Act." *Walling*, 317 U.S. at 568 (internal quotations omitted). Additionally, many courts have articulated the test to determine whether an employee is engaged in commerce under FLSA as asking whether the employee's activities are "actually in or so closely related to the movement of the commerce as to be a part of it." *E.g., McLeod v. Threlkeld*, 319 US 491, 497 (1943); *Locke v. St. Augustine's Episcopal Church*, No. 07-CV-3226 (JMA), 2010 U.S. Dist. LEXIS 18749, at *11 (E.D.N.Y. March 3, 2010). Transporting goods from the doorstep to their final destination passes this test in that the act literally enables and terminates a good's physical movement through commerce.[12]

---

[12] Only *Wirtz v. Natl. Electric Co*., 285 F.Supp. 30 (D.C. Okl. 1968), disagrees with the holding in *Successors of De A. Mayol & Col.*, 280 F.2d 477, 480-81 (1st Cir. 1960). However, it fails to show that the

All four Plaintiffs with wage and hour claims from the period from 1999 to 2003 — He, Cai, Yuan, and Ma — were responsible for storing goods that arrived at the Restaurant via interstate commerce and thus bringing them to their final destination. Drivers coming from out-of-state unloaded goods and placed them at the door of the Restaurant every week. (Cai Decl.¶6, Ex. K; Yuan Decl. ¶8, Ex. L; Ma Decl.¶8, Ex. M; He Decl.¶8., Ex. N.) The Restaurant Workers then picked up the goods and proceeded to store them in the kitchen refrigerator. (*Id.*) Checks from the Restaurant to New York Seafood Wholesale Co., Inc. indicate that the Restaurant paid, on average, over $2,000 per month to that out-of-state company for goods transported to the Restaurant. (Restaurant's Checks to New York Seafood Wholesale Co., Inc. for the years 2002 and 2003, Ex. J. at 1-28.) Thus, the doorstep at the Restaurant was only a temporary stop for goods travelling from out-of-state, and the Restaurant Workers were responsible for moving the goods to their final destination.

Based on evidence of the Restaurant Workers' storage duties, Plaintiffs He, Cai, Yuan, and Ma were all individually engaged in commerce in accordance with the holding in *Successors of De A. Mayol & Col.,* as well as with the general principles that goods remain in commerce until they reach their final destination, that FLSA intended to reach the "farthest reaches of the channels of interstate commerce," *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 567 (1943), and that individual engagement in commerce must be so closely related to it as to be a part of it.

     **b. Plaintiffs' individual engagement in commerce was substantial enough to merit FLSA individual coverage.**

---

Supreme Court, or any other binding authority, has held that interstate commerce ends when goods are unloaded at their destination, as opposed to when goods are actually stored.

Plaintiffs' storage of goods as part of their Restaurant duties was substantial enough for FLSA's individual coverage to apply to their wage and hour claims. For an employee's engagement in commerce to qualify for individual FLSA coverage it must not be "isolated, sporadic, or occasional and involve only insubstantial amounts of goods." 29 C.F.R. §779.109 (2009). The employee's engagement in commerce must be a substantial part of his or her work. *Boekemeier v. Fourth Universalist Society in the City of New York*, 86 F.Supp. 2d. 280, 287 (S.D.N.Y. 2000). However, "[t]he law is settled that every employee whose activities in commerce or in the production of goods for commerce, even though small in amount are regular and recurring, is considered 'engaged in commerce or in the production of goods for commerce.'" 29 C.F.R. §779.109 (2009).

In considering what constitutes "substantial," the court in *Boekemeier* held that an employee who made fourteen to thirty major purchases from out-of-state vendors between 1992-1997 satisfied the FLSA individual coverage standard. *Boekemeier* looked for guidance to the standard set in *Wirtz v. Durham Sandwich Co.*, 367 F.2d. 810, 811 (4th Cir. 1966), a case closely analogous to the one at hand. In *Wirtz*, the court determined that an employee who spent only approximately one-half hour per week receiving, unloading, and storing out-of-state shipments was covered under FLSA individual coverage.

Restaurant Workers Cai, Yuan, He, and Ma stored goods delivered from out-of-state on average two to three times per week. (Cai Decl. ¶6, Ex. K; Yuan Decl. ¶7, Ex. L; He Decl. ¶6, Ex. N; Ma Decl. ¶6, Ex. M.) Their declarations attest that each spent approximately ten to twenty minutes storing goods each time an out-of-state delivery was

made to the Restaurant. (Cai Decl. ¶6, Ex. K; Yuan Decl. ¶7, Ex. L; He Decl. ¶6, Ex. N; Ma Decl. ¶6, Ex. M.) Therefore, the Restaurant Workers, on average, spent twenty minutes to an hour each week transferring goods from the doorstep of the Restaurant to the refrigerator, which makes their engagement in commerce regular and recurring. The extent of Restaurant Workers' engagement in commerce also easily parallels the degree of engagement in commerce in *Boekemeier* and *Wirtz*, which have influenced the Second Circuit's determination of when an employee can be considered to have been engaged in commerce for FLSA individual coverage.

At the very least, the Restaurant Workers' storage of goods arriving from out-of-state could allow a reasonable jury to determine that they were engaged individually in commerce. Restaurant Workers therefore have demonstrated that Defendants should not be granted summary judgment on the question of FLSA coverage.


