UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| BING WU, et al | : | CIVIL ACTION NUMBER: |
| --- | --- | --- |
| Plaintiffs | : | |
| | : | 3:08-CV-00746-WWE |
| v. | : | |
| | : | |
| CHANG'S GARDEN OF STORRS, L.L.C., et al | : | |
| | : | |
| Defendants | : | June 18, 2010 |

### DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure Defendants Le Shih Chang, Chang's Garden of Storrs, LLC and Chang's Garden of CT, Inc. hereby submit this Reply to the plaintiffs' Memorandum in Opposition to Defendants' Second Motion for Summary Judgment dated May 18, 2010 ("Opposition").[1]/ The purpose of the Reply is to address the arguments and misstatements set forth by the Plaintiffs in their Opposition.

**II.    Facts and Proceedings:**

In Section 2 of the Opposition, the plaintiffs have again made misleading statements regarding the defendants and their actions, and attempt to characterize these statements as facts. On page 6 of the Opposition, the plaintiffs claim that because the restaurant's bank accounts do not show any cash deposits from 1999 to 2003 and that Le Shih Chang admitted that he paid employees in cash which he took from the restaurant's register, the defendants, therefore, reported the restaurant's income inaccurately. Even assuming that the plaintiffs are correct about the cash deposits and Le Shih Chang's paying employees in cash from the restaurant's register, these facts do not support the conclusion that the

---

[1]/  Defendant Hsiang I Chang does not participate in this Reply as he filed for Chapter 7 bankruptcy protection on April 23, 2010.

defendants recorded and/or reported the restaurant's income inaccurately. This issue is discussed in more detail below.

On page 7 of the Opposition, the plaintiffs claim that the restaurant's revenue figures were only reported to the defendant's "accountant over the phone and were not based on receipts or any paper records whatsoever." (*See*, Opposition at pp 6-7.) In fact, Le Shih Chang would report the restaurant's monthly income figures to the restaurant's accountant over the phone, but would also provide the accountant with written monthly sales reports so that the accountant could determine the restaurant's quarterly sales tax liabilities. (*See*, excerpt from the deposition of Le Shih Chang as the corporate representative of both corporate entities which is attached hereto as Exhibit A at pp. 141 - 144.) Examples of the restaurant's sales reports and quarterly filings are attached hereto as Exhibit B which contains all of the monthly sales reports for 2005. All of the reports from January 2005 to March 2009 have been disclosed to the plaintiffs. The plaintiffs are well aware that the restaurant supplied its accountant with the monthly sales statements as support of its daily and monthly income. Consequently, the plaintiffs' statements are misleading and false.

On page 7 and throughout the Opposition, the plaintiffs continue to claim that the defendants "deducted $200 per month from each Restaurant Worker's paychecks and used that money to pay Le Shih Chang to house the Restaurant Workers in his basement apartment." The plaintiffs cite to Exhibits R and CC to the Opposition in support of this assertion. The Exhibits, however, do not state that any money was "deducted" or removed from the plaintiff's wages, but, in fact, states that the $200 paid to Le Shih Chang was in addition to the plaintiffs' base salary and should be added to the base salary of each plaintiff to determine their total compensation. (*See*, plaintiffs' Exhibit R at pp. 5-7, 9 and 10 and plaintiffs' Exhibit CC at pp. 5-6.) It its Memorandum of Decision to the defendants' first Motion for Summary Judgment [Dkt. # 242], the court determined that the "plaintiffs

have failed to adduce evidence raising an inference that the value of the occupancy was deducted from wages otherwise due." (*See*, Memorandum of Decision [Dkt. # 242] at p. 17 and 15.) Nothing has changed in the 13 week period since the court issued its decision on the defendants' first motion for summary judgment. The plaintiffs still have not produced any evidence that would even suggest that the value of the housing was deducted or removed from their wages.

IV. **Argument:**

In subsection A of Section IV of the Opposition, the plaintiffs appear to have misconstrued the defendants' arguments regarding the application of the two-year statute of limitations set forth in C.G.S. § 52-596, which governs the plaintiffs' State wage claims. The defendants are not claiming that the statute of limitations set forth in C.G.S. § 52-596 commences at the time each plaintiff was hired, rather the language of the statute mandates that the time period for filing any State wage claims commences upon the defendants' **first alleged failure to pay each Plaintiff full wages** under the Connecticut Minimum Wage Act. According to the allegations set forth in the plaintiffs' Fifth Amended Complaint, each plaintiff was paid semi-monthly. Therefore, the two year time period for commencing an action under the State minimum wage act would commence, at the latest, within one month following the hiring of each plaintiff. Based upon this analysis, each plaintiff would have to commence his or her State wage claim within the two-year period from when each claim first accrued which would be, at the latest, one month after each plaintiff was hired.

