# EXHIBIT C

Westlaw.

Not Reported in A.2d, 2009 WL 5322206 (Conn.Super.)
**(Cite as: 2009 WL 5322206 (Conn.Super.))**

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Hartford.
James BRULE et al.
v.
NERAC CORPORATION et al.
**No. HHDCVX04085023811S.**

Dec. 9, 2009.

Francis Gilbert Gleason Jr., Ashland, MA, for James Brule, Stephen Warner, Dawn Wynkoop, Carol Green, Jennifer Santry.

Day Pitney LLP, Hartford, for Nerac Inc., Kevin A. Bouley, Betsy Petrie, Gerri Potash, Jil Corso, Paul Harger.

ROBERT B. SHAPIRO, Judge.

**\*1** The court heard argument on October 20, 2009 concerning the defendant Nerac, Inc.'s (Nerac) motion for summary judgment as to the remaining counts of the plaintiffs' amended complaint (complaint). After considering the parties' arguments, the court issues this memorandum of decision. For the reasons set forth below, the motion is granted.

*I*

*BACKGROUND*

The five plaintiffs in this matter, James Brule, Stephen Warner, Dawn Wynkoop, Carol Green, and Jennifer Santry, are former employees of Nerac. Each alleges that their employment was terminated. Based on various legal theories, they seek damages against Nerac.

By memorandum of decision dated December 23, 2008 (# 118) (decision), the court granted the defendants' motion to strike other counts. The court addresses each of the plaintiffs' remaining claims below, as well as their assertion that Nerac's motion was untimely filed.

*II*

*STANDARD OF REVIEW*

"Summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Practice Book § [17-49]. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party ... Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact ... a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue ... It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact ... are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment] ... Requiring the nonmovant to produce such evidence does not shift the burden of proof. Rather, it ensures that the nonmovant has not raised a specious issue for the sole purpose of forcing the case to trial." (Internal quotation marks omitted.) *Gold v. Town Of East Haddam,* 290 Conn. 668, 677-78, 966 A.2d 684 (2009). "A material fact ... [is] a fact which will make a difference

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 5322206 (Conn.Super.)
**(Cite as: 2009 WL 5322206 (Conn.Super.))**

Page 2

in the result of the case." (Internal quotation marks omitted.) *Deming v. Nationwide Mutual Insurance Co.,* 279 Conn. 745, 757, 905 A.2d 623 (2006).

"Only evidence that would be admissible at trial may be used to support or oppose a motion for summary judgment. See Practice Book [§ 17-46]." (Internal quotation marks omitted.) *Home Ins. Co. v. Aetna Life & Casualty Co.,* 235 Conn. 185, 202-03, 663 A.2d 1001 (1995). However, the Supreme Court has stated that parties may "knowingly waive ... compliance with the procedural provisions of the Practice Book relating to motions for summary judgment." (Footnote omitted.) *Krevis v. Bridgeport,* 262 Conn. 813, 824, 817 A.2d 628 (2003). Also, the Supreme Court has stated, "[w]e previously have afforded trial courts discretion to overlook violations of the rules of practice and to review claims brought in violation of those rules as long as the opposing party has not raised a timely objection to the procedural deficiency." *Schilberg Integrated Metals Corp. v. Continental Casualty Co.,* 263 Conn. 245, 273, 819 A.2d 773 (2003).

*2 Here, no objection was raised to any exhibit. Accordingly, the court deems such objections to have been waived. In the exercise of its discretion, the court has considered the exhibits which were presented.

III

DISCUSSION

A

*Timeliness Of Motion*

The court is unpersuaded that Nerac's motion was untimely filed. Nerac has presented evidence to show that its motion was hand-delivered to the court on September 15, 2009, which complied with the scheduling order. Apparently, due to delay in the clerk's office, it was not date-stamped as filed until the next day.

B

*Breach Of Express/Implied Contract*

In count one, Brule alleges that he had an employment contract which included a condition which provided that he could use Nerac's president's (Kevin Bouley) "open door" policy, to raise issues with Bouley, without retaliation from Brule's supervisor, Gerri Potash. He claims that Nerac breached his employment contract (1) by terminating his employment in retaliation for his use of the "open door" policy, and (2) by failing to compensate him according to promises made to him. See complaint, count one, ¶ 22.[FN1]

> FN1. The court separately addresses Brule's compensation claims below in part C.

In counts fifteen, twenty-one, and twenty-six, respectively, plaintiffs Wynkoop, Green, and Santry each allege that "[a] term of [their] employment contract at Nerac was that she would not be terminated without cause if she met her sales goals and quotas." See complaint, counts fifteen (¶ 9), twenty-one (¶ 4), and twenty-six (¶ 4). Each alleges that Nerac breached her employment contract by terminating her employment despite the fact that she met all her sales goals and/or quotas.