### C.  A REASONABLE JURY COULD FIND THAT THE DEFENDANTS VIOLATED THE CONNECTICUT UNFAIR TRADE PRACTICES ACT.

By deducting money from the Restaurant Workers' wages in exchange for illegal and unsafe housing, the Defendants violated the Connecticut Unfair Trade Practices Act (CUTPA). Furnishing illegal housing is a violation of Connecticut's landlord-tenant law, and doing so for money is indisputably a violation of CUTPA. In its adjudication of Defendants' first motion for Summary Judgment [Dkt. #242], this Court found that the housing arrangement between Defendants and the Restaurant Workers was not covered by CUTPA because the arrangement was "incidental to and for the purpose of the employment." The Restaurant Workers urge this Court to re-examine the issue here and reach a different conclusion on this motion for three reasons.

First, CUTPA's text covers *all* rental agreements and makes no exception for those between employer and employee.  Second, *Muniz v. Kravis*, 59 Conn. App. 704 (2000), upon which this Court based its earlier holding, is entirely distinguishable from this case: the employee in *Muniz* did not allege a separate rental agreement with her employer and lived *on* the work premises. In contrast, both parties here *acknowledge* the existence of a separate landlord-tenant agreement that cost the Restaurant Workers $200 a month. In addition, the Restaurant Workers did not live at the Restaurant where they worked and were not required to live in the Defendants' home basement as part of their employment. The rental agreements were supplemental to and independent from the employment agreements and, as such, the case at bar is readily distinguishable from *Muniz*.

Third, shielding the Defendants from CUTPA liability would create dangerous incentives for illegal behavior on the part of employers, who could rent out to their employees dangerous, crowded, and illegal living spaces with impunity. Employers should not be given an exemption from Connecticut's landlord tenant law with respect to their employees.

For these reasons, Restaurant Workers urge the Court to find the Defendants liable under CUTPA. Below, the Restaurant Workers show that (1) the housing provided to the Restaurant Workers by the Defendants violated Connecticut's landlord-tenant law, (2) the Defendants can find no protection under law simply because they were the workers' employers in addition to the providers of their housing, (3) CUTPA creates a private right of action for violations of Connecticut's landlord-tenant law and (4) the Defendants are liable under CUTPA for the provision of illegal housing.

**1.   The Defendants Provided Illegal Housing to the Restaurant Workers.**

There is no material dispute of facts regarding the Restaurant Workers' claim that Chang's Garden of Storrs, LLC ("the LLC"), Chang's Garden of CT, Inc.,  ("the Inc."), and Le Shih Chang provided them with housing that was illegal under Connecticut's landlord tenant law. According to inspectors from the Town of Mansfield's Department of Building and Housing Inspection, the basement apartment violated multiple state and local housing laws and created a severe risk of serious injury or death. The inspectors identified the following violations of law:

- Three of the "bedrooms" were illegal because they lacked emergency escape openings, such as windows, and were therefore unsafe for human habitation. All five of the "bedrooms" and the living room lacked the legally required smoke detectors. (Inspection Report, May 21, 2008, Ex. Z at 1.) This combination, in a basement with a working gas stove and a large population of cigarette smokers, created a serious risk of deadly fire. As the Housing Code Enforcement Officer noted, "Repairs and/or resolution of *life safety hazards* found at the time of inspection of the unit must be made immediately" (emphasis added). (Letter from Derek Debus, May 22, 2008, Ex. AA at 1.)
- The absence of smoke detectors constituted a *per se* violation of Connecticut's Fire Code, Conn. Gen. Stat. § 29-292, which is itself a *per se* violation of Connecticut's landlord tenant law, Conn. Gen. Stat. §47a-7, which mandates that landlords comply with "all applicable building and housing codes materially affecting health and safety."
- The entire basement apartment was illegal because it violated the town's zoning regulations, which prohibit boarding houses in that neighborhood. (Letter from Curt Hirsch, May 22, 2008, Ex. BB at 1, citing Mansfield Article 4.A.1.) This violation of local zoning law was a *per se* violation of Conn. Gen. Stat. § 47a-7.
- The failure to obtain a certificate of occupancy for the basement boarding house was also a violation of Mansfield regulations and, thus, Conn. Gen. Stat. § 47a-57, which prohibits human habitation in dwelling units that lack a certificate of occupancy. (Inspection Report, May 21 2008, Ex. Z; Letter from Curt Hirsch, May 22, 2008, Ex. BB at 1).
- The bathroom ceiling was "in disrepair and coming down," in violation of Mansfield Code § 305.3. (Inspection Report, May 21, 2008, Ex. Z at 2.)

Under Connecticut's landlord-tenant law, these violations of Conn. Gen. Stat. § 47a-7 preclude the receipt of rental payments: "A rental agreement shall not permit the receipt of rent for any period during which the landlord has failed to comply with subsection (a) of section 47a-7." Conn. Gen. Stat. § 47a-4. And both parties agree that the Defendants deducted money from the Restaurant Workers' paychecks in order to pay Le Shih Chang rent for the basement apartment.