This analysis is supported by the language of the statute itself as well as by State case law interpreting the statute. The statute states that:

> No action for the payment of remuneration for employment payable periodically shall be brought but within two years after the right of action accrues, except that this limitation shall be tolled upon the filing with the

> Labor Commissioner of a complaint of failure to pay wages pursuant to the provisions of chapter 558.

C.G.S. § 52-596. The right of action accrues for each plaintiff when the defendants allegedly first failed to pay each plaintiff his or her full wages. In the case of Burns v. Koellmer, 11 Conn. App. 375 (1987), the court held that the plaintiff's claim for unpaid wages did not arise until the defendant breached the employment agreement by refusing to fully compensate the plaintiff. Burns at 388. In Burns, the defendant refused to fully compensate the plaintiff in September 1981 and the plaintiff commenced an action that same month. Burns at 389.

In the case of Brule v. Nerac Corp., 2009 WL 5322206 (Conn.Super., Dec. 9, 2009, Shapiro, J.), the plaintiff asserted that he was owed additional wage compensation from June 2004 through February 2007, when he was terminated, as a result of a base salary increase which the defendants failed to include in his wages. Brule at *6 (a copy is attached as Exhibit C.) The court in Brule concluded that the plaintiff's State wage claim was governed by the two year statute pursuant to C.G.S. § 52-596 and that his claim accrued in July 2004 when the defendant first failed to include the additional compensation in his periodic salary payments. Id at *8. The court further concluded that the plaintiff's State wage claim was barred by C.G.S. § 52-596 as he did not commence his action until June 30, 2008 which was more than two years after the claim first accrued. Id. at *6-10. In Brule, the plaintiff continued to receive periodic wage payments through February 2007 when he was terminated. Brule at *7-9. Despite the continuing deficient wage payments, the court still concluded that the plaintiff's wage claim was time barred as it first accrued in July 2004 when the plaintiff did not receive the additional compensation in his periodic salary payments.

4

In the case of <u>Williams v. Cushman and Wakefield</u>, 1998 WL 246493 (Conn.Super., May 5, 1998, D'Andrea, J.), the plaintiff commenced working for the defendant in January 1991 under an oral agreement that she would be paid an annual salary of $34,000 but was provided with weekly paychecks that amounted to only $27,000 per year. <u>Williams</u> at *1 (copy attached as Exhibit D.) The plaintiff continued working for the defendant until November 1994, continued receiving deficient paychecks during that time period and commenced her action sometime after she left her employment with the defendant in 1994. <u>Id</u>. at *1-2. The court concluded that the two-year statute of limitations set forth in C.G.S. § 52-592 expired in 1993 two years after the defendant **first denied** her the additional $7,000 per annum to which she claims she was entitled. <u>Id</u>. at *2 (emphasis added.)

These cases support the defendants' position that the statute of limitations on State wage claims, brought pursuant to C.G.S. § 31-72, commences or begins to run when the defendants first allegedly failed to pay the plaintiffs overtime or proper wages. The plaintiffs, however, claim that a separate claim for unpaid wages accrued each time that the defendants failed to pay the plaintiffs the amounts required under the State wage and hour laws. The plaintiffs, therefore, argue that a separate right of action accrues for each plaintiff at the end of each pay period in which each plaintiff was not paid proper wages. (*See*, pp. 10-13 of the Opposition.) The plaintiffs argue that the cases cited by the defendants are actions based upon breaches of the employment agreement and not for unpaid wages which is the basis for the plaintiffs' claims. The cases cited by the defendants, however, are all actions to recover unpaid wages where there were periodic wage payments being made to the plaintiffs which failed to include the proper amount of wages just as the plaintiffs in this case are claiming.