In support of its motion, Nerac argues that the breach of contract claims asserted by Brule, Wynkoop, Green and Santry concerning Nerac's terminations of their employment must fail because they cannot establish that, despite the at-will nature of their employment, Nerac formed a contract with them which prohibited their terminations except in limited circumstances. Nerac has presented evidence showing that each of these plaintiffs repeatedly acknowledged, in writing, and in their de-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 5322206 (Conn.Super.)
**(Cite as: 2009 WL 5322206 (Conn.Super.))**

position testimony, that, when they were hired, and afterwards, they were at-will employees at Nerac.

In response, the plaintiffs do not dispute this evidence. Instead, they contend that Nerac inconsistently also made oral promises to them, which amounted to contractual agreements, and included the terms described above.

"In Connecticut, an employer and employee have an at-will employment relationship in the absence of a contract to the contrary. Employment at will grants both parties the right to terminate the relationship for any reason, or no reason, at any time without fear of legal liability." (Internal quotation marks omitted.) *Cweklinsky v. Mobil Chemical Co.,* 267 Conn. 210, 225, 837 A.2d 759 (2004). "Pursuant to traditional contract principles ... the default rule of employment at will can be modified by the agreement of the parties." *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 234 Conn. 1, 15, 662 A.2d 89 (1995).

*3 "Under established principles of contract law, an agreement must be definite and certain as to its terms and requirements." (Internal quotation marks omitted.) *Glazer v. Dress Barn, Inc.,* 274 Conn. 33, 51, 873 A.2d 929 (2005). "The rules governing contract formation are well settled. To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms ... between the parties ... If the minds of the parties have not truly met, no enforceable contract exists." (Internal quotation marks omitted.) *Duplissie v. Devino,* 96 Conn.App. 673, 688, 902 A.2d 30, cert. denied, 280 Conn. 916, 908 A.2d 536 (2006).

"A contract implied in fact, like an express contract, depends on actual agreement." (Internal quotation marks omitted.) *Coelho v. Posi-Seal International, Inc.,* 208 Conn. 106, 111, 544 A.2d 170 (1988). To sustain a cause of action based on the alleged existence of an implied agreement, "the plaintiff has the burden of proving ... that the [employer] had agreed, by either words or action or conduct, to undertake [some] form of actual contract commitment under which [the employee] could not be terminated without just cause ..." (Internal quotation marks omitted.) *Reynolds v. Chrysler First Commercial Corp.,* 40 Conn.App. 725, 730, 673 A.2d 573, cert. denied, 237 Conn. 913, 675 A.2d 885 (1996).

"[C]ontracts are not created by evidence of customs and usage." (Internal quotation marks omitted.) *Gagnon v. Housatonic Valley Tourism District Commission,* 92 Conn.App. 835, 843, 888 A.2d 104 (2006) (allegation of implied contract; plaintiff had burden to establish that adherence to policies and procedures was result of contract commitment by defendant). "A contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties." (Internal quotation marks omitted.) *Reynolds v. Chrysler First Commercial Corp., supra,* 40 Conn.App. at 730, 673 A.2d 573.

In support of their arguments, Brule, Wynkoop, Green and Santry cite deposition testimony. Brule stated that "There was a promise that I would be treated fairly, and that there would be no retaliation from the use of the open door policy." See Brule deposition, p. 70. According to Brule, concerning the alleged "open door" policy, Bouley stated, "Come in here. You're not going to be treated any different. You can come in the office and, you know, talk to me. Everybody does it ... I wouldn't have it any other way." See Brule deposition, p. 70. Brule also testified that, "[s]o I felt that ... I was going to be treated fairly; that if other people use the open door policy and didn't get terminated and didn't get retaliated on, then I wouldn't either. You used the word promise, but I think it's an implied promise or duty to not be negligent with me." See Brule deposition, p. 70. According to Brule's testimony, the alleged "implied promise or duty ... was broken by not giving me warnings, progressive discipline." See Brule deposition, p. 70.

*4 Brule also cites Bouley's deposition, pages 51-52, concerning the existence of the "open door" policy, and page 57, concerning the "Speak Out

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 5322206 (Conn.Super.)
**(Cite as: 2009 WL 5322206 (Conn.Super.))**

Page 4

Board," which employees were encouraged to use to communicate, either anonymously or with attribution. In his testimony, Bouley stated that the policy was "the door is always open for anybody at any time with any question or no question to come in and meet with me[.]" See Bouley deposition, p. 52.

Where language is "neither sufficiently promissory nor sufficiently definite to support contractual liability," *D'Ulise-Cupo v. Board of Directors of Notre Dame High School,* 202 Conn. 206, 214, 520 A.2d 217 (1987), no contract is formed. Similarly, where the provisions at issue "contain no language that can reasonably be construed as a basis for a contractual promise" (footnote omitted), *Christensen v. Bic Corporation,* 18 Conn.App. 451, 457, 558 A.2d 273 (1989), a question of law is presented, which the court should not submit to the trier of fact. See *id.,* at 458, 558 A.2d 273.