This Court's decision on Defendants' first motion for partial summary judgment was based in part on a material finding of fact that contradicts the undisputed position of both parties. The Court stated that "plaintiffs have failed to adduce evidence raising an inference that the value of the occupancy was deducted from wages otherwise due." Memorandum of Decision on Motion for Summary Judgment 17 [Dkt. # 242]. However, it is *uncontested* that the Defendants deducted $200 per month from each of the Restaurant Workers' paychecks and used that money to pay Le Shih Chang to house the Restaurant Workers in his basement apartment. (Chang's Garden of Storrs, LLC's Resp. to Pls.' 4th Set of Interrog. No. 3, Ex. CC at 2-3) ("Chang's Garden of Storrs, LLC would pay about $200 a month to Le Shih Chang for each employee who lived in the walk-in apartment"). In addition, Defendants acknowledge that living in the basement apartment was *optional* and not a requirement of working at the restaurant. (Le Shih Chang's Revised Resp. to Pls.' 4th Set of Interrog. No. 6, Ex. R at 8-9) (benefits included "housing if they wanted it"). Finally, Defendants admit that if a worker chose not to live in the basement, he or she would receive an additional $200 in salary. (Le Shih Chang's Resp. to Pls.' 4th Set of Interrog. No. 7, Ex. R at 9-10) ("If the employee does not want to live in the walk-in apartment, I would pay them about $200 extra each month...").

Thus, the *undisputed* evidence shows that the rental agreement was independent from the employment agreement and constituted an oral contract that included an offer, acceptance, and consideration. Because the housing provided was illegal, the Defendants' admitted deduction and payment of rent from the Restaurant Workers' paychecks violated Connecticut's landlord-tenant law.

**2. Defendants Cannot Escape Liability Under Connecticut's Landlord-Tenant Law Simply Because They Were The Restaurant Workers' Employers In Addition to the Providers of Their Housing.**

**a. The landlord-tenant statute clearly covers the relationship between Defendants and the Restaurant Workers.**

Defendants argue that their housing arrangement with the Restaurant Workers was "incidental to the Plaintiffs' employment" and thus not subject to Connecticut's landlord-tenant law. Defs.' Memo of Law at 33-36 [Dkt. #250-3]. They provide no statutory evidence for this claim, relying instead on a 1924 Connecticut Supreme Court decision that predates – by fifty years – the state's first comprehensive landlord-tenant law.

Connecticut's first comprehensive landlord-tenant statute, Conn. Pub. Act. No. 76-95, was passed in 1976, and it enumerated in great detail the rights and obligations of landlords and tenants.[13] Ignoring this law and instead relying on *Guiel v. Barnes*, 100 Conn. 737 (1924), to adjudicate contemporary landlord-tenant disputes, as Defendants would have this court do, is like relying on *Lochner*-era common law decisions governing employment contracts, and ignoring the enactment of FLSA. Despite Defendants' claims

---

[13] Until 1976, the Connecticut general statutes had very little to say about landlord-tenant law. *See, e.g.*, Conn. Gen. Stat. 47-24a (1958), announcing that there could be "No rent recoverable for period of unlawful occupation," but saying little else about landlord-tenant relationships. In contrast, the 1976 law laid out for the first time definitions of "landlord," "dwelling unit," "rent," and "rental agreement." Conn. Pub. Act. No. 76-95 § 1.

to the contrary, current landlord-tenant law clearly covers the relationship between the Defendants and the Restaurant Workers.

Conn. Gen. Stat. §47a-1 establishes definitions of "dwelling unit," "landlord," "rent," "rental agreement," and "tenant" that all clearly apply to this case: The basement apartment was a portion of a house that was rented out to more than one person as a residence; Le Shih Chang fit the definition of a landlord; the LLC made periodic rent payments to Le Shih Chang; there was an oral rental agreement to pay $200 per person per month; and the Restaurant Workers were "tenants" entitled to occupy the dwelling unit to the exclusion of others. [14] The Defendants ignore these clear statutory definitions.

If the plain meaning of these definitions is not enough to prove that the rental relationship in this is case is covered by the law, then Conn. Gen. Stat. Sec. § 47a-2a certainly is. That subsection lists the type of housing arrangements that are not covered by the landlord-tenant law. It exempts from coverage occupancy: at a medical or educational institution, under a contract for sale of a unit, at a fraternal organization, at a hotel or motel, and at a condominium. Section 47a-2a(6) also exempts from the landlord tenant law "occupancy by a personal care assistant…[who] is provided dwelling space in the personal residence" of the disabled person for whom the assistant works.  According to the statutory canon of *expressio unius est exclusio alterius*, the presence of specific exemptions in §47a-2a, including one specific exemption relating to an employer-

---

[14] "(c) 'Dwelling unit' means any house or building, or portion thereof, which is occupied, is designed to be occupied, or is rented, leased or hired out to be occupied, as a home or residence of one or more persons…(d) 'Landlord' means the owner, lessor or sublessor of the dwelling unit, the building of which it is a part or the premises….(h) 'Rent' means all periodic payments to be made to the landlord under the rental agreement….(i) 'Rental agreement' means all agreements, written or oral, and valid rules and regulations adopted under section 47a-9 or subsection (d) of section 21-70 embodying the terms and conditions concerning the use and occupancy of a dwelling unit or premises…. (l) 'Tenant' means the lessee, sublessee or person entitled under a rental agreement to occupy a dwelling unit or premises to the exclusion of others or as is otherwise defined by law…." Conn. Gen. Stat. Sec. §§ 47a-1(c) to 47a-1(l).

employee relationship, means that other types of occupancy agreements are not excluded from the landlord tenant law. The legislature created no exception for occupancy agreements like the one between the Restaurant Workers and the Defendants.