Even assuming that the plaintiffs' position is correct, which is not conceded by any means, any claims made by the plaintiffs for unpaid wages prior to June 14, 2006 (two

years from the date of service of process) would be barred by the two-year statute of limitations. The plaintiffs have only cited one case which supports their position that a separate claim for unpaid wages accrued each time the defendants failed to pay the plaintiffs the amounts required under the State wage and hour laws. (*See*, p. 12 of the Opposition in which the plaintiffs cite to Mckosky v. Plastech Corp., 2001 LEXIS 1635 (Conn. Super., Blue, J., June 13, 2001)). Although the court in McKosky states that "McKosky's right of action thus accrued every week that he was not paid", the court also states that any claims that accrued prior to "May 12, 1997 (two years prior to service of process)" were barred by the operation of C.G.S. § 52-596. Assuming that the court finds that a separate claim for unpaid wages accrued each time the defendants failed to pay the plaintiffs, then the court should bar all of the plaintiffs' claims prior to June 14, 2006 which is two years prior to the date of service on the defendants.

On pages 13 to 24, the plaintiffs assert that any applicable statute of limitations barring the plaintiffs' State wage claims should be equitably tolled in order to avoid inequitable consequences. As stated in the defendants' Memorandum, there are two principal reasons given for the enactment of a statute of repose:

> (1) it reflects a policy of law, as declared by the legislature, that after a given length of time a [defendant] should be sheltered from liability and furthers the public policy of allowing people, after the lapse of a reasonable time, to plan their affairs with a degree of certainty, free from the disruptive burden of protracted and unknown potential liability . . . and (2) to avoid the difficulty in proof and record keeping which suits involving older [claims] impose . . . . [T]he policy of statutes of limitation includes promoting repose by giving security and stability to human affairs . . . . [W]e will not deprive . . . defendants of the finality, repose and avoidance of stale claims and stale evidence for which the statute of limitations was designed.

Haggerty v. Williams, 84 Conn. App. 675, 679-80 (2004) (internal quotation marks omitted). Furthermore, C.G.S. § 52-596 contains its own tolling provisions. Section 52-596 states the following:

> No action for the payment of remuneration for employment payable periodically shall be brought but within two years after the right of action accrues, **except that this limitation shall be tolled upon the filing with the Labor Commissioner** of a complaint of failure to pay wages pursuant to the provisions of chapter 558.

C.G.S. § 52-596.  There is no evidence that any of the plaintiffs filed a complaint with the Labor Commissioner nor can there be as no such complaints were ever filed.  As the statute itself contains a tolling provision, there is no basis for the plaintiffs to seek to toll the statute of limitations set forth in C.G.S. § 52-596 on other grounds.

As stated above, the plaintiffs now seek to toll the applicable statute of limitations so that their claims, some of which date back to 1999, can all be adjudicated despite the State of Connecticut's public policy of limiting stale claims especially where the plaintiffs fail to conduct any investigation of or to perform any due diligence as to their rights.  As pointed out by the plaintiffs, the doctrine of equitable tolling should only be employed when the plaintiffs lack knowledge of the existence of their cause of action **and** have exercised "due diligence" to investigate or discover their rights.  (*See*, Opposition at pp. 9 and 14.)

In support of their position, the plaintiffs rely upon the case of Gallop v. Commercial Painting Co., Inc. 42 Conn. Supp. 187 (Feb. 5, 1992, Blue, J.) (emphasis added) (copy attached as Exhibit E.)  In addressing the doctrine of equitable tolling, the court in Gallop stated that equitable tolling "'permits a plaintiff to avoid the bar of the statute of limitations if **despite all due diligence** he is unable to obtain vital information bearing on the existence of his claim.'" Gallop, at 192 (emphasis added.)  The Connecticut Appellate Court has defined "equitable tolling" as "[t]he doctrine that the statute of limitations will not bar a claim if the plaintiff, **despite diligent efforts**, did not discover the injury until after the limitations period had expired." Wiele v. Board of Assessment Appeals of City of Bridgeport, 119 Conn. App. 544, 554 (2010) (internal quotation marks and citations omitted.)