Brule's evidence of Bouley's very general references to an open door policy cannot reasonably be construed as contractual in nature. "The mere fact that the plaintiff believed [Bouley's statements] to constitute a contract does not bind [the employer] without some evidence that it intended to be bound to such a contract." *Christensen v. Bic Corporation, supra,* 18 Conn.App. at 458, 558 A.2d 273. "Contrary to the plaintiff's assertion, these representations manifested no present intention on the part of [Nerac] to undertake immediate contractual obligations ..." *D'Ulise-Cupo v. Board of Directors of Notre Dame High School, supra,* 202 Conn. at 214-15, 520 A.2d 217. Brule has not presented evidence showing that he and Nerac had "a mutual understanding of ... terms that are definite and certain between the parties." (Internal quotation marks omitted.) *Duplissie v. Devino, supra,* 96 Conn.App. at 688, 902 A.2d 30. He has not presented evidence to show that Nerac made a contractual commitment to alter his at-will status.

The lack of evidence of contractual commitments applies also to Wynkoop, Green and Santry's breach of contract claims. Wynkoop testified that "[m]y understanding of my job at the time I was terminated, that keeping that job was dependent upon two things. One was attaining an overall renewal percentage of the clients in the territory I was responsible for ... The other was to maintain and price the clients in my territory to be profitable for NERAC as opposed to being priced and being unprofitable to NERAC." See Wynkoop deposition, pp. 34-35. When asked whether there was ever a time when she thought Nerac could not terminate her employment for any reason or no reason at all, she testified that she understood that to be the case but that "I believe I also understood that they would not have expected to terminate me for an illegitimate reason or bad reason." See Wynkoop deposition, p. 49. She stated that she never received any documentation or progressive discipline. See Wynkoop deposition, p. 50. She acknowledged that Nerac never made any contractual promise to her. See Wynkoop deposition. p. 54. Wynkoop's belief that meeting her sales goals entitled her to continued employment or her expectation of progressive discipline do not amount to evidence of a contractual promise by Nerac to change her employment status from that of an at-will employee.

*5 Likewise, Green's and Santry's deposition testimony, in which each stated that she met the sales goals established for her, do not provide evidence of such a contractual commitment by Nerac. See Green deposition, p. 64; Santry deposition testimony, p. 75-76. Santry's testimony, that she was given a warning document which made a contractual promise, is unsupported by evidence of the document itself. See Santry deposition, pp. 77, 79.

The plaintiffs also presented deposition testimony from former Nerac sales manager Wayne Simpson, who stated that he helped to institute a progressive discipline system at Nerac. See Simpson deposition, pp. 116-17. Also, they refer to Bouley's deposition testimony, in which he stated that an employee had been placed on probation. See Bouley deposition, p. 39. Evidence of the use of progressive discipline at Nerac or of the existence of a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 5322206 (Conn.Super.)
**(Cite as: 2009 WL 5322206 (Conn.Super.))**

Page 5

policy concerning the use of progressive discipline does not demonstrate the existence of a material issue of fact in order to show that Nerac made a contractual commitment to provide progressive discipline. See *Reynolds v. Chrysler First Commercial Corp., supra,* 40 Conn.App. at 732, 673 A.2d 573 (summary judgment affirmed; plaintiff's "burden to establish that adherence to these policies and procedures was the result of a contractual commitment by the defendant"). In addition, as to the plaintiffs' allegations concerning the "Managing Within The Law" training course, on the motion to strike, the court already determined that the language which the plaintiffs selected from the training materials, and included in their complaint (see complaint, pages 4-7), cannot reasonably be construed as bases for contractual promises. See decision, pp. 3-12.

Similarly, the plaintiffs' presentation of evidence concerning pregnancy and age discrimination is insufficient to create material issues of fact concerning contract formation. The counts now at issue do not allege either pregnancy or age discrimination. "[T]he principle that a plaintiff may rely only upon what he has alleged is basic ... It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint." (Internal quotation marks omitted.) *Foncello v. Amorossi,* 284 Conn. 225, 233, 931 A.2d 924 (2007). Such evidence does not create a material issue of fact concerning claims of breach of express or implied contract. While the plaintiffs argue that such evidence is presented for the purposes of evaluating Nerac's credibility, it is not a substitute for the plaintiffs' meeting the requirement that they support their assertions of fact with evidence of contractual commitments by Nerac in order to establish the existence of a material fact. See *Gold v. Town Of East Haddam, supra,* 290 Conn. at 677-78, 966 A.2d 684.

Likewise unavailing is the plaintiffs' new claim that Nerac illegally monitored its employees' email, in violation of General Statutes § 31-48d. The plaintiffs do not cite to any portion of the counts at issue wherein such an allegation is contained. Evidence thereof does not provide evidence which creates a material issue of fact as to a contractual promise by Nerac. Also, plaintiffs' argument that they are the victims of Bouley's greed is immaterial.