### b. Connecticut Case Law Confirms That the Parties' Relationship Is Covered By the Landlord-Tenant Statute.

Connecticut judicial decisions make clear that the parties' relationship is covered by the state's landlord-tenant law. In *Cruess Realty v. Heath*, for example, the court applied the state's landlord-tenant law to an occupancy agreement between an employer and employee. *Cruess Realty v. Heath*, No. SPWA 970417934, 1997 Conn. Super. LEXIS 1707 (Conn. Super. Ct. May 28, 1997). As in the case at bar, the tenant there worked as a cook at a company owned by the landlord. Nevertheless, the court did not doubt that landlord-tenant law applied to their housing relationship.

Defendants point to *Muniz v. Kravis*, 59 Conn. App. 704 (2000), for the proposition that housing arrangements "incidental" to employment agreements are not protected by the states landlord-tenant law. However, *Muniz* does not help the Defendants. First, *Muniz* is entirely distinguishable from this case because the employee in *Muniz* had no rental agreement with her employer and lived on the premises where she worked. Second, *Muniz* was wrongly decided: the court completely ignored the language of the landlord-tenant statute, relying instead on *Guiel v. Barnes,* a decision that pre-dated the law by fifty years and focused on commercial-subcontracting cases completely unrelated to residential occupancy agreements.

### i. *Muniz* is easily distinguishable from this case.

*Muniz* can be distinguished from the case at bar in at least two fundamental ways. First, in *Muniz*, the court concluded that there was no occupancy agreement, noting that

the plaintiff made "no allegation as to the amount of 'rent' paid by the plaintiff or that the value of the occupancy [wa]s deducted from wages otherwise due." *Id.* at 715. In the present case, however, neither party disputes the existence of an occupancy agreement. *See, e.g.*, Chang's Garden of Storrs, LLC's Resp. to Pls.' 4th Set of Interrog. No. 3, Ex. CC at 2-3, ("Chang's Garden of Storrs, LLC would pay about $200 a month to Le Shih Chang for each employee who lived in the walk-in apartment."); Le Shih Chang's Revised Resp. to Pls.' 4th Set of Interrog. No. 7, Ex. R at 9-10. ("If the employee does not want to live in the walk-in apartment, I would pay them about $200 extra each month to help them with their housing expenses.") This occupancy agreement – which was not a required component of the Restaurant Workers' employment – proves the existence of a distinct landlord-tenant relationship between the parties.

Second, the cook in *Muniz* lived *at her place of employment* along with her husband, who was a butler *on the premises*. As a result, the court found that the occupancy was nothing other than "incidental to and allowed for the purpose of the plaintiff's employment." *Id.* at 714. In contrast, the Restaurant Workers did not live at Chang's Garden Restaurant. They lived in a basement seven miles away, and were shuttled back and forth between the basement and the restaurant on a daily basis.

Although it may have been convenient for the Restaurant Workers and the Defendants to enter into an oral occupancy agreement in addition to their oral employment agreement, the housing arrangement was not "incidental" to the employment relationship; unlike the live-in cook and butler in *Muniz,* it was not subordinate to or necessary as a result of the employment relationship. Rather, it was a separate contractual

relationship, which cost the Restaurant Workers $200 per month each, subject to extensive regulation under Connecticut state law.

Extending *Muniz* to apply to the case at bar – thereby denying the Restaurant Workers protection under Connecticut's landlord -tenant law – would provide employers with a perverse incentive to offer (or even require) housing as a component of compensation without any obligation to ensure that the housing was habitable. Indeed, it would sanction, for example, the provision of overcrowded dwelling units without heat and exposed to asbestos.

### ii. *Muniz* was a badly reasoned decision that conflicted with Connecticut law

The court in *Muniz* failed to even examine Connecticut's landlord-tenant law. It provided a cursory cite to Conn. Gen. Stat. §47a-1(l), which defines a "tenant," but failed to acknowledge that its ruling conflicted with the plain meaning of the statute. The court in *Muniz* should have applied the plain meaning of the statute and recognized that the only employer-employee exception to the coverage of occupancy agreements by the landlord tenant law relates specifically to home health care workers caring for a disabled patient, Conn. Gen. Stat. 47a-2a, *supra*, Section IV.C.2.a.  Instead of reasoning from the text and structure of the statute, *Muniz* improperly relied on analogies to non-residential contractual and employment disputes. *Muniz,* 59 Conn. App. at 713. Although federal courts should ordinarily look to state decisions in interpreting state law, *Muniz* was so poorly reasoned that it should not be given undue weight here.  *See, e.g.*, *West v. American Tel. & Tel. Co.,* 311 U.S. 223 (1940) (the decisions of state intermediate courts are not binding on federal courts but are useful in interpreting state law); *Pinto v. Allstate*

*Ins. Co.*, 221 F.3d 394 (2d Cir. 2000) (in the absence of guidance from the state's highest court, a federal court should predict how that court would resolve the issue at hand).