7

In both cases, the court stated that the party seeking to employ the court's equitable powers **must** have made diligent efforts to obtain information regarding the existence of the claim and the injury to which the claim pertains. On pages 15 to 17 of the Opposition, the plaintiffs claim that they were unaware of their rights and the existence of wage and hour laws. While the plaintiffs may not have been aware of their rights or the existence of any applicable wage and hour laws, they did absolutely nothing to investigate what rights they had or to obtain information which would have apprised them of their rights. In their affidavits, plaintiffs' Exhibits K through Q, the plaintiffs, with the exception of Feng Chun Guan and Tina Wang, claim that they were either unaware of their rights or did not understand the substance of the wage and hour laws. (*See*, Opposition at p. 15.) The plaintiffs, however, did nothing to investigate what rights they had or to obtain a better understanding of the wage and hour laws which form the basis for their claims.

In addressing a claim for a new trial based upon newly discovered evidence, the court in <u>Kubeck v. Foremost Foods Co., Inc.</u>, 190 Conn. 667 (1983), opined that the term "due diligence" means doing everything reasonable to discover or obtain the information needed. <u>Kubeck</u>, at 672. The court in <u>Kubeck</u> stated that "[t]he question which must be answered is not what evidence might have been discovered, but rather what evidence would have been discovered by a reasonable plaintiff by 'persevering application, [and] untiring efforts in good earnest.'" <u>Id</u>. Although the court's statements are in the context of a claim for a new trial based upon newly discovered evidence, the statements apply with equal force in this case. In order to avail themselves of the court's equitable power to toll an otherwise valid statute of limitations, which already contains a tolling provision, the plaintiffs must show that they made reasonable efforts to obtain the information regarding their rights and any applicable wage and hour laws. The documents submitted by the plaintiffs show that they did nothing to investigate or discover their rights and their alleged

8

cause of action until sometime in late 2007 or 2008. (*See*, plaintiff's Exhibits K through Q.) The fact that the plaintiffs failed to do anything prior to late 2007 or 2008 to investigate their rights or to obtain information bearing on the existence of their claims shows a lack of due diligence and should preclude the application of the doctrine of equitable tolling.

On pages 21 to 24, the plaintiffs argue that the District Courts in the Second Circuit have applied the doctrine of equitable tolling to claims under the FLSA and should, therefore, also apply the doctrine to the plaintiff's State wage claims. The statute of limitations for State wage claims, unlike the FLSA, contains a specific mechanism for the tolling of any wage claims. As stated above, C.G.S. § 52-596 specifically states that limitation period shall be tolled upon the filing of a complaint with the Labor Commissioner. Consequently, the situations are not analogous and it is inappropriate to compare the application of the doctrine of equitable tolling of claims under the FLSA to the equitable tolling of claims under Connecticut's wage and hour act.

In subsection B of Section IV of the Opposition, the plaintiffs argue that there are questions of fact relating to the following: (1) FLSA coverage for their claims; and (2) the defendants' claim that the FLSA does not apply to the plaintiffs' claims from 1999 to 2003. The defendants claim that the individual plaintiffs were not engaged in interstate commerce and that the restaurant's gross income for the years 1999 through 2003 was below the FLSA's $500,000 minimum.

On pages 25 through 34 of the Opposition, the plaintiffs assert that the defendants' reliance on the restaurant's corporate tax returns for 1999 through 2004 is suspect because the plaintiffs claim that the defendants under reported cash income as well as their payroll expenses. The plaintiffs' arguments and supplemental calculations, however, are not based upon facts, but, rather, are based upon speculation, conjecture and supposition.

9

On pages 26 and 27, the plaintiffs claim that the restaurant's tax returns for 1999 through 2003 are inaccurate and fraudulent and then claim that "strong evidence shows that the Defendants engaged in inaccurate and fraudulent accounting practices." (*See*, Opposition at p. 27.) The "strong evidence" claimed by the plaintiffs is the dubious report of Joseph A. DeCusati, CPA in which Mr. DeCusati reportedly found that the "Restaurant likely underreported its cash income." (*See*, Opposition at p. 26.) Mr. DeCusati's opinions regarding the alleged under reporting of cash income, however, are based upon his review of the restaurant's financial information, its daily sales reports and its sales tax returns from 2005 through 2009 and not from 1999 through 2003 which are the years in question. (*See*, Opposition at p. 27 and n.2) Based upon his review of the restaurant's financial information from 2005 to 2009, Mr. DeCusati makes the "inference" that the restaurant under reported its cash income from 1999 to 2004. (*See*, Opposition at pp. 26-27.) In responding to a motion for summary judgment, the "nonmovant must do more than present evidence that is merely colorable, conclusory, or speculative and must present concrete evidence from which a reasonable juror could return a verdict in his favor . . ." Alteri v. General Motors Corp., 919 F.Supp. 92, 94-95 (N.D.N.Y. 1996) (*quoting*, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The plaintiffs' rely solely upon Mr. DeCusati's report for their position that the defendants under reported their gross income. At his deposition, however, Mr. DeCusati stated that he does not actually know whether or not the defendants under reported their gross income. (*See*, excerpt from the deposition of Joseph DeCusati attached hereto as Exhibit F at pp. 57-59.)