*6 Thus, the plaintiffs have not presented evidence to show that their at-will employment status at Nerac was modified by agreement. See *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., supra,* 234 Conn. at 15, 662 A.2d 89. Nerac's motion for summary judgment is granted as to counts fifteen, twenty-one, and twenty-six.

C

*Compensation*

In addition to his other allegations in count one, Brule also alleges that he earned annual bonuses in the years 2003, 2004, 2005, and 2006. See complaint, count one, ¶ 8. He claims that, although he earned $7,500 in bonuses in 2003, Nerac only paid him $5,000 of that amount. See complaint, count one, ¶¶ 9-10.

Brule also alleges that, in 2003, Nerac established a program known as the "Leads Battalion Effort," under which Nerac promised him increased annual base salary compensation, based on the number of new contract leads which he generated. See complaint, count one, ¶¶ 11-16. He alleges that he understood that any annual base salary increase which he earned in this program would remain in place for all future years during which he was employed by Nerac, and that, according to the points which he accumulated under the program, "his annual base salary should have been increased by approximately an additional $13,500 beginning in June 2004 and included for all years of employment thereafter." See complaint, first count, ¶ 15. He further alleges that he was paid one-twelfth of the additional base salary increase he earned under the program in June

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 5322206 (Conn.Super.)
**(Cite as: 2009 WL 5322206 (Conn.Super.))**

Page 6

2004, but that the program was cancelled one month after he "earned this base salary increase in May 2004 and [Nerac] did not include this earned increase in [his] base salary from July 2004 until February 6, 2007 when he was unlawfully terminated." See complaint, first count, ¶ 16.

In addition, Brule alleges, in paragraphs 17-18 of count one of the complaint, that his supervisor, Gerri Potash, "acknowledged to [him] in 2004 that she had 'made a mistake' by canceling the compensation promised by Nerac and by her in connection with the Leads Battalion Effort, but did nothing to rectify the discrepancies and the failure to pay such compensation." See complaint, first count, ¶ 17. Brule also alleges that, in July 2004, Potash advised him not to go to Bouley to correct this. See complaint, first count, ¶ 18. Brule also alleges that, "[a]t that time [he] chose not to go to Mr. Bouley to address and seek correction of his compensation problem because he feared that Ms. Potash would terminate his employment if he did." See complaint, first count, ¶ 18.

As to these aspects of Brule's claims, Nerac argues that they are statutory wage claims,[FN2] recast as a breach of contract claims in order to avoid the applicable two-year statute of limitations, General Statutes § 52-596, [FN3] and that they are time-barred. The marshal's return which was filed in this matter states that service of process on Nerac occurred on June 30, 2008, making that the date this action was commenced against Nerac. See *Rocco v. Garrison*, 268 Conn. 541, 553, 848 A.2d 352 (2004) ("[A]n action is commenced when the writ, summons and complaint have been served upon the defendant").

> FN2. The fact that Brule did not plead the relevant statutory basis, General Statutes § 31-72, does not preclude consideration of Brule's wage claims. Nerac does not contend that it was not "sufficiently apprised of the nature of the action." (Internal quotation marks omitted.) *Caruso v. City Of Bridgeport,* 285 Conn. 618, 628, 941 A.2d 266 (2008) (discussing Practice Book § 10-3(a)).

> FN3. Section 52-596 provides, "No action for the payment of remuneration for employment payable periodically shall be brought but within two years after the right of action accrues, except that this limitation shall be tolled upon the filing with the Labor Commissioner of a complaint of failure to pay wages pursuant to the provisions of chapter 558."

*7 In his claims for compensation, Brule clearly seeks to recover what he alleges was payable to him periodically as remuneration for employment, making those claims subject to General Statutes § 52-596's two-year limitations period. See *Gazo v. Stamford,* 255 Conn. 245, 263, 765 A.2d 505 (2001) (on summary judgment, gravamen of claim depends on its essential character).

In response to Nerac's arguments, Brule provides no decisional authority showing that these portions of count one, which are also incorporated in count two, which is premised on claimed breach of the implied covenant of good faith and fair dealing, [FN4] are not claims for wages which are governed by the two-year statute of limitations set forth in General Statutes § 52-596. Rather, Brule contends that Nerac's argument is incorrect because it fails to take into account (1) that the alleged promises for compensation in addition to his base salary included promises for the remaining years that he would be employed at Nerac, including the years 2005 through 2007; and (2) equitable tolling and the continuing course of conduct doctrine, which pertain to ongoing circumstances between Brule and Nerac, such that the limitations period did not begin to run until the course of conduct was completed. The court addresses these arguments below.