### 3. CUTPA creates a private right of action for violations of Connecticut's landlord-tenant law.

CUTPA prohibits unfair or deceptive acts in the conduct "of any trade or commerce" and defines those terms liberally, to include "the sale or rent or lease, the offering for sale or rent or lease...any property, tangible or intangible, real, personal or mixed." Conn. Gen. Stat. § 42-110. The Supreme Court of Connecticut has held that a landlord's failure to obtain a certificate of occupancy prior to renting a dwelling unit, in violation of Conn. Gen. Stat § 47a-57, creates a private cause of action under CUTPA. *Conaway v. Prestia*, 191 Conn. 484, 491 (Conn. 1983). Federal and state courts have repeatedly followed *Conaway* and explained that it must also mean that CUTPA governs violations of § 47a-7, which describes landlords' various responsibilities to their tenants. *See, e.g.*, *Gonzalez v. City of Bridgeport,* No. 3:07CV435 (EBB), 2008 U.S. Dist. LEXIS 66750 (D. Conn. Sept. 2, 2008) (granting summary judgment in favor of a tenant on her CUTPA claim against her landlord for illegal entry in violation of Conn. Gen. Stat. § 47a-43(a)); *Donaldson v. Auger Assocs.*, CVBR-9112 01502, 1993 Conn. Super. LEXIS 1265 (Conn. Super. Ct. Apr. 13, 1993) ("The leasing of premises or the collection of rent while the premises are known to be in violation of 47a-7 does in fact constitute an unfair/deceptive practice for which a tenant may recover under CUTPA"); *High Hopes, Inc. v. Fornaciari*, CVNH8206123, 1986 Conn. Super. LEXIS 200 (Conn. Super. Ct. Dec. 2, 1986) (holding that, under *Conaway*, CUTPA also applies to Conn. Gen. Stat. § 47a-7(a), which delineates the landlord's obligations to keep the apartment in good condition.)

### 4. Defendants' illegal behavior violated CUTPA.

The behavior of Le Shih Chang, who provided housing to the Restaurant Workers, and the LLC and the Inc., which deducted money from the workers' paychecks in exchange for the housing, clearly met the Connecticut state courts' standard for a violation of CUTPA. CUTPA covers far more business conduct than does common law tort law, and "because CUTPA is a self-avowed 'remedial' measure, General Statutes 42-110b(d), it is construed liberally in an effort to effectuate its public policy goals." *Caleb Village Heights Found. v. Barclay*, 063265, 2001 Conn. Super. LEXIS 42, *9 (Conn. Super. Ct. Jan. 8, 2001). CUTPA is to be interpreted to comply with interpretations of the Federal Trade Commission Act. Conn. Gen. Stat. § 42-110b(b). The Connecticut Supreme Court thus applies the Federal Trade Commission's "cigarette rule" to assess whether a business practice is unfair under CUTPA. The rule examines three criteria:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise- in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].

*Updike, Kelly & Spellacy v. Beckett*, 269 Conn. 613, 655-56, 850 A.2d 145 (2004) (citations omitted). Not all three criteria need to be satisfied to establish CUTPA liability. "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three," *Hartford Electric Supply Co. v. Allen-Bradley Co.*, 250 Conn. 334, 367-68, 736 A.2d 824 (1999) (citation omitted).

### a. Defendants' landlord practices violated public policy.

Violations of regulatory statutes are *per se* violations of public policy. Defendants' landlord practices have already been deemed illegal by the Town of Mansfield, *see* Section IV.E.1., *supra*, and thus meet the first prong of the CUTPA "cigarette test." Connecticut's appellate court has ruled that "a violation of a regulatory statute satisfies the first and second criteria of the 'cigarette rule,'" *Green v. Gosselin*, CV040072559, 2005 Conn. Super. LEXIS 1247, *6-7 (Conn. Super. Ct. May 10, 2005) (citation omitted) (finding that a landlord's failure to remove snow in violation of § 47a-7, leading to slip-and-fall, created a CUTPA cause of action). The Defendants' failure to maintain the apartment in a safe and habitable condition similarly satisfies at least the first two, if not all three, of the cigarette test's prongs. *See Caleb Village*, 063265, 2001 Conn. Super. LEXIS 42 at *13 (Conn. Super. Ct. Jan. 8, 2001) (finding that a landlord's failure to maintain property in a safe and habitable condition "satisfies the cigarette rule and opens the landlord to liability for violations of CUTPA.")

### b. Defendants' practices were immoral, unethical, oppressive, and unscrupulous.

It is immoral and unethical to violate a regulatory statute intended to protect the health and welfare of the public for one's own financial gain. *See Green,* 2005 Conn. Super. LEXIS 1247 at *6-7 ("a violation of a regulatory statute satisfies the first and second criteria of the 'cigarette rule'" (quotation omitted)) and *Caleb Village*, 2001 Conn. Super. LEXIS 42, at *13 (Conn. Super. Ct. Jan. 8, 2001). When the Restaurant Workers arrived in Connecticut, they were extremely poor and were new to the area. They did not speak English and had no connections in the local town, and they were entirely unaware of their rights under Connecticut and Mansfield law. In contrast, Defendant Le Shih Chang is a business and home owner with extensive ties in his community. Le Shih

Chang deposited the Restaurant Workers in his illegal, unsafe, and isolated basement – eight or nine people squeezed into 1500 square feet, sharing one or sometimes two working toilets and showers. The LLC and the Inc. then paid Le Shih Chang rent by withdrawing money from the Restaurant Workers' paychecks. The Defendants' actions satisfied the standard of being immoral, unethical, oppressive, or unscrupulous.

### c.  Defendants' acts caused substantial injury to consumers.

The Restaurant Workers suffered financial injury as a result of Defendants' illegal business practices. As previously stated, Conn. Gen. Stat. § 47a-4a prohibits "the receipt of rent for any period during which the landlord has failed to comply" with the health and safety requirements of the housing code. Because the Defendants continuously failed to abide by those requirements, as delineated in Section IV.C.1., *supra*, they were legally prohibited from receiving rent from the Restaurant Workers

The rent that was illegally taken out of Restaurant Workers' paychecks constitutes a verifiable and concrete harm to them, fulfilling the third prong of the FTC's "cigarette test." Although all three elements of the "cigarette test" need not be proven in order to show a violation of CUTPA, *Hartford Electric Supply Co.*, 250 Conn. at 367-368, the Restaurant Workers have established all three prongs, thus establishing Defendants' liability.