At the bottom of page 27 and on page 28, the plaintiffs claim that the bank deposits for the restaurant for 2002 and 2003 indicate that the restaurant did not make any cash deposits in those years. The plaintiffs argue that "the absence of case deposits is highly suspect" and leads to the conclusion that the defendants "engaged in significant under-

reporting of income on their taxes." (*See*, Opposition at pp. 27-28.) In the very next paragraph, however, the plaintiffs answer their own accusation by indicating that Le Shih Chang would pay the plaintiffs and other employees in cash which he took from the restaurant's cash register. In the deposition of the restaurant's corporate designee, taken on December 15, 2010, Le Shih Chang stated that he kept daily records of all income, including cash income, and would place it on a monthly form which would then be faxed to the restaurant's accountant after the close of each month. (A copy of the relevant portion of the deposition transcript is attached hereto as Exhibit A at pp. 141 to 144.)

On pages 29 and 30 of the Opposition, the plaintiffs claim that the defendants also under reported their payroll expenses, but offer no real or actual evidence to support their allegations. Rather the plaintiffs rely upon their own assumptions and the opinions of Mr. DeCusati which are also based upon assumptions instead of reliable facts. Furthermore, even if the defendants under reported their payroll expenses, which is denied, such under reporting would have no effect upon the restaurant's gross income. The plaintiff's claim that "Mr. DeCusati's evaluation shows that the Restaurant likely underreported income in an amount equivalent to the unreported expenses." This statement, however, has no basis in fact. Mr. DeCusati is simply making the assumption that the restaurant under reported its income because it under reported its payroll expenses which is also based upon an assumption on his part.

On page 30 of the Opposition, the plaintiffs make the unsupported assertion that the "underreporting of payroll expenses likely exceeded $100,000 for most of the years in question." There is absolutely no basis for this assertion which is speculation at best. The plaintiffs even indicate, on page 30, that they are, in fact, estimating the amount of the alleged unreported payroll expenses. Furthermore, the analysis provided by the plaintiffs on pages 30, 31 and 32 is riddled with assumptions. The plaintiffs make the assumption

that between 1999, when the restaurant opened, and 2003, there were five full-time kitchen employees and two additional waiters or waitresses in the front restaurant. This assumption is erroneous as it assumes that the restaurant had five full-time kitchen employees from its inception. The plaintiffs also assume that the restaurant had two full-time waiters or waitresses who were all making the same salary as the full-time kitchen staff. There simply is no basis for such an assumption. In addition, any waiters or waitresses would be tipped employees who are exempt from the FLSA requirements because they receive tips and would, therefore, have less of a base salary than anyone working in the kitchen. Given the amount of assumptions used in their analysis, it is the plaintiffs' analysis which is suspect, not the defendants' corporate tax returns.

On pages 34 and 35, the plaintiffs compound this issue by making additional assumptions and then speculate as to the amount of cash income that the restaurant should have made based upon Mr. DeCusati's faulty prediction that at least 40% of the gross income for restaurants like Chang's Garden comes from cash sales. As stated above, Mr. DeCusati only examined the restaurant's financial records from 2005 through 2009. Based upon Mr. DeCusati's speculative opinion that at least 40% of the restaurant's gross income should have been derived from cash sales, the plaintiffs take the yearly amounts deposited by the restaurant from 1999 to 2003 and add 40% of that amount to each annual amount in order to arrive at a figure which they refer to as the "Estimates Total Gross Volume of Business Done." These numbers, however, are purely fictional as they are solely based upon faulty assumptions made by the plaintiffs and their expert in order to artificially inflate the restaurant's gross income so that it exceeds the jurisdictional monetary threshold required by the FLSA. As the plaintiffs fail to show the existence of any genuine issues of material fact regarding the restaurant's tax returns and the gross

income for the restaurant from 1999 through 2003, the defendants are entitled to partial summary judgment as to the plaintiff's FLSA claims from 1999 through 2003.