> FN4. The court discusses other allegations in the second count below in part D.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 5322206 (Conn.Super.)
**(Cite as: 2009 WL 5322206 (Conn.Super.))**

Page 7

### 1. Accrual Of Right Of Action

"The purpose of the statute of limitations is well settled in our law. There are two principal reasons generally given for the enactment of a statute of repose: (1) it reflects a policy of law, as declared by the legislature, that after a given length of time a [defendant] should be sheltered from liability and furthers the public policy of allowing people, after the lapse of a reasonable time, to plan their affairs with a degree of certainty, free from the disruptive burden of protracted and unknown potential liability ... and (2) to avoid the difficulty in proof and record keeping which suits involving older [claims] impose ... [T]he policy of statutes of limitation includes promoting repose by giving security and stability to human affairs ... [W]e will not deprive ... defendants of the finality, repose and avoidance of stale claims and stale evidence for which the statute of limitations was designed." (Internal quotation marks omitted.) *Haggerty v. Williams,* 84 Conn.App. 675, 679-80, 855 A.2d 264 (2004).

As set forth above, § 52-596 provides for a two-year limitations period "after the right of action accrues." There is no claim here that the tolling period provided in § 52-596, where a complaint of failure to pay wages is filed with the Labor Commissioner, applies.

"For purposes of section 52-596, a cause of action for payment of remuneration for employment accrues when an employer refuses to compensate an employee according to the terms of an express or an implied contract. See *Burns v. Koellmer,* 11 Conn.App. 375, 388, 527 A.2d 1210 (1987) (stating that the cause of action arose when 'the defendant breached the agreement by refusing to fully compensate the plaintiff for her services')[.]" *Warzecha v. Nutmeg Companies, Inc.,* 48 F.Sup.2d 151, 158 (D.Conn.1999). See *Anderson v. Zweigbaum,* 150 Conn. 478, 481, 191 A.2d 133 (1963) (agreement precluded plaintiff from claiming wages prior to decedent's death, which "prevented the Statute of Limitations from commencing to run ... until its accrual at that time"); *Schempp v. Beardsley,* 83 Conn. 34, 38, 75 A. 141 (1910) (same).

*8 Dicta in *Shortt v. New Milford Police Department,* 16 Conn.App. 232, 234-35, 547 A.2d 107 (1988), reversed on other grounds, 212 Conn. 294, 562 A.2d 7 (1989) also supports this conclusion: "[T]he plaintiff brought suit under General Statutes [§ ]31-72 to collect wages allegedly due him for the period of six months between October 15, 1984, and April 17, 1985. This action was commenced on October 10, 1986, just as the two year statute of limitations; General Statutes [§ ]52-596; was about to expire." (Footnote omitted.) This dicta indicates that the statute began to run, i.e. the cause of action accrued, at the beginning of the period when wages were withheld from the plaintiff. See also *Biello v. Town of Watertown,* Superior Court, judicial district of Waterbury at Waterbury, Docket No. CV99 0155286 (January 18, 2006, Moraghan, J.), affirmed on other grounds, 109 Conn.App. 572, 953 A.2d 656, cert. denied, 289 Conn. 934, 958 A.2d 1244 (2008) (defendant refused to pay a greater salary prior to September 13, 1997; salary claims from July 1, 1997 through September 13, 1997 were time-barred by § 52-596); *Corcoran v. F & W Welding Service, Inc.,* Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. CV 91 036083 (January 13, 1998, Skolnick, J.) (commissions due and owing to employee upon payment by rental customer; suit commenced on February 6, 1992; claims for commissions owed from 1988 and 1989 were outside the two-year limitations period of § 52-596).

Here, similarly, Brule alleges in his complaint that he did not receive annual bonus compensation to which he was entitled in 2003, and that his annual base salary should have been increased an additional $13,500, to be received starting in July 2004, and which was to continue thereafter, but that it was not so increased. He also alleges that, in July 2004, Potash acknowledged her "mistake" about Brule's compensation, advised him not to complain to Bouley, and Brule chose not to so. These claims accrued in 2003 and 2004. The two-year limitations

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 5322206 (Conn.Super.)
**(Cite as: 2009 WL 5322206 (Conn.Super.))**

Page 8

periods on these claims expired two years later, respectively, in 2005 and in 2006.

### 2. Continuing Course Of Conduct

"In its modern formulation, we have held that in order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong ... Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act ... The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied." (Internal quotation marks omitted.) *Bednarz v. Eye Physicians Of Central Connecticut, P.C.,* 287 Conn. 158, 170, 947 A.2d 291 (2008).

*9 A commercial relationship, between contracting parties, is insufficient, for the purposes of the continuing course of conduct doctrine, to establish that a "special relationship" existed. See *id.* Brule does not contend that such a relationship existed here.