### D.  A REASONABLE JURY COULD FIND THAT THE CUTPA STATUTE OF LIMITATIONS IS TOLLED BECAUSE DEFENDANTS ENGAGED IN A CONTINUOUS ILLEGAL COURSE OF CONDUCT.

Over the course of eight years, the Defendants deducted rent from the Restaurant Workers' paychecks to pay for illegal housing in Le Shih Chang's basement. A reasonable jury could find that this course of conduct tolls the statute of limitations

governing the Restaurant Workers' CUTPA claims until the date when each Restaurant Worker stopped living in Le Shih Chang's basement.

CUTPA includes a three year statute of limitations. Conn. Gen. Stat. § 42-110g (f). However, Connecticut courts regularly toll that statute of limitations under the continuous course of conduct doctrine. *See, e.g.*, *Sherwood v. Danbury Hospital*, 252 Conn. 193 (2000); *see also Manufacturers Hanover Trust Co. v. Stamford Hotel L.P.*, 1994 Conn. Super. LEXIS 3319 at *4 ) (Conn. Super. Dec. 19, 1994) (explicitly rejecting the notion that the CUTPA statute of limitations cannot be tolled under the continuous course of conduct doctrine).

In order to toll the statute of limitations, the continuous course of conduct doctrine requires that (a) the defendant have committed an initial wrong upon the plaintiff and (b) there be evidence of a later breach of a duty that remained in existence after commission of the original wrong. This second prong can be fulfilled by "either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." *Sherwood*, 252 Conn. at 203. The doctrine "reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied." *Blanchette v. Barrett*, 229 Conn. 256, 276 (1994) (overruled for other reasons). The policy rationale applies here, where there was an ongoing employment and landlord-tenant relationships between the Restaurant Workers and the Defendants.

The Connecticut Supreme Court has explained that, in application, the continuous course of conduct doctrine is "conspicuously fact-bound." *Blanchette v. Barrett*, 229 Conn. 256, 276 (1994). Such fact-bound determinations thus "are for the jury to

make...[and] are inappropriate for resolution on a motion for summary judgment." *Ahern v. Yale-New Haven Hosp., Inc.*, No. CV 940358769S, 1999 Conn. Super. LEXIS 691, *6 (Conn. Super. Ct., Mar. 12, 1999). A jury must determine the type of duty that Defendants owed the Restaurant Workers and whether the provision of illegal housing constituted a legal breach of duty.  A reasonable jury could find that the Defendants' act of housing the Restaurant Workers in Le Shih Chang's basement over the course of a decade was a course of conduct that tolls the CUTPA statute of limitations because the Defendants' later wrongful deduction of rent was related to the initial wrongful act of housing the Restaurant Workers in an illegal basement.

### 1. A Reasonable Jury Could Find that Defendants Committed an Initial Wrong

As described in great detail in Section IV.C, *supra*, the Defendants admit that Le Shih Chang offered the Restaurant Workers housing and that the Defendants deducted $200 per month from each worker's paycheck and paid Le Shih Chang to house the workers in his basement apartment. Le Shih Chang also admits that he would have paid them an additional $200 per month had they lived elsewhere. The Restaurant Workers and the Defendants reached a contractual landlord-tenant agreement and they both performed on that contract. Because the apartment was indisputably illegal – overly crowded and lacking emergency escape openings and fire detectors – and unfit for habitation, *see* Section IV.C.1, *supra*, that rental agreement violated state landlord-tenant law and CUTPA. A reasonable jury could find that entering into this agreement in violation of those laws constituted an initial wrong against the Restaurant Workers.

### 2. A Reasonable Jury Could Find that Defendants' Subsequent Acts Were Breaches of Legal Duty Related to their Prior Wrong

Sufficient evidence exists for a reasonable jury to find that when Defendants continued to deduct wages from the Restaurant Workers' paychecks, they engaged in breaches of legal duty that were related to their prior wrong of entering into an illegal rental agreement. Each month that Defendants illegally deducted rent, they exacerbated the initial wrong perpetrated against the Restaurant Workers: not only did the Defendants wrongfully take the Restaurant Workers' money, but they exposed the workers to illegally dangerous crowding and risk of injury or death from a lack of smoke detectors or emergency escape openings. *See* Section IV.C.1, *supra*. Connecticut courts confronted with similar facts have found them legally sufficient to warrant a jury determination as to whether they constituted a continuous course of conduct that tolls the statute of limitations.