On pages 35 through 40 of the Opposition, plaintiffs He, Cai, Yuan and Ma, who were the only plaintiffs employed between 1999 and 2003, claim that they are entitled to individual FLSA coverage even if they might not otherwise be entitled to enterprise FLSA coverage on the basis that a substantial part of their jobs as kitchen workers involved storing shipments of seafood, which were shipped to the restaurant from New York, in the restaurant's refrigerator. The defendants maintain that the storage of food shipped to the restaurant was not a substantial part of the plaintiffs' job and that the chain of commerce ceased once the shipments were delivered to the restaurant.

The "test" for individual coverage under the FLSA "is not whether an employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be part of it." McLeod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248 (1943) (*holding*, that an employee who prepared meals for covered employees is not engaged in interstate commerce.) The United State's Supreme Court has also held that goods are considered "in commerce" "until they reach the customers for whom they are intended." Walling v. Jacksonville Paper Co., 317 U.S. 564, 568, 63 S.Ct. 332 (1943). In this case, the occasional shipments of seafood from New York were delivered to the restaurant which is the customer for whom the shipment was intended. Consequently, the chain of commerce ended once the shipments were delivered to the restaurant.

In addressing the test for individual FLSA coverage, courts in the Second Circuit hold that "to be engaged in commerce, 'a substantial part' of the employee's work must be related to interstate commerce" Boekemeier v. Fourth Universalist Society in the City of New York, 86 F.Supp. 2d 280, 287 (S.D.N.Y. 2000) (*citing*, Divins v. Hazeltine Electronics

13

Corp., 162 F.2d 100, 103 (2d. Cir. 1977) (*citing*, Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332 (1943)). Where, however, an employee's interstate activities are *"de minimis"*, or not regular or recurring, neither courts nor the DOL consider the employee covered under the FLSA. Bowrin v. Catholic Guardian Soc., 417 F. Supp. 2d 449, 466 (S.D.N.Y. 2006) (*See also*, Remmers v. Egor, 332 F.2d 103, 104 (2d Cir.1964) (*ruling*, sporadic or occasional shipments of insubstantial amounts of goods are insufficient to bring an employee within the coverage of the act) (*citing*, Mabee v. White Plains Publ'g Co., 327 U.S. 178, 66, S.Ct. 511, 90 L.Ed. 607 (1946); and Lamont v. Frank Soup Bowl, 2001 WL 521815, at *2 (S.D.N.Y. May 16, 2001)). In this case, the activities of the four plaintiffs who worked at the restaurant from 1999 to 2003 can only be considered *de minimis* and not a substantial part of their employment. The defendants simply picked up the shipments of seafood and stored them in the restaurant's refrigerator. (*See*, plaintiff's Exhibits K through M.)

The plaintiffs, however rely on the case of Sucrs. De A Mayol & Col., Inc. v. Mitchell, 280 F.2d 477 (1st Cir. 1960) for the proposition that employees who simply store goods which travel through interstate commerce and are left on a customer's door, fall within the scope of individual FLSA coverage. Unlike the plaintiffs in this case, the employees in Mitchell received the goods, open the goods, checked the goods and then stored the goods which were awaiting sale and then later distribution in Puerto Rico. Mitchell at 479-80. In this case, the plaintiffs simply picked up the shipments and place them in the refrigerator. Furthermore, the plaintiffs were hired to work in the kitchen and the act of occasionally storing the shipments of seafood from New York is incidental to their jobs and is not a substantial part of their work. As the plaintiffs are not involved in interstate commerce, the defendants are entitled to partial summary judgment.