In support of his continuing course of conduct argument Brule cites two Appellate Court decisions, *Sanborn v. Greenwald,* 39 Conn.App. 289, 295, 664 A.2d 803, cert. denied, 235 Conn. 925, 666 A.2d 1186 (1995) (attorney malpractice) and *Golden v. Johnson Memorial Hospital, Inc.,* 66 Conn.App. 518, 529, 785 A.2d 234, cert. denied, 259 Conn. 902, 789 A.2d 990 (2001) (medical malpractice), neither of which dealt with a claim for unpaid wages. Brule contends that it is completely unrealistic to expect an employee in Brule's position to bring suit while still employed. Rather, he asserts his claims for compensation are timely since his employment was terminated in February 2007 and he brought suit in 2008, within § 52-596's two-year statute of limitations. Significantly, however, the Legislature, in formulating § 52-596, made no exception for employees who continue to be employed. As explained above, the Legislature specifically provided for tolling in § 52-596, in the event that an employee timely filed a complaint of failure to pay wages with the Labor Commissioner. "Had the legislature intended to limit the breadth of [ § 52-596] ... it could have easily and expressly done so." *Jim's Auto Body v. Commissioner Of Motor Vehicles,* 285 Conn. 794, 814, 942 A.2d 305 (2008).

Further, it is clear that the facts here do not involve acts or omissions which were difficult to identify. See *Bednarz v. Eye Physicians Of Central Connecticut, P.C., supra,* 287 Conn. at 170, 947 A.2d 291. Likewise, the situation here did not make it "impossible to pinpoint the exact date of a particular ... act or omission that caused injury[.]" (Internal quotation marks omitted.) *Sanborn v. Greenwald, supra,* 39 Conn.App. at 295-96, 664 A.2d 803. Brule's complaint states that he knew when the Leads Battalion program was ended and when he was not receiving the wages to which he claims he is entitled. The complaint alleges when he was paid under the program and the date after which he was allegedly not paid what he claims was promised. Months, and eventually, years passed while he knew that Potash had not corrected the alleged "mistake." "Upon discovery of actionable harm, the policy behind the continuing course of conduct doctrine, to preserve the ongoing relationship with the hope that any potential harm from a negligent act or omission may yet be remedied, no longer has any force." *Rivera v. Fairbank Management Properties, Inc.,* 45 Conn.Supp. 154, 160, 703 A.2d 808 [20 Conn. L. Rptr. 338] (1997).

Also, rather than allege some later wrongful conduct by Nerac related to the prior breach, which, as stated above, is alleged to have occurred, at the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 5322206 (Conn.Super.)
**(Cite as: 2009 WL 5322206 (Conn.Super.))**

latest, in July 2004, Brule alleges that he was terminated in retaliation for complaining to Bouley in December 2006, and January 2007, in the course of using the "open door" policy. See complaint, count one, ¶¶ 20-22. According to Brule's deposition testimony, p. 167, all Bouley stated at that time concerning the compensation issues was that he "would look into it" by speaking to Potash and that it would be straightened out. By that time, Brule had long been aware of the alleged actionable harm, since July 2004. Bouley's alleged statements do not amount to later wrongful conduct related to the alleged prior acts. Brule's compensation claims were time-barred by the time he met with Bouley in December 2006.

*10 Accordingly, the court concludes that the two-year limitations period provided in § 52-596 applies to bar Brule's compensation claims in the first and second counts. Brule also has incorporated these compensation claims into his fourth count, which is premised on negligent misrepresentation. Claims of negligent misrepresentation are also subject to a two-year limitations period, provided in General Statutes § 52-584.[FN5] See *Lombard v. Edward J. Peters, Jr.*, 79 Conn.App. 290, 295, 830 A.2d 346 (2003); *Aponte v. Alinabal, Inc.*, Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. AAN CV 054003670 (May 29, 2008, Levin, J.) (45 Conn. L. Rptr. 818). As discussed above, Brule has alleged that he sustained injury as a result of the alleged misrepresentations concerning his compensation in July 2004, at the latest, making those aspects of his negligent misrepresentation claims time-barred two years later. Accordingly, the court need not consider Nerac's other arguments concerning Brule's negligent misrepresentation claims as they relate to his claims for unpaid wages.

> FN5. Section 52-584 provides, "No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed."

Brule also refers to equitable tolling as a basis for asserting that his compensation claims are not time-barred. As discussed above, the fact that he continued to be employed does not provide a basis on which to toll the limitations period. No decisional authority for Brule's conclusory assertion concerning the applicability of equitable tolling is presented. The court is "not required to review issues that have been improperly presented ... through an inadequate brief ... Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly ... Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." *Taylor v. Mucci*, 288 Conn. 379, 383 n. 4, 952 A.2d 776 (2008).

In view of the court's determination that Brule's compensation claims are time-barred, there is no need for the court to consider Nerac's other arguments concerning them. Nerac's motion for summary judgment is granted as to count one.

D

*Good Faith And Fair Dealing*

As a matter of law, since the plaintiffs have not presented evidence to establish that Nerac breached a contract with any of them, their claims of breach

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 5322206 (Conn.Super.)
**(Cite as: 2009 WL 5322206 (Conn.Super.))**

Page 10

of the implied covenant of good faith and fair dealing also fail. [FN6] "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff [']s right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." (Internal quotation marks omitted.) *Ramirez v. Health Net Of The Northeast, Inc.*, 285 Conn. 1, 16 n. 18, 938 A.2d 576 (2008). Here, as discussed above, the plaintiffs have not presented evidence to show that they were parties to modified contracts under which they reasonably expected to receive certain benefits, which is an essential element of their claims of breach of the implied covenant of good faith and fair dealing.