In *Hayden Machinery v. Stonecrafters*, CV95-0249141S, 1995 Conn. Super. LEXIS 2892 at *2 (Conn. Super. Oct. 12, 1995), for example, the court applied the course of conduct doctrine to toll the CUTPA statute of limitations in favor of a corporate tenant that alleged that it was fraudulently induced to enter into a lease eight years earlier. Like the Defendants here, the landlord in *Hayden Machinery* had misrepresented the quality of the property that it was offering for lease. Similarly, in *Assurance Company of America v. Yakemore*, 50 Conn. Supp. 28 (Conn. Super. 2005), the court relied on the continuous course of conduct doctrine to toll the statute of limitations on a tenant's negligence claim against its landlord for "failure to design, construct, operate or maintain the property in accord with basic building and fire codes and by permitting the premises to be occupied without a valid certificate of occupancy." *Id.* at 33. Even though the design and construction of the building had occurred between 1983 and 1986, the court

refused to impose a time bar against the lawsuit, brought in 2004, because the plaintiffs alleged that the defendant had engaged in a continuous course of conduct for nearly two decades. The court determined that the three year statute of limitations could be tolled because "[c]learly, the failure to do what was necessary to install a sprinkler system, obtain a permanent certificate of occupancy, and correct construction deficiencies so as to comply with applicable codes relate to the original alleged wrongdoings. He is being sued not simply as the builder, but as the 'operator' of the premises." *Id.* at 34.[15]

The Defendants' behavior in this case is very similar to the behavior in the cases above: Le Shih Chang's failure to install fire alarms, obtain a certificate of occupancy, and rent out the premises in a way that did not violate the Mansfield code relates to his original wrongdoing of having agreed to rent illegal premises to each of the Restaurant Workers. Similarly, the LLC's and Inc.'s continuous deduction of salary from the Restaurant Workers' paychecks in order to pay rent for that illegal apartment is related back to their original act of agreeing to pay for that housing. There is sufficient evidence for a reasonable jury to find that the Defendants' later acts of deducting rent from the Restaurant Workers' paychecks was related to the Defendants' initial agreement to house the workers illegally. This finding would fulfill the continuous course of conduct doctrine and toll the CUTPA statute of limitations. Because there exists a dispute of material fact regarding the nature and timing of the parties' landlord-tenant relationship, summary judgment is inappropriate.

---

[15] The court found that the facts alleged were sufficient to toll the CUTPA statute of limitations, *37, but dismissed that claim because the plaintiffs' pleadings were insufficient on the merits, *39-40.

### E. A REASONABLE JURY COULD FIND THAT DEFENDANTS ENGAGED IN A CONTINUOUS ILLEGAL COURSE OF CONDUCT AND THAT THE BREACH OF IMPLIED CONTRACT IS THUS TOLLED.

Defendants have moved for partial summary judgment on three of the Restaurant Workers' claims for breach of implied contract, but their motion should be denied because a reasonable jury could find that the statute of limitations on these claims has been tolled. The Restaurant Workers' Seventh Claim for relief alleges that, by promising to provide them with living accommodations and then housing them in an illegal and unsafe basement, the Defendants breached their implied contract with the Restaurant Workers. Defendants argue that the statute of limitations bars some parts of some of the Restaurant Workers' Seventh Claim. But the "continuous course of conduct" doctrine refutes Defendants' effort to escape liability. Since the Defendants cannot show an absence of any dispute of material fact regarding the nature and duration of the parties' landlord-tenant relationship, summary judgment is inappropriate.

### 1. The Defendants Seek Only Partial Summary Judgment With Respect to Only Three of the Restaurant Workers.

Defendants' *only* argument relates to the statute of limitations: they do not argue that the facts alleged by the Restaurant Workers are insufficient to raise a material dispute of fact regarding the *existence* of a breach of implied contract. Furthermore, they do not argue that the statute of limitations has barred any of the claims by Bing Wu, Feng Chun Guan, Tina Wang, Jun Zhang, Jin Lu Ma, or Bao Wen Tan. *See* Memorandum of Law 23 [Dkt. # 250-3].

Defendants have only moved for summary judgment on the following parts of the breach of implied contract claims: by Gui Bin Cai for any breaches from March 23, 2002

until June 15, 2002; by Qin Ping Yuan for any breaches from April 20, 2001 through November, 2001; and by Zhen Hai He for any breaches from July 1, 1999 through February 15, 2002. However, for the reasons articulated below, even this partial motion must be denied.

### 2. A Reasonable Jury Could Find That the Defendants' Housing of the Restaurant Workers in an Illegal Apartment Constituted a Breach of Contract

The Defendants and the Restaurant Workers agree that there was a contract between the parties to provide the latter with housing. And although Defendants do not admit it, overwhelming evidence shows that they breached that contract by providing illegal and dangerous accommodations in exchange for financial consideration by the Restaurant Workers.

Both parties acknowledge that the Defendants made an offer of housing, that the Restaurant Workers accepted that offer, and that the workers subsequently gave consideration in exchange for the housing. Thus, there is no dispute that an implied contract existed. Le Shih Chang acknowledges that, on behalf of the Defendants, he made an explicit oral offer of housing: "All of the employees at the restaurant…were hired through an employment agency….I would then speak with each potential employee….During my discussion with each potential employee, I would tell them about the benefits available to them which included three meals a day when they worked at the restaurant, housing if they wanted it..." (Le Shih Chang's Revised Resp. to Pls.' 4th Set of Interrog. 6, Ex. R at 8-9). Le Shih Chang also admits that Gui Bin Cai, Qin Ping Yuan, and Zhen Hai He accepted his offer to work at Chang's Garden in exchange for a salary and those benefits, including the housing. *See, e.g.,* Le Shih Chang's Revised Resp. to

Pls. 4th Set of Interrog. 10, Ex. R at 11) ("The plaintiffs know what they were hired to do and what their respective job requirements were."). Finally, Le Shih Chang admits that the workers could have taken additional cash in lieu of the housing, indicating undisputed consideration on their part: "The salary and benefits available to each employee are discussed during my initial telephone discussion with the potential employee. If the employee does not want to live in the walk-in apartment, I would pay them $200 extra each month to help them with their housing expenses." (Le Shih Chang's Revised Resp. to Pls.' 4th Set of Interrog. 7, Ex. R at 9-10[16].