On pages 40 through 52, the plaintiffs argue that a jury could reasonably find that the defendants violated CUTPA. Interestingly, the plaintiffs make the same exact arguments here as they did in their Opposition to the defendants' first Motion for Summary Judgment. In this section of the Opposition, the plaintiffs repeatedly argue that the defendants deducted $200 from the plaintiffs' paychecks despite the fact that this Court, in its Memorandum of Decision to the defendants' first Motion for Summary Judgment, held that there was no evidence to support such a claim. The plaintiffs even state that "both parties agree that the Defendants deducted money from [the plaintiffs'] paychecks" (*See*, Opposition at p. 43) and that the defendants admitted making such deductions (*See*, Opposition at p. 44.) At no time have the defendants agreed nor admitted that they deducted any sums from the wages of the defendants. At all times, the defendants have claimed that the $200 payments made to Le Shih Chang by the corporate defendants were "in addition" to the plaintiffs' base wages. (*See*, Opposition Exhibits R at pp. 5-7 and CC at 5-6.) The plaintiffs then state that "it is *uncontested* that the Defendants deducted $200 per month from each of the [plaintiffs] paychecks and used that money to pay Le Shih Chang to house the [plaintiffs]...." In support of this erroneous statement, the plaintiffs cite to Exhibit CC (Chang's Garden of Storrs, LLC's discovery response at p 5. ) which states "Chang's Garden of Storrs, LLC would pay about $200 a month to Le Shih Chang for each employee who lived in the walk-in apartment." That same response, however, also states that "[t]hese payments were **in addition to what each employee was receiving in monthly salary**." (*See*, Opposition Exhibit CC at p. 5.) The plaintiffs are making these erroneous statements to try to claim that there was a separate rental agreement between the plaintiffs and defendants which was independent of the employment agreement. The fact is, however, that the housing arrangement with each of the plaintiffs was incidental to and for the purpose of the plaintiffs' employment which, as previously determined by this

Court, constituted a benefit of employment.  (*See*, Memorandum of Decision [Dkt # 242] at p. 17.)

On pages 44 to 52 of the Opposition, the plaintiffs make the exact same arguments, almost word for word, that they did in their opposition to the defendants' first Motion for Summary Judgment.  In its Memorandum of Decision [Dkt # 242 at pp. 16-18], this Court rejected these arguments and held that the housing arrangement gave the plaintiffs a license to use the apartment during the course of their employment and was thus incidental to the employment.  In its decision, the Court also held that an "employment relationship is not itself trade or commerce for the purpose of CUTPA."  Id. at p 16 (*quoting*, Banerjee v. Robert, 641 F. Supp. 1093, 1108 (D. Conn. 1986)).  Finally, this Court held that act of the defendants making the payments to Le Shih Chang "does not constitute a trade or commerce that falls within the statute."  Id. at p. 18.  For these reasons, the defendants are entitled to summary judgment on the plaintiffs' CUTPA claim.

On pages 52 through 56 of the Opposition, the plaintiffs claim that a reasonable jury could find that the three-year statute of limitations for CUTPA claims should be tolled due to the defendants' conduct.  The plaintiffs' argument assumes the existence of a continuing landlord-tenant relationship, a continuing course of wrongful conduct by the defendants and that there is, in fact, a valid CUTPA claim.  As stated above, the plaintiffs do not have a CUTPA claim as there is no landlord-tenant relationship and that the housing arrangements gave the plaintiffs a license for the use and occupancy of the apartment while they were employed.

In the event that the Court does find a CUTPA violation, the three-year statute of limitations set forth in the C.G.S., § 42-110g(f) applies and bars any CUTPA claims prior to June 14, 2005.  The plaintiffs' arguments that the defendants' conduct should toll the three-year statute are as specious as their claims that the defendants deducted wages from the

plaintiffs' paychecks. The basis for the plaintiffs' claim that the three-year statute should be tolled are: (1) that the defendants wrongfully deducted wages from the plaintiffs' paychecks; and (2) that there was a continuing landlord-tenant relationship. As stated above, the defendants did not deduct any sums from the plaintiffs wages nor is there any evidence that the payments to Le Shih Chang were anything other than a benefit of employment. There is also no evidence to support the plaintiffs' claim that a landlord-tenant relationship existed. Consequently, there is no basis to toll the three-year statute of limitations should the court conclude that there was a CUTPA violation. Indeed, the tolling principles that apply to other causes of action, such as a continuing course of conduct or fraudulent concealment, would not likely apply to CUTPA claims in general, particularly where, as here, there is no fiduciary relationship. See Fichera v. Mine Hill Corp., 207 Conn. 204, 541 A.2d. 472 (1988). See also Langer, et al, THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (Vol. 1, pp. 182-184) (1994).