> FN6. Brule's compensation claims, which also are incorporated in this count, are separately addressed above in part C.

*11 Accordingly, Nerac has shown that it is entitled to summary judgment as to counts two, sixteen, twenty-two, and twenty-seven.

E

*Promissory Estoppel*

In the third count, which is premised on promissory estoppel, Brule alleges that he used Nerac's "open door policy" to complain to Nerac's president, Kevin Bouley, about job functions and pay issues. He alleges that Nerac reasonably should have expected him to rely on its promises that employees could use this policy without fear of retaliation. Further, he alleges that he reasonably relied on promises that employees could use the open door policy without fear of retaliation. He alleges that he was terminated in retaliation for his use of the open door policy to complain about his supervisor, Gerri Potash, to Bouley. See complaint, count three, ¶¶ 23-26.

Nerac contends that Brule's promissory estoppel claim fails as a matter of law because he was an at-will employee, because he has no evidence of a "clear and definite" promise of an open door policy, because Nerac had no reason to expect that he would rely on a promise of no retaliation, and because he has no evidence that he relied to his detriment thereon. In support of its argument, Nerac cites Brule's deposition testimony concerning the alleged policy, wherein he testified that Bouley stated that employees could come to Bouley's office to talk to Bouley and would not be treated differently as a result. See Brule deposition, p. 70 (quoted above in Section B, p. 6).

"[U]nder the doctrine of promissory estoppel [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise ... A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance. Thus, a promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all." (Citation omitted; internal quotation marks omitted.) *Stewart v. Cendant Mobility Services Corp.*, 267 Conn. 96, 104-05, 837 A.2d 736 (2003).

"To succeed on a claim of promissory estoppel, the party seeking to invoke the doctrine must have relied on the other party's promise That reliance, of course, may take the form of action or forbearance ... Nevertheless, the asserted reliance, must amount to a detrimental change in the plaintiff's position." (Citations omitted.) *Id.*, at 112-13, 837 A.2d 736.

The court addresses Nerac's arguments concerning promissory estoppel in the order in which they are presented. First, an at-will employee may make out a claim of promissory estoppel. See *Stewart v. Cendant Mobility Services Corp., supra*, 267 Conn. at 109, 837 A.2d 736 (promissory estoppel claim premised on claimed promise that plaintiff's em-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 5322206 (Conn.Super.)
(Cite as: 2009 WL 5322206 (Conn.Super.))

Page 11

ployment would not be affected adversely by her husband's future employment with a competitor; "plaintiff otherwise remained an at-will employee subject to termination at Cendant's sole discre- tion").

*12 Second, while "whether a representation rises to the level of a promise is generally a question of fact, to be determined in light of the circumstances under which the representation was made," *id .,* at 267 Conn. 106, here, the evidence presented shows the lack of a fundamental element of promissory estoppel, since there is no evidence of a clear and definite promise. Rather, Brule himself referred to the "open door" policy as an implied promise or duty, and to his feeling that he was going to be treated fairly, that if others used the open door policy and were not terminated or retaliated against, then he would not be so treated either. There is no evidence of a clear and definite promise. Rather, the claim is admittedly based both on Brule's drawing of an inference of an implied promise from Bouley's alleged, vague reference to an employee who spoke with him not being treated differently, and on Brule's feelings. Similarly, in his deposition testimony, Bouley's description of the "open door" policy does not amount to a clear and definite promise.

The evidence here contrasts with the clear promise discussed in *Stewart v. Cendant Mobility Services Corp., supra,* 267 Conn. at 99-100, 109, 837 A.2d 736. It also is markedly different from the circumstances concerning another "open door" policy promissory estoppel claim, where the employer's "employee handbook contained an explicit promise that no employee would be penalized for using the open-door procedure[.]" *Holt v. Home Depot, U.S.A., Inc.,* United States District Court, Docket No. 3:00CV1578 (RNC), 2004 U.S. Dist. LEXIS 824 (D.Conn. January 22, 2004), affirmed, 135 Fed. Appx. 449 (2d Cir. April 6, 2005). The trial court found that "the jury could reasonably find that [the employer's] promise was so clear, emphatic, highly touted, and widely proclaimed that plaintiff could reasonably believe it was inviolable[.]" *Id.* Here, there is no evidence of such a clear and definite promise.

In the absence of such evidence, Brule's presentation is insufficient to establish the existence of this material fact, which is essential to a claim of promissory estoppel. See *Gold v. Town Of East Haddam, supra,* 290 Conn. at 677-78, 966 A.2d 684; *Stewart v. Cendant Mobility Services Corp., supra,* 267 Conn. at 104-05, 837 A.2d 736. Since there is no evidence of a clear and definite promise, Nerac is entitled to the entry of summary judgment as to count three. In view of this determination, the court need not consider Nerac's other arguments concerning this count.