Furthermore, although Defendants do not admit it, there is overwhelming evidence that they breached the acknowledged contract. There are four elements in a breach of implied contract: "(1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party and (4) damages." *Chiulli v. Zola*, 97 Conn. App. 699, 706-707 (2006) (internal quotation marks omitted, numerals inserted). All four exist here.

As documented in the paragraphs above, neither party disputes (1) the formation of the agreement or (2) performance by the Restaurant Workers. In Section IV.C.1, *supra*, the Restaurant Workers have supplied ample documentation of (3) breach of the agreement by the Defendants: it was a violation of Connecticut law to house human beings in the basement that the Defendants rented to the Restaurant Workers. Thus, the Defendants' failure to provide lawful and habitable housing in exchange for the $200 monthly deduction from the Restaurant Workers' paycheck – as promised by Le Shih

---

[16] Defendants argue that this $200 constituted a portion of the Restaurant Workers' remuneration: "The defendant claims that the amounts paid to Le Shih Chang for rent is in addition to the base salary paid to each plaintiff and should be added to the amounts paid to each plaintiff for purposes of determining each plaintiffs' total compensation." (Le Shih Chang's Revised Resp. to Pls.' 4th Set of Interrog. No. 3, Ex. R at 5-6).

Chang during his telephone conversations with the prospective employees – constituted a breach of the implied contract between the parties.

Finally, living in an illegal apartment and being exposed to serious risk constituted the fourth element of the breach of implied contract: material damages to the Restaurant Workers, who were promised lawful and habitable housing. Thus, Restaurant Workers have produced ample evidence that would allow a reasonable jury to find that the Defendants breached their implied contract with the Restaurant Workers.

> ### 3. A Reasonable Jury Could Find that the Defendants' Subsequent Illegal Acts As Landlords Were Related to their Initial Breach of Duty to the Restaurant Workers.

A reasonable jury could find that the Defendants' continuous failure to provide legal and habitable housing for the Restaurant Workers was related to the initial contractual breach. Although Le Shih Chang promised Qin Ping Yuan, Gui Bin Cai, and Zhen Hai He housing when he hired them – an offer that impliedly referred to habitable and lawful housing  – he continued to violate this promise throughout their employment with him and his companies: As the City of Mansfield found and the Restaurant Workers have recounted in greater detail in Section IV.C.1, *supra*, the basement apartment where they were housed violated city codes, was overcrowded, lacked emergency escape openings and smoke detectors, was excessively cold in the winter and humid in the summer, and was infested with rodents. Housing the Restaurant Workers in this undisputedly illegal basement apartment for nearly a decade was subsequent conduct related to the Defendants' initial illegal act of contracting with the Restaurant Workers to rent this space.

As discussed above, Connecticut courts regularly toll statutes of limitation under the continuing course of conduct. The doctrine is applicable in this case because the Defendants had a continuing duty to provide the Restaurant Workers with lawful and habitable housing, and they breached that duty throughout the long relationship between the parties.

Like the defendants in *Hayden Machinery v. Stonecrafters*, CV95-0249141S, 1995 Conn. Super. LEXIS 2892 at *2 (Conn. Super. Oct. 12, 1995), and *Assurance Company of America v. Yakemore*, 50 Conn. Supp. 28 (Conn. Super. 2005), who were found to have engaged in a continuous course of conduct when over the course of many years they rented property to their tenants in breach of the parties' contract, the Defendants here engaged in a continuous course of conduct that breached their original agreement with the Restaurant Workers and thus tolls the statute of limitations.

Because the Restaurant Workers have adduced ample evidence showing that the Defendants breached their implied housing contract with the Restaurant Workers, and because Defendants admittedly housed the workers in an illegal basement apartment over the course of many years, a reasonable jury could find that the Defendants' continuous course of conduct tolls the statute of limitations on the Restaurant Workers' breach of implied contract claim. Thus, defendants' motion for summary judgment must be denied.

## V.  CONCLUSION

The evidentiary record establishes that a reasonable jury could find that the Restaurant Workers have met their burden for equitable tolling on their state wage claims and FLSA coverage for the years 1999 to 2003. Further, the record would allow a reasonable jury to conclude that Defendants violated CUTPA and breached implied

contracts with the Restaurant Workers through a continuing course of illegal conduct. Since a material dispute of fact exists with regard to all these issues, the Restaurant Workers respectfully request that this Court deny the Defendants' motion for summary judgment.


Dated: May 18, 2010

                                     Respectfully submitted,

                                           /s/
                                     Muneer I. Ahmad, Esq., ct28109
                                     Susan Hazeldean, Esq., ct28093
                                     Ohad Barkan, Law Student Intern
                                     William C. Collins, Law Student Intern
                                     Laura Huizar, Law Student Intern
                                     Jingni Zhao, Law Student Intern
                                     Jerome N. Frank Legal Services
                                     Organization
                                     P.O. Box 209090
                                     New Haven, CT 06520-9090
                                     Telephone: (203) 432-4800
                                     Facsimile: (203) 432-1426
                                     Email: muneer.ahmad@yale.edu

                                     *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 18, 2010 a copy of foregoing Memorandum was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

_____/s/_____
Muneer Ahmad, Esq.
Jerome N. Frank Legal Services
Organization
P.O. Box 209090
New Haven, CT 06520-9090
203-432-4800