On pages 57 through 61, the plaintiffs argue that a reasonable jury could find that the defendants breached implied contracts with the plaintiffs and that the defendants' alleged conduct tolls the six-year statute of limitations set forth in C.G.S. § 52-576. On pages 57 and 58, the plaintiffs correctly state that the defendants' statute of limitations argument on their breach of implied contract claims only apply to plaintiffs: Gui Bin Cai for his claims between March 23, 2002 to June 15, 2002; Qin Ping Yuan for his claims between April 20, 2001 to November 30, 2002; and Zhen Hai He for his claims between July 1, 1999 and February 15, 2002. The plaintiffs then claim that the statute of limitations for the breach of implied contract claims for Gui Bin Cai, Qin Ping Yuan and Zhen Hai He should be tolled based upon: (1) the defendants' wrongful conduct as a landlord; and (2) the defendants deducting $200 a month from the plaintiffs' wages to pay for rent in substandard housing.

17

As stated above, the evidence shows that there was no landlord-tenant relationship between the plaintiffs and the defendants. The evidence also shows that no sums were deducted from the plaintiffs' wages to pay for rent. The allegations of the plaintiff's Fifth Amended Complaint indicate that Qin Ping Yuan ceased working for the defendants and living in the apartment on or about November 30, 2001 and then returned on or about May 4, 2003 and worked through August 1, 2007. Consequently, there was nothing preventing Mr. Yuan from asserting a breach of implied contract claim, for his first stay in the apartment, within the six-year period after he left on November 30, 2001. The allegations also indicate that Mr. He worked for the defendants and resided in the apartment from July 1, 1999 to February 15, 2002 and then again from August 1, 2007 to February 11, 2008. There are no claims that Mr. He was somehow prevented from filing a breach of implied contact claim for his first stay in the apartment within the six-year period after he left on February 15, 2002. Mr. Cai allegedly worked for the defendants and lived in the apartment from May 23, 2002 through July 26, 2007. There are no allegations that Mr. Cai was somehow prevented from bringing his breach of implied contract claims within the six year period between May 23, 2002 and May 23, 2006. For the reasons stated above, the plaintiffs fail to demonstrate any basis for the tolling of the statute of limitations as it applies to the claim being asserted by Gui Bin Cai, Qin Ping Yuan and Zhen Hai He.

Finally, the plaintiffs are not opposing the defendants' motion for summary judgment as it relates to the following:

1. The defendants' argument that any claims for intentional infliction of emotional distress prior to June 14, 2005 are barred by the application of the three-year statute of limitations set forth in C.G.S. § 52-577;

2. The defendants' argument that any claims for negligent infliction of emotional distress prior to June 14, 2006 are barred by the application of the two-year statute of limitations set forth in C.G.S. § 52-584;

3. The defendants' argument that any claims based upon a theory of unjust

18

enrichment and/or quantum meruit prior to June 14, 2005 are barred by the application of the three-year statute of limitations set forth in C.G.S. § 52-581(a);

4. The defendants' argument that they are entitled to summary judgment as to all of the plaintiffs claims based on the intentional infliction of emotional distress as set forth in their Third Claim for Relief; and

5. The defendants' argument that they are entitled to summary judgment as to all of the plaintiffs' claims based on the negligent infliction of emotional distress as set forth in their Fourth Claim for Relief.

The defendants, however, are withdrawing their claim that they are entitled to summary judgment as to the plaintiffs' negligent infliction of emotional distress claims as set forth in Section II.F. of their Memorandum, but are still claiming that the plaintiffs' claims for negligent infliction of emotional distress are barred by the applicable statute of limitation as set forth in Section II.C.3 of the Memorandum in which the defendants claim that all claims for negligent infliction of emotional distress prior to June 14, 2006 are barred.

DEFENDANTS:
CHANG'S GARDEN OF STORRS, LLC,
CHANG'S GARDEN OF CT, INC. and
LE SHIH CHANG

By: /s/
Christopher M. Harrington, Esq.
Fed Bar No: ct 16851
Howard, Kohn, Sprague & FitzGerald
237 Buckingham Street
Hartford CT 06126-1798
Ph: (860) 525-3101; Fax: (860)247-4201
cmh@hksflaw.com

## **CERTIFICATION**

      I hereby certify that on June 18, 2010, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of this Court's electronic filing system and by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Michael J. Wishnie, Esq.
Muneer I. Ahmad, Esq.
Jerome N. Frank Legal Services
Yale Law School
127 Wall Street
New Haven, CT 06511

                                                  /s/
                                      Christopher M. Harrington, Esq.