F

*Negligent Misrepresentation*

In counts four, eleven, seventeen, twenty-three, and twenty-eight, respectively, Brule, Warner, Wynkoop, Green, and Santry seek to recover, on claims of negligent misrepresentation, based on the same allegations discussed above.[FN7] Nerac contends that the negligent misrepresentation claims must fail because the plaintiffs did not justifiably rely on the alleged promises that their employment would not be terminated except under limited circumstances, such as for cause or after the use of progressive discipline, or in violation of the "open door" policy. In response, the plaintiffs assert that whether they relied on Nerac's representations presents issues of fact for determination by the trier of fact.

> FN7. The court separately addresses Brule's compensation claims, which also are incorporated in this count, in part C above.

*13 "The governing principles [of negligent misrepresentation] are set forth in ... § 552 of the Re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 5322206 (Conn.Super.)
**(Cite as: 2009 WL 5322206 (Conn.Super.))**

Page 12

statement (Second) of Torts (1977): One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Internal quotation marks omitted.) *Barton v. City Of Bristol,* 291 Conn. 84, 102-03, 967 A.2d 482 (2009).

As discussed above, it is undisputed that Brule, Wynkoop, Green, and Santry acknowledged in writing, and in their deposition testimony, that they were employees at-will. In addition, in his deposition, Warner stated that he repeatedly acknowledged his at-will status in writing and admitted that he understood the meaning thereof. In his deposition, pages 130-33, he cited the "Managing Within The Law" training materials as the basis for his belief that he was entitled to progressive discipline before Nerac could terminate his employment. As discussed above, in its decision on the motion to strike, the court determined that the language which the plaintiffs selected from the training materials, and included in their complaint (see complaint, pages 4-7), cannot reasonably be construed as bases for contractual promises. In the complaint, Section III, paragraph 2, page 6, the plaintiffs specifically allege that these training materials explained that "[a]n 'at-will' employee means that you do not have a contract with your employees that promises them continued employment absent good cause for dismissal."

The Appellate Court recently affirmed the granting of summary judgment where the facts showed, as a matter of law, that a plaintiff did not justifiably rely on the alleged negligent misrepresentation. In *Petitte v. DSL.net, Inc.,* 102 Conn.App. 363, 373, 925 A.2d 457 (2007), the plaintiff's reliance on a letter offering employment, which stated that the plaintiff's employment would be "at-will" "was not justifiable as a matter of law." (Internal quotation marks omitted.) Rather, "the offer letter was fraught with risk because [the defendant] reserved unfettered discretion to end the employment relationship at any time." (Internal quotation marks omitted.) *Id.*

Here, likewise, where the plaintiffs acknowledged that they were at-will employees, their continued employment was frought with risk. The plaintiffs have not provided documentation showing that they were other than at-will employees until their employment was terminated. Their alleged reliance on alleged statements concerning meeting sales goals, or the use of progressive discipline, or the "open door" policy, was, as a matter of law, also not justifiable. Likewise, reliance on the "Managing Within The Law" training materials was not justifiable.

**\*14** Similarly, in *Visconti v. Pepper Partners Ltd. Partnership,* 77 Conn.App. 675, 683, 825 A.2d 210 (2003), the trial court granted summary judgment on a negligent misrepresentation claim, where the plaintiff/purchaser of real property alleged that a defendant represented that the "authorities were satisfied" with the removal of underground tanks, see *id.,* at 77 Conn.App. at 678-79, 825 A.2d 210, but he (1) acknowledged in his deposition that he had independent knowledge of soil contamination at the site; (2) acknowledged in the contract of sale that the property might be an environmental "establishment" and undertook to investigate and disclose the property's environmental condition; and (3) acknowledged in the mortgage that he had assumed the responsibility for remediating environmental hazards. "In light of these specific assertions of assumption of risk, the trial court properly found no probative value in the plaintiff's bare statements that he had relied on [the] representation." *Id.,* at 683-84, 825 A.2d 210. Here, in light of the plaintiffs' admissions of their at-will status and the signed documentation reflecting the same, the plaintiffs assumed the risk that their employment would be terminated at any time by Nerac. The plaintiffs' bare statements of reliance are insufficient. The plaintiffs have not met their burden to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 5322206 (Conn.Super.)
**(Cite as: 2009 WL 5322206 (Conn.Super.))**

provide evidence of justifiable reliance, which is an essential element of a negligent misrepresentation claim.

Accordingly, Nerac's motion for summary judgment is granted as to counts four, seventeen, twenty-three, and twenty-eight.

## CONCLUSION

For the foregoing reasons, Nerac's motion for summary judgment is granted. Judgment may enter for Nerac on the remaining counts of the complaint. It is so ordered.

Conn.Super.,2009.
Brule v. Nerac Corp.
Not Reported in A.2d, 2009 WL 5322206 (Conn.Super.